COPY

FILED

2009 MAR 19  AM 10: 58

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP
2   A. William Urquhart (Bar No. 140996)
    billurquhart@quinnemanuel.com
3   Richard A. Schirtzer (Bar No. 150165)
    richardschirtzer@quinnemanuel.com
4   John S. Purcell (Bar No. 158969)
    johnpurcell@quinnemanuel.com
5  865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
6  Telephone:  (213) 443 3000
   Facsimile:  (213) 443 3100
7

8  QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP
9   Philippe Z. Selendy
    philippeselendy@quinnemanuel.com
10  Neil G. Cave
    neilcave@quinnemanuel.com
11  Peter N. Tsapatsaris
    petertsapatsaris@quinnemanuel.com
12 51 Madison Avenue
   New York, New York 10010
13 Telephone:  (212)-849-7000
   Facsimilie:  (212)-849-7100
14

15 Attorneys for United Guaranty Mortgage
   Indemnity Company

16

17

18                 UNITED STATES DISTRICT COURT

19                 CENTRAL DISTRICT OF CALIFORNIA

20

| | |
|---|---|
| 21 UNITED GUARANTY MORTGAGE INDEMNITY COMPANY, | CASE NO. **CV09-1888** RZ |
| 22                     Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT, BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING, FRAUD, NEGLIGENT MISREPRESENTATION, NEGLIGENCE, RESCISSION, UNFAIR COMPETITION AND BUSINESS PRACTICES** |
| 23            vs. | |
| 24 COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE HOME LOANS, INC., and THE BANK OF NEW YORK TRUST COMPANY, N.A., | |
| 25 | |
| 26 | |
| 27                  Defendant. | Complaint Filed: 3/19/09<br>Trial Date:  None Set<br>DEMAND FOR JURY TRIAL |
| 28 | |

1   This is a diversity action pursuant to 28 U.S.C. §1332(a), in which
2   plaintiff United Guaranty Mortgage Indemnity Company ("United Guaranty"), by
3   its attorneys, Quinn Emanuel Urquhart Oliver & Hedges LLP, for its Complaint
4   herein against Countrywide Financial Corporation ("Countrywide Financial"),
5   Countrywide Home Loans, Inc. ("Countrywide Home") (collectively,
6   "Countrywide"), and The Bank of New York Trust Company, N.A. ("Bank of New
7   York Trust" or "Trustee") alleges as follows:

8                          **NATURE OF ACTION**

9       1.      This action arises out of the fraudulent acts and misrepresentations of
10  Countrywide, through which it induced United Guaranty to insure over one billion
11  dollars of mortgage loans generated by Countrywide and its network of brokers.

12      2.      In 2006 and 2007, Countrywide, the largest residential mortgage
13  originator and servicer in the country, orchestrated the issuance of billions of dollars
14  of residential mortgage-backed securities that it dubbed Countrywide Asset-Backed
15  Securities ("CWABS").  In order to form these securities, Countrywide originated
16  and sold (or otherwise conveyed) tens of thousands of subprime mortgage loans (the
17  "Mortgage Loans") to trusts, for which Bank of New York Trust served as the
18  trustee.  Bank of New York Trust in turn issued and sold shares of these CWABS to
19  investors in the secondary market.  As part of its contracts with Bank of New York
20  Trust conveying the Mortgage Loans and structuring the CWABS, Countrywide
21  agreed to purchase insurance from United Guaranty to cover the Mortgage Loans.

22      3.      United Guaranty is a provider of mortgage insurance, which covers
23  mortgage lenders in the case a borrower defaults on a loan.  Mortgage insurance
24  shifts some of the risk of default from the lender to the insurer, and therefore, with
25  mortgage insurance in place, lenders have generally been willing to accept lower
26  down payments on homes.  Mortgage insurance has historically been a vehicle to
27  allow responsible borrowers easier access to the housing market.  United Guaranty
28  is a leader in the industry and since 1963 has sold Mortgage Insurance to a wide

1    variety of clients.  In particular, United Guaranty has sold Mortgage Insurance to

2    Countrywide for over forty years.  Since 1963, United Guaranty has traditionally

3    insured mostly fixed-rate residential mortgages with 30-year and 15-year terms.

4         4.    Countrywide sought insurance from United Guaranty to cover the

5    Mortgage Loans underlying the CWABS.  However, unlike the traditional use of

6    mortgage insurance – to facilitate home purchases by responsible borrowers –

7    Countrywide wanted coverage in order to increase the credit rating of the CWABS,

8    and thus make them more marketable to investors.   United Guaranty had limited

9    experience in the subprime market, and Countrywide made multiple representations

10   and traded on its long-standing relationship with United Guaranty to induce United

11   Guaranty to insure the Mortgage Loans.

12        5.    In order to procure coverage, Countrywide falsely represented to

13   United Guaranty that it had originated the Mortgage Loans in strict compliance with

14   its underwriting standards and guidelines, which were developed over time to screen

15   the creditworthiness of borrowers and the likelihood that mortgage loans would be

16   repaid.  As Countrywide well knew, United Guaranty relied on these underwriting

17   guidelines to evaluate the risk it would incur by insuring the Mortgage Loans.

18   United Guaranty priced and issued eleven policies ("Insurance Policies") to Bank of

19   New York Trust to cover the Mortgage Loans underlying each of the eleven

20   CWABS based on Countrywide's representations concerning the quality of the

21   Mortgage Loans and Countrywide's adherence to both its own underwriting

22   standards and industry standards of reasonable and prudent underwriting.  Since the

23   Mortgage Loans were subprime, strict adherence to underwriting standards was

24   essential to control the risk inherent in subprime lending.

25        6.    In reality, Countrywide had abandoned any reasonable and prudent

26   underwriting standard in order to secure as large a piece of the mortgage boom as

27   possible.  Under the direction of former Chief Executive Officer Angelo Mozilo and

28   former President and Chief Operating Officer David Sambol, Countrywide

1  systematically disregarded its own underwriting guidelines in order to generate an
2  unprecedented volume of loans and intentionally extended billions of dollars in
3  loans to borrowers who could not afford to repay loans, who committed fraud in
4  loan applications – often with the assistance and encouragement of Countrywide
5  employees and brokers – or who otherwise did not satisfy the basic risk criteria for
6  prudent and responsible lending that Countrywide claimed to use.

7          7.      Countrywide's failure to abide by any standard of care in its loan
8  origination practice dramatically changed the risk profile of the covered Mortgage
9  Loans, and as a direct result, thousands of insured loans are in default or foreclosure.
10  Due to the high number of defaults, United Guaranty undertook a review of the
11  Mortgage Loans and obtained from Countrywide the original loan files for a sample
12  of the loans.  To date, United Guaranty's review has found that the majority of the
13  Mortgage Loans were either underwritten in violation of Countrywide's guidelines,
14  or contain some other material defect, such as missing documentation,
15  misrepresented credit scores, or false social security numbers.  In many cases,
16  Countrywide's files note that the sole justification for granting an underwriting
17  exception was to increase its market share by matching a competitor's offer.

18          8.      As a result of the unprecedented number of defaults in the Mortgage
19  Loans, United Guaranty has already paid out insurance claims totaling over $30
20  million and is exposed to additional claims of several hundred million dollars more.
21  If Countrywide had truthfully represented the Mortgage Loans, United Guaranty
22  would not have insured them at the same rate of premium.  Instead, it would have
23  issued a different insurance policy at a different rate of premium, or refused to
24  insure the loans at all.  Either way, United Guaranty would not be exposed to the
25  huge losses it faces today.

26          9.      In the wake of the collapse of the mortgage market, it has become clear
27  that the proliferation of high risk mortgages combined with inadequate and
28  fraudulent underwriting processes is largely responsible for the historically high

1  rates of default in the mortgage industry. At the end of 2007, after United Guaranty
2  had already insured the last CWABS, Fitch Ratings released a paper entitled, "The
3  Impact of Poor Underwriting Practices and Fraud in Subprime RMBS [Residential
4  Mortgage-Backed Securities] Performance," which found that underwriting
5  processes are critically important in controlling the risk of subprime mortgages and
6  that the lack of such processes is a significant reason for the state of the mortgage
7  industry. The paper explained:

8      In addition to the inherent risk of these products, evidence is mounting
9      that in many instances their risks were not controlled through sound
10     underwriting practices. Moreover, in the absence of effective
11     underwriting, products such as 'no money down' and 'stated income'
12     mortgages appear to have become vehicles for misrepresentation or
13     fraud by participants in the mortgage origination process. ... High risk
14     products, which require sound underwriting and which are easy targets
15     for fraud account for some of the largest variances to expected default
16     rates.

17  Countrywide's combination of high risk loan products and fraudulent or willfully
18  blind underwriting created a perfect storm that has lead to massive defaults in the
19  Mortgage Loans underlying the CWABS.

20     10.    Countrywide was able to make these loans because it shifted the risk of
21  repayment to others, such as the investors who purchased the CWABS and the
22  insurers who insured the loans, by misrepresenting that risk. Countrywide pursued a
23  practice of keep the best and sell the rest – it kept only the best loans for its own
24  portfolio, and packaged the rest into the CWABS and sold them to the public. The
25  sale of CWABS generated new capital that Countrywide could then use to originate
26  new loans, thereby continuing the cycle. Countrywide's misrepresentations of risk
27  allowed it to perpetuate and profit from this cycle. If investors and insurers had
28

1  known the true risk involved, they would never have entered into these transactions
2  with Countrywide.

3       11.    United Guaranty is not alone among the victims of Countrywide's
4  fraud.  Dozens of lawsuits have been filed against Countrywide by cities, states,
5  shareholders, former employees, appraisers and insurers.  Many of the complaints
6  filed allege fraud in Countrywide's underwriting processes that are nearly identical
7  to those abuses alleged in the instant complaint.  Countrywide recently announced
8  the settlement of multiple actions brought by the Attorneys General of eleven
9  different states.  Instead of contesting these claims, Countrywide agreed to provide
10 $8.6 billion to reduce payments on thousands of its predatory mortgage loans.

11      12.    Former Countrywide insiders have admitted to Countrywide's reckless
12 and abusive course of conduct.  A former senior level vice president at Countrywide
13 has said, according to a securities class action filed against Countrywide, that "so
14 long as we could sell it, we'd do it."  Brian Koss, a former senior regional vice
15 president, told Business Week:

16     [Countrywide] approached making loans like making widgets, focusing
17     on cost to produce and not risk or compliance.  Programs like 'Fast and
18     Easy' where the income and assets were stated, not verified, were open
19     to abuse and misuse. The fiduciary responsibility of making sure
20     whether the loan should truly be done was not as important as getting
21     the deal done.

22      13.    In short, Countrywide abandoned its own underwriting guidelines to
23 boost its market share and then misrepresented the quality of its loans so that United
24 Guaranty would provide insurance coverage for them.  Since United Guaranty
25 issued the Insurance Policies based on Countrywide's representations, and would
26 not have issued the Insurance Policies on the same terms or at all had it known many
27 of these representations were false, United Guaranty is entitled to damages and
28 rescission of these policies.

1                              **PARTIES**

2           14.    Plaintiff United Guaranty Mortgage Indemnity Company is a North

3    Carolina corporation with its principal place of business in Greensboro, North

4    Carolina. United Guaranty is one of the nation's largest providers of mortgage

5    guaranty insurance.

6           15.    Defendant Countrywide Financial Corporation is a Delaware

7    corporation with its principal executive offices in Calabasas, California.

8    Countrywide Financial, itself or through its subsidiaries, is engaged in mortgage

9    lending and other real estate finance-related businesses, including mortgage

10   banking, securities dealing, and insurance underwriting. On July 1, 2008,

11   Countrywide Financial was acquired by Bank of America.

12          16.    Defendant Countrywide Home Loans, Inc., a wholly-owned subsidiary

13   of Countrywide Financial Corporation, is a New York corporation with its principal

14   executive offices in Calabasas, California. Countrywide Home Loans originates and

15   services residential home mortgage loans.

16          17.    On information and belief, Countrywide employees involved in the

17   CWABS transactions held positions at both Countrywide Home and Countrywide

18   Financial and made representations to United Guaranty on behalf of both

19   companies. For example, Steven Radu of Countrywide was involved in the

20   CWABS transactions and often acted as United Guaranty's main contact at

21   Countrywide for these transactions. Mr. Radu had titles at both Countrywide Home

22   and Countrywide Financial. In addition, his email correspondence did not

23   distinguish whether he was writing on behalf of Countrywide Home or Countrywide

24   Financial.

25          18.    Defendant the The Bank of New York Trust Company, N.A. is a

26   national banking association incorporated under the laws of the United States and

27   located in Los Angeles, California. Bank of New York Trust served as the co-

28   trustee for the transactions at issue.

**JURISDICTION AND VENUE**

19.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over the defendants by virtue of their business activities within California.

21.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as substantial events giving rise to this complaint took place in California.

**FACTUAL ALLEGATIONS**

I.      UNITED GUARANTY HAS LONG FOLLOWED A PRACTICE OF INSURING CONSERVATIVE MORTGAGES.

22.     United Guaranty has provided insurance to mortgage lenders since 1963. For over forty years, United Guaranty has been and continues to be a conservative insurer whose business focuses on generic, low-risk mortgages. Throughout its history, United Guaranty has insured mostly fixed-rate residential mortgages with 30-year and 15-year terms.

23.     Traditionally, the role of a mortgage insurer such as United Guaranty is to enable borrowers to obtain a mortgage with only a small down payment. Lenders normally require a down payment of at least 20 percent of a home's value, which can be a significant obstacle for first-time or low-income homebuyers. By law, the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac") can purchase subprime mortgage loans that have a certain level of mortgage insurance. With mortgage insurance, the lender is therefore willing to make loans with a smaller down payment because it is then able to sell the loans to Fannie Mae or Freddie Mac.

24.     Mortgage insurance is payable to the lender when a borrower defaults and the lender is not able to recover its costs after foreclosure and sale of the

1  mortgaged property. When the borrower's property fails to adequately secure the
2  loan, United Guaranty can be required to pay out an insurance claim. United
3  Guaranty is therefore directly exposed to the underlying property, which serves as
4  collateral for the loan. As United Guaranty pays covers the risk of borrower default,
5  it shares many of the same risks as homeowners, e.g., fluctuations in the economy
6  and property values that make it difficult for homeowners to pay their mortgages.

7       25.    Since the 1980's, United Guaranty has used a "delegated model" for
8  underwriting. Underwriting is the process whereby an insurer determines the risk
9  associated with a loan and decides whether to offer insurance. Under the delegated
10 model, United Guaranty does not underwrite each loan itself. Instead, it relies on
11 the lender to represent information on the loans to be insured. For example, the
12 lender may represent that the loans meet with certain underwriting guidelines such
13 as minimum credit scores or maximum loan-to-value ratios. Based on the lender's
14 representations, United Guaranty then decides whether to offer insurance. This
15 model is efficient, cost-effective, and preferred by many lenders.

16      26.    United Guaranty properly performs its due diligence for loans
17 underwritten using the delegated model. For example, United Guaranty reviews the
18 information on loans to be insured to determine that each loan conforms with the
19 applicable underwriting guidelines. However, United Guaranty's due diligence is
20 based on the lender's representations regarding the loans and on the lender's
21 exercise of due care in properly underwriting the loans.

22 II.    COUNTRYWIDE HISTORICALLY ORIGINATED LOW RISK LOANS
23        AND REPRESENTED ITSELF TO BE A RESPONSIBLE LENDER.

24      27.    United Guaranty has done business with Countrywide for almost forty
25 years. Countrywide began in 1969 and soon became a customer of United
26 Guaranty. Since that time, Countrywide has purchased insurance from United
27 Guaranty to cover its first-lien residential mortgages in the event of default.
28

1        28.    Countrywide is now a leader in the residential mortgage lending

2    industry. Each year, it originates hundreds of billions of dollars in mortgage loans

3    nationwide. In 2006 and 2007, Countrywide generated approximately $880 billion

4    in mortgage loans and serviced over a trillion dollars of mortgage loans.

5        29.    Prior to 2004, United Guaranty's business with Countrywide was

6    limited to traditional long term, fixed-rate, first lien mortgage loans to prime

7    borrowers meeting the guidelines for sale to Fannie Mae or Freddie Mac. By law,

8    Fannie Mae and Freddie Mac can only purchase mortgage loans that conform to

9    certain regulatory guidelines. These loans are known in the industry as "conforming

10   loans." Conforming loans, if properly underwritten and serviced, are historically the

11   most conservative loans and have the lowest rates of delinquency and default.

12   Mortgage loans that fail to meet the regulatory guidelines are known in the industry

13   as "non-conforming loans."

14       30.    Throughout its relationship with United Guaranty, Countrywide

15   extolled its conservative credit policy, as well as the multiple safeguards it used to

16   ensure the creditworthiness of borrowers and prevent fraud. Countrywide made

17   similar representations to the public. For instance, Countrywide claimed its policies

18   were "designed to produce high quality loans through a rigorous pre-loan screening

19   procedure and post-loan auditing and appraisal and underwriting reviews." In its

20   2004 annual report, Countrywide summarized the comprehensive standards of its

21   credit policy:

22            Our Credit Policy establishes standards for the determination of

23            acceptable credit risks. ... Our loan origination standards and

24            procedures are designed to produce high quality loans. These standards

25            and procedures encompass underwriter qualifications and authority

26            levels, appraisal review requirements, fraud prevention, funds

27            disbursement controls, training of our employees and ongoing review

28            of their work ... In addition, we employ proprietary underwriting

1    systems in our loan origination process that improve the consistency of

2    underwriting standards, assess collateral adequacy and help to prevent

3    fraud, while at the same time increasing productivity.

4    31.    Countrywide claimed that its disciplined underwriting standards made

5    it an industry leader and a role model for other lenders. For example, at an investor

6    forum hosted by Countrywide in September 2006, Mozilo explained that

7    Countrywide led the industry in responsible lending:

8        Not only did we drive efficiency in the marketplace, but as an industry

9        leader we served as a role model to others in terms of responsible

10       lending. We take seriously the role of a responsible lender for all of

11       our constituencies. . . . To help protect our bond holder customers, we

12       engage in prudent underwriting guidelines.

13   32.    United Guaranty relied upon these and other representations by

14   Countrywide in deciding to issue the Insurance Policies.

15   III.  <u>COUNTRYWIDE DRAMATICALLY INCREASES THE VOLUME OF</u>

16        <u>ITS LOAN ORIGINATION WHILE REPRESENTING IT WILL</u>

17        <u>MAINTAIN THE SAME HIGH UNDERWRITING STANDARDS.</u>

18   33.    In the early 2000s, the demand for mortgage backed securities

19   increased dramatically. In particular demand were securitizations of non-

20   conforming loans, which are arranged and underwritten by private firms (i.e., not

21   government-sponsored entities) and comprised of non-conforming loans that cannot

22   be purchased by Fannie Mae and Freddie Mac. Because they may be comprised of

23   riskier loans than conforming loans, these "private label" securitizations generate

24   higher returns for investors, as well as greater revenues for originators such as

25   Countrywide.

26   34.    Countrywide sought to capitalize upon this increased demand by

27   embarking on a radical campaign to increase the volume of loans it originated –

28   loans that would then be securitized and sold on the secondary market. In a

1   January 2004 call with analysts, Mozilo announced that Countrywide, already the

2   industry leader with nearly a 15% loan origination market share, planned to double

3   its market share within four years: "Our goal is market dominance, and we are

4   talking 30% origination market share by 2008."

5         35.    Mozilo pledged that Countrywide would maintain its commitment to

6   loan quality by targeting only the safest borrowers in this market: "Going for 30%

7   mortgage share here is totally unrelated to quality of loans we go after … There will

8   be no compromise in that as we grow market share.  Nor is there a necessity to do

9   that."

10         36.    During a March 15, 2005 conference with analysts, Mozilo responded

11   to a question about Countrywide's strategy for increasing market share:

12           Your question is 30 percent, is that realistic, the 30 percent goal that we

13           set for ourselves 2008? … Is it achievable?  Absolutely … But I will

14           say this to you, that under no circumstances will Countrywide ever

15           sacrifice sound lending and margins for the sake of getting to that 30

16           percent market share.

17         37.    As part of this drive for increased market share, Countrywide expanded

18   its origination and securitization of riskier lines of products, including subprime

19   mortgages, stated income loans, interest-only loans, Pay Option ARMs (an

20   adjustable rate mortgage loan that allows a borrower to make initial minimum

21   monthly payments less than monthly accrued interest), closed-end second liens, and

22   home equity lines of credit, with a much broader base of potential borrowers.

23         38.    While it expanded its business into riskier areas, Countrywide

24   reassured investors and insurers, such as United Guaranty, that its underwriting

25   procedures and credit risk management remained rigorous.  For example, in its 2005

26   10-K, Countrywide represented that:

27           [Countrywide] ensure[s] … ongoing access to the secondary mortgage

28           market by consistently producing quality mortgages and servicing those

1   mortgages at levels that meet or exceed secondary mortgage market
2   standards....[W]e have a major focus on ensuring the quality of our
3   mortgage loan production and we make significant investments in
4   personnel and technology in this regard.

5       39.    In particular, Countrywide touted its underwriting guidelines, claiming
6   that it took into consideration facts about loan applicants' sources and amounts of
7   income, assets, debts, employment history, personal information, as well as a full
8   property appraisal.  Countrywide claimed that it obtained all applicable income,
9   liability, asset, employment, credit, and property information, on the basis of which
10  it ascertained debt-to-income ratios (the ratio of a borrower's total monthly debt
11  obligations to gross monthly income) and combined loan-to-value ratios (the ratio of
12  the total outstanding value of the senior and subordinate loans on a property to the
13  value of such property).  Because Countrywide's underwriting guidelines are
14  ostensibly designed to ensure that loans perform over time, Countrywide knew that
15  the quality of its guidelines – and its adherence to them – would materially affect the
16  risks of insuring the Mortgage Loans.

17  IV.   COUNTRYWIDE INDUCES UNITED GUARANTY TO INSURE THE
18        MORTGAGE LOANS UNDERLYING ELEVEN SECURITIES
19        TRANSACTIONS.

20      40.    In 2006 and 2007, at the height of its efforts to increase market share,
21  Countrywide orchestrated the creation of eleven securitizations encompassing over
22  $13 billion of Mortgage Loans:  CWABS 2006-20, CWABS 2006-21, CWABS
23  2006-22, CWABS 2006-23, CWABS 2006-26, CWABS 2007-01, CWABS 2007-
24  02, CWABS 2007-03, CWABS 2007-05, CWABS 2007-06, and CWABS 2007-07
25  (collectively, the "Securitizations").  The Securitizations closed between November
26  2006 and May 2007.

27      41.    Each Securitization was composed of a pool of residential mortgage
28  loans, originated or acquired by Countrywide, that were conveyed to a trust, with

1   Bank of New York Trust acting as trustee. The trust then issued certificates to
2   private investors that represented interests in the mortgage loans, and entitled
3   certificate owners to distributions of loan payments. Credit ratings were provided
4   by Moody's and Standard & Poor's for each tranche of a CWABS. Because the
5   mortgages are the only collateral supporting the CWABS, their credit quality is of
6   critical importance to a certificate holder.

7       42.   Countrywide acted in several capacities on the Securitizations, in each
8   of which it stood to profit. First, Countrywide Home originated or acquired all the
9   Mortgage Loans for each Securitization, and sold (or otherwise conveyed) the
10  Mortgage Loans to the Trusts that issued the certificates. Second, Countrywide
11  Securities arranged each Securitization, structuring and marketing the transaction as
12  well as making SEC filings. Third, Countrywide Home Loans Servicing LP acted
13  as servicer for the Mortgage Loans in each Securitization, contracting with each of
14  the Trusts that it caused to be created to issue the CWABS.

15      43.   In 2006, Countrywide approached United Guaranty about insuring the
16  subprime mortgage loans underlying the Securitizations. United Guaranty's
17  insurance would increase the marketability of the notes by allowing Countrywide to
18  obtain a better credit rating for its securities, which in turn made the certificates
19  appear to be a safer investment.

20      44.   Countrywide proposed that United Guaranty issue mortgage insurance
21  for a pool of residential mortgage loans generated by Countrywide, but held in trust
22  by Bank of New York Trust. Thus the insured would not be the loan originator, but
23  the trustee that held the loans for securitization. Instead of allowing first-time
24  homebuyers or subprime borrowers to obtain mortgages, the purpose of this
25  mortgage insurance was to increase the marketability of the Securitizations secured
26  by the loans. The coverage would increase the ratings given to the Securitizations
27  by Moody's and Standard & Poor's, and thus make the investments appear less
28  risky. Since Countrywide sold the securities and thereby transferred the risk of

1  default to the investors, it was not concerned about the risk of default except as it
2  affected marketability of the securities.

3      45.    Prior to 2006, United Guaranty had very limited experience insuring
4  subprime mortgage loans. While other insurers rushed into this new market, United
5  Guaranty held back due to the difficulty of evaluating the risks associated with
6  subprime loans. United Guaranty first began insuring subprime loans in 2004.

7  V.    COUNTRYWIDE MAKES MULTIPLE REPRESENTATIONS TO
8        INDUCE UNITED GUARANTY TO INSURE ITS MORTGAGE LOANS.

9      46.    United Guaranty relied on multiple representations by Countrywide
10  when it insured the loans underlying the CWABS Securitizations. As described
11  above, United Guaranty's insurance for first lien mortgages operates under a
12  "modified delegated" model, whereby United Guaranty issues insurance based on
13  data provided by the lender. In order to initiate obtaining coverage for each
14  CWABS, prior to their formation, Countrywide would send United Guaranty a loan
15  tape, which contained information on the loans that were to be included in the loan
16  pool. While a loan tape was originally an actual tape, today the term refers to an
17  electronic file, such as an Excel spreadsheet, containing information on a particular
18  loan pool. The loan tape reported information such as the loan-to-value ratio
19  ("LTV") for each loan and the debt-to-income ("DTI") ratio for each borrower, as
20  well as each borrower's FICO score, a standard measure of creditworthiness.

21      47.    United Guaranty would then examine the data, price the insurance
22  based on Countrywide's representations, and in some cases issue a term sheet to
23  Countrywide, which described the loans it was willing to insure. Each term sheet
24  stated, "[a]ll loans and loan products must conform to underwriting guidelines that
25  are mutually agreed upon between United Guaranty and Countrywide." The term
26  sheet also contained a list of factors that would exclude a loan from coverage, e.g.,
27  loans that fell below a certain FICO score would be excluded, as well as loans that
28  exceeded a certain LTV, or loans that were secured by a second lien. It was

1 understood between Countrywide and United Guaranty that up to 10% of the loans
2 submitted for insurance would not be identified until the transaction closed, and that
3 these loans would be underwritten according to the same standards as the rest of the
4 pool.

5      48.   A set of contracts were then executed in order to form each CWABS
6 and issue the insurance. These documents contained representations of both
7 Countrywide and Bank of New York Trust that United Guaranty relied upon in
8 agreeing to issue insurance to cover the Mortgage Loans. The relevant documents
9 were:

10          *(a) The Pooling and Servicing Agreement*

11      49.   This agreement conveyed all rights, title and interest in the Mortgage
12 Loans to the Trust for the purpose of using the Mortgage Loans as collateral for
13 asset-backed securities to be sold to investors. United Guaranty is not a signatory to
14 the Pooling and Servicing Agreements. Each Agreement requires Countrywide to
15 obtain a mortgage insurance policy from United Guaranty on behalf of the Trustee,
16 which the Agreements refer to as a "Required Insurance Policy."

17          *(b) The Commitment Letter*

18      50.   The Commitment Letter for each CWABS is an agreement between
19 United Guaranty and Countrywide under which United Guaranty agrees to issue an
20 insurance policy to Bank of New York Trust to cover certain loans that underlie the
21 CWABS. In each Commitment Letter, Countrywide makes specific representations
22 concerning the quality of the loans and standards used to underwrite each loan. For
23 example, Countrywide specifically represents in each letter that: (i) the loans were
24 underwritten in accordance with Countrywide's subprime underwriting guidelines;
25 (ii) the electronic data files prepared by Countrywide and delivered to United
26 Guaranty are true and correct; (iii) none of the Mortgage Loans are in default as of
27 the date of execution; (iv) none of the Mortgage Loans negatively amortize; and (v)
28 none of the Mortgage Loans have been more than thirty days delinquent and that no

1  loan has been thirty days delinquent more than once in the last twelve months.  The
2  Commitment Letters were signed by Countrywide, United Guaranty and Bank of
3  New York Trust.

4          *(c)  The Policy*

5          51.    Pursuant to the Commitment Letter, which served as an application for
6  insurance, United Guaranty issued a master policy to Bank of New York Trust.  The
7  terms of the Policy state that in the event that Mortgage Loans in the pool go into
8  default, the Trustee or servicer submits a claim to United Guaranty.  United
9  Guaranty then evaluates the claim, and if the loan conforms with the terms of the
10  policy, United Guaranty pays the loss.

11          Bank of New York Trust expressly represents and warrants in each
12          Policy that:  (i) Each Mortgage Loan was accurately and completely
13          described in all material respects; and (ii) Bank of New York Trust
14          accepts the risk of any material misrepresentation made to it by any
15          "First Party" to the agreement, which includes Countrywide as loan
16          originator, and further assumes the risk of any subsequent
17          misrepresentation of that same information to United Guaranty.

18          52.    Additionally, each Policy states that "[t]he Insured covenants and
19  agrees that all Loans shall be reported by it in accordance with the terms and
20  conditions of the Reporting Acceptance Program Manual and underwritten in
21  accordance with prudent underwriting judgment."  The Commitment Letter for each
22  CWABS expressly substitutes Countrywide's subprime underwriting guidelines for
23  those in the Reporting Acceptance Program Manual, so in each Policy, Bank of New
24  York Trust covenants that all Mortgage Loans were underwritten in accordance with
25  these subprime guidelines and with prudent underwriting judgment.

26          53.    Bank of New York Trust and Countrywide also agreed to provide
27  United Guaranty with any "reports as it may deem necessary" and United Guaranty
28  "may inspect the books and accounts of the Insured."  Additionally, the Insured,

1 which is defined to include Countrywide as servicer, is required to "submit to

2 examination under oath" by United Guaranty.

3     54.    Each CWABS included these documents, and each set of documents is

4 substantially similar. The dates of each of the eleven transactions are as follows:

5          CWABS 2006-20     November 8, 2006

6          CWABS 2006-21     November 30, 2006

7          CWABS 2006-22     November 30, 2006

8          CWABS 2006-23     December 8, 2006

9          CWABS 2006-26     December 29, 2006

10          CWABS 2007-01     February 9, 2007

11          CWABS 2007-02     February 28, 2007

12          CWABS 2007-03     March 29, 2007

13          CWABS 2007-05     March 30, 2007

14          CWABS 2007-06     March 30, 2007

15          CWABS 2007-07     May 4, 2007

16     55.    Each CWABS closed in an abbreviated time frame. For example, the

17 Insurance Policy covering the CWABS 2006-07 securitization was issued ten days

18 after Countrywide identified the loan population for which it sought insurance. The

19 deal flow for the CWABS 2007-06, in relevant part, was as follows: (i) on March

20 19, 2007, Alex Panin of Countrywide emailed Christopher Walendin and Christian

21 Thielman of United Guaranty a loan tape describing the preliminary population of

22 loans in the CWABS 2007-06 securitization for which Countrywide sought

23 insurance; (ii) on March 28, 2007, Elizabeth Chen of Countrywide emailed

24 Christopher Walendin and Christian Thielman a final schedule of insurable loans to

25 be included in the transaction; (iii) on March 29, 2007, Christopher Walendin

26 emailed Alex Panin, Elizabeth Chen and John Lee of Countywide, and others, a

27 Commitment Letter and Schedule of Loans setting forth United Guaranty's

28 premiums for each loan to be covered by the Insurance Policy; (iv) the parties

1   executed the Commitment Letter on March 29, 2007, with Elizabeth Chen signing

2   on behalf of Countrywide, Bill Marshall for Bank of New York Trust, and Daniel

3   Walker for United Guaranty; (v) on March 30, 2007, Christopher Walendin emailed

4   Alex Panin, Elizabeth Chen, John Lee and others a set of closing documents,

5   including the executed Commitment Letter and the Insurance Policy.

6       56.    Countrywide set up this and other CWABS transactions so as to exert

7   maximum pressure on United Guaranty and other insurers to close the transaction as

8   quickly as possible. As a result, multiple transactions often closed simultaneously.

9   For example, in the same week that the CWABS 2007-06 transaction was closed,

10  Countrywide, United Guaranty, and Bank of New York Trust also executed

11  Commitment Letters for two other CWABS transactions.

12      57.    Countrywide set up the CWABS transactions in this manner so that

13  United Guaranty and other insurers were obligated to rely on its representations as

14  to the Mortgage Loans underlying the transaction. In particular, the abbreviated

15  time frame for the transaction rendered a loan-level review infeasible. Moreover,

16  the loan files themselves were not available to United Guaranty prior to the close of

17  the transaction. While United Guaranty properly performed its due diligence to the

18  extent possible prior to closing, Countrywide limited the extent of due diligence

19  United Guaranty was able to perform.

20              *(d)  The Countrywide Technical Manuals*

21      58.    In addition to the documents specific to the individual Securitizations,

22  United Guaranty also relied on Countrywide's Technical Manuals. Countrywide

23  provided these Technical Manuals to United Guaranty, and they set forth the

24  underlying general guidelines that apply to all of Countrywide's mortgage loans. In

25  the Technical Manuals, Countrywide made extensive representations and warranties,

26  including that:

27          It is Countrywide's policy to originate and purchase investment quality

28          loans. An investment quality loan is one that is made to a borrower

1       from whom timely payment of the debt can be expected, is adequately

2       secured by property, and is originated in accordance with

3       Countrywide's Technical Manual and Loan Program Guides.

4  Countrywide's Technical Manuals further provide that "[w]hen underwriting

5  exception loans, the underwriter [Countrywide] must ... [e]nsure that the mortgage

6  file contains documentation that supports the final underwriting decision and the

7  Uniform Underwriting and Transmittal Summary fully documents compensating

8  factors in determining the investment quality of the loan."

9  VI.    THE COUNTRYWIDE MORTGAGE LOANS SHOW AN ABNORMALLY

10      HIGH RATE OF DEFAULT.

11       59.    Starting in the summer of 2007, after United Guaranty issued the

12  Insurance Policy for the last Securitization described above, Countrywide's

13  Mortgage Loans began to show a high number of delinquencies.  Many of these

14  delinquent loans resulted in defaults, despite the availability of foreclosure and other

15  remedies.  These deficiencies caused Bank of New York Trust to submit claims on

16  the Insurance Policies.

17       60.    In response, United Guaranty diligently complied with its obligations

18  under the Insurance Policies.  As of October 2008, while reserving its rights, United

19  Guaranty has paid over $10 million on the Insurance Policies covering

20  Countrywide's Securitizations.

21       61.    United Guaranty normally investigates each claim under an Insurance

22  Policy before making a payment on that claim.  United Guaranty's investigation of

23  claims under the Insurance Policies covering Countrywide's Securitizations revealed

24  an unusually high rate of fraud.

25       62.    As a result of this high rate of fraud, United Guaranty denied several

26  claims under the Insurance Policies.  In 2007, United Guaranty's rescission rate was

27  almost 50% for loans covered by these Insurance Policies.  In contrast, in 2007

28

1 │ United Guaranty's rescission rate was about 11% for claims made under all other
2 │ first lien insurance policies.

3 │ VII.   UNITED GUARANTY'S INTERNAL REVIEW REVEALS WIDESPREAD
4 │        FRAUD BY COUNTRYWIDE.

5 │       63.    Following discovery of this high rate of fraud, United Guaranty began
6 │ an internal review of the loans underlying the CWABS transactions.  As part of this
7 │ review, United Guaranty requested and obtained loan files from Countrywide for
8 │ certain Mortgage Loans, which represented a sample of the Mortgage Loans in
9 │ particular CWABS.  As described above, in the course of each transaction,
10 │ Countrywide transmitted to United Guaranty a loan data tape containing some
11 │ information on the loans that were to be included in the loan pool.  Both during and
12 │ after these transactions, Countrywide retained in its possession the loan files
13 │ themselves.  It is the loan files that contain the actual documents on which a loan is
14 │ based.

15 │       64.    United Guaranty's review of these loan files to date has revealed that
16 │ many of the Mortgage Loans failed to comply with Countrywide's underwriting
17 │ guidelines.  For example, for many loans the borrower's debt-to-income ratio is
18 │ higher than permitted under the guidelines.  As another example, the guidelines may
19 │ allow for exceptions when there are strong compensating factors.  However, many
20 │ of Countrywide's numerous exceptions have no compensating factors whatsoever.
21 │ Instead, Countrywide granted exceptions where the express justification was to
22 │ increase its own market share by meeting a competitor's offer.

23 │       65.    The following are some specific examples of material errors and
24 │ underwriting violations found in United Guaranty's review of the loan files:

25 │       a.     Countrywide misrepresented the FICO credit score for a borrower with
26 │              two prior bankruptcies, two prior foreclosures, and multiple
27 │              delinquencies on a current mortgage in the past 12 months.  Based on
28 │

1             the correct FICO credit score, this mortgage loan would never have

2             been approved.

3     b.     Countrywide approved a loan for a borrower presenting different social

4             security numbers on tax returns for different years. In addition, the

5             letter from the borrower's employer, verifying employment and

6             income, actually came from the real estate agent who sold the property.

7             Finally, the loan file contained a letter from this same real estate agent

8             advising the borrower, a first time homebuyer, to buy a triplex and

9             volunteering to manage the property for the borrower.

10     c.     Countrywide approved a loan for a borrower whose bank account

11             showed a negative balance. When the borrower produced a check for

12             $8,100 at the closing one month later, Countrywide did not ask for any

13             explanation regarding the source of the funds. The borrower himself

14             provided no explanation. In any case, the funds actually required at

15             closing were $19,000. Finally, the borrower's reported income was not

16             supported by his tax return or the single pay stub in the loan file.

17     66.     In addition to misrepresenting that the loans complied with its

18 underwriting guidelines, Countrywide also misrepresented the Mortgage Loans in

19 the loan data tapes submitted to United Guaranty. These tapes were the only

20 information that Countrywide transmitted to United Guaranty about the loans prior

21 to the close of each CWABS transaction, because prior to the closing Countrywide

22 retained in its possession the loan files themselves. The tapes contain the following

23 misrepresentations about the Mortgage Loans:

24     a.     Countrywide misrepresented borrowers' credit scores. A borrower's

25             credit score is one of the most important measures of the risk posed by

26             lending money to that borrower.

27

28

b.   Countrywide misrepresented borrowers' incomes and debts. The debt-to-income ratio for a borrower is one of the most important measures of that borrower's ability to repay a loan.

c.   Countrywide's property appraisals materially overstated the value of the collateral underlying the loans. Because the property is the only security pledged for repayment of a loan should the borrower default, such overstatements fundamentally alter the risk of insuring that loan.

d.   Countrywide misrepresented borrowers' social security numbers. Several social security numbers either had multiple users or did not actually belong to the borrower.

67.   To date, United Guaranty's internal review has revealed that about 40% of the Mortgage Loans reviewed fail to comply with Countrywide's own underwriting guidelines. In addition, over 40% of these loans contained other material defects, such as false credit scores or social security numbers. Accounting for loans with both deficiencies, over 55% of the Mortgage Loans either failed to comply with Countrywide's underwriting guidelines or contained some material defect. In summary, United Guaranty's internal review to date has shown that Countrywide falsely represented the majority of the Mortgage Loans underlying the CWABS Securitizations so as to induce United Guaranty to issue the Insurance Policies.

68.   Countrywide's misrepresentations are material because if United Guaranty had been aware of the true nature of the Mortgage Loans, it would not have issued the Insurance Policies at the same rate of premium. Instead, it would have either declined to issue any insurance policy or it would have issued a different insurance policy at a different rate of premium.

VIII. NUMEROUS LAWSUITS FILED AGAINST COUNTRYWIDE HAVE REVEALED ITS CORRUPT PRACTICES.

69.   The impact of the Mozilo-Sambol plan on Countrywide has been a disaster. Countrywide's market capitalization declined by more than 90% in just one year, losing $25 billion in value. In July 2008, Bank of America acquired Countrywide Financial for just 27% of Countrywide's stated $15.3 billion book value.

70.   The scope and breadth of Countrywide's fraudulent schemes and other unlawful conduct have prompted a substantial number of public and private inquiries, investigations and actions. The actions are based, in part, upon misconduct by Countrywide that violates Countrywide's representations, warranties and covenants in the Insurance Policies.

71.   On information and belief, the Department of Justice and the SEC are investigating potential securities frauds in the securitizations of mortgage loans and offerings of mortgage-backed securities in the secondary market, as well as allegations that false and misleading disclosures were made to influence the stock trading price and allegations of insider trading by Mozilo and Sambol.

72.   A number of states and municipalities have announced investigations of Countrywide's lending practices, and several commenced actions against Countrywide, including:

a.   In *People of the State of California v. Countrywide Financial Corp.*, the Attorney General for the State of California filed a civil action on behalf of Countrywide borrowers in California Superior Court against Countrywide, Mozilo and Sambol, asserting statutory claims for false advertising and unfair competition based on a plan by Mozilo and Sambol to increase the volume of mortgage loans for securitization regardless of borrower creditworthiness.

b.   In *People of the State of Illinois v. Countrywide Financial Corp.*, the Attorney General for the State of Illinois filed a civil suit in Illinois Circuit Court

1   on behalf of Illinois borrowers against Countrywide and Mozilo, asserting state

2   consumer protection and unfair competition statutory claims. This complaint

3   alleges that beginning in or around 2004, Countrywide engaged in unfair and

4   deceptive practices, including diminished underwriting standards, structuring unfair

5   loan products with risky features, and engaging in deceptive sales practices.

6           c.      In *State of Connecticut v. Countrywide Financial Corp.*, the

7   Connecticut Insurance Commissioner filed a civil action in Connecticut Superior

8   Court asserting that Countrywide violated state unfair and deceptive practices

9   statutory law by deceiving consumers into purchasing mortgage loans they could not

10  afford.

11          d.      In *Office of the Attorney General for the State of Florida v.*

12  *Countrywide Financial Corp.*, the Florida Attorney General filed a civil action in

13  Florida Circuit Court against Countrywide and Mozilo, asserting state unfair

14  practices statutory claims and alleging that since January 2004, Countrywide

15  promoted a deceptive scheme to originate subprime mortgage loans to unqualified

16  borrowers, and a related fraudulent scheme to sell securities. The Attorney General

17  further alleges that Countrywide falsely represented that it originated each mortgage

18  loan in accordance with its underwriting guidelines and that each borrower had the

19  ability to repay the mortgage loan.

20          e.      In *State of Washington v. Countrywide Financial Corp.*, the

21  Washington Attorney General filed a civil action asserting that Countrywide

22  violated state anti-discrimination laws in 2005 and 2006 by engaging in racially

23  discriminatory lending.

24          f.      In *State of Indiana v. Countrywide Financial Corp.*, the State of

25  Indiana filed a civil action asserting that Countrywide violated the state's unfair and

26  deceptive practices law from 2005 through 2008 by deceiving consumers into

27  obtaining mortgage loans for which they were not suited and could not afford.

28

1         g.    In *State of West Virginia v. Countrywide Financial Corp.*, the

2 West Virginia Attorney General filed a civil action in West Virginia Circuit Court

3 against Countrywide alleging violations of state unfair competition laws.

4         h.    In *City of Cleveland v. Countrywide Financial Corp.*, the City

5 filed a civil action in the Ohio Court of Common Pleas asserting claims against

6 Countrywide for, among other things, extending loans to borrowers knowing they

7 could not afford to repay them.

8         i.    In *City of San Diego v. Countrywide Financial Corp.*, the City

9 has asserted claims against Countrywide for engaging in predatory lending practices

10 in violation of consumer protection statutes.

11      73.    The Department of Justice and the U.S. Trustees for federal bankruptcy

12 courts in several judicial districts, including districts in Rhode Island, Pennsylvania,

13 Texas, Florida and Georgia, commenced investigations of Countrywide's alleged

14 fraudulent foreclosure practices. For example, in the Western District of

15 Pennsylvania, on information and belief, within the last year, Countrywide's

16 practices were under investigation in connection with at least 300 debtors'

17 proceedings in that district. Similarly, the Assistant U.S. Trustee for the District of

18 Rhode Island, in testimony about his investigation, explained that after reviewing

19 cases filed since 2002, "we have a specific and grave concern that Countrywide" is

20 trying to obtain money and property from debtors "under false pretenses." The U.S.

21 Trustee for the District of Georgia filed suit against Countrywide, and likewise

22 noted: "Countrywide's failure to ensure the accuracy of its pleadings and accounts

23 in this case is not an isolated incident. . . . In recent years, Countrywide and its

24 representatives have been sanctioned for filing inaccurate pleadings and other

25 similar abuses within the bankruptcy system."

26      74.    In addition, a number of private actions have been commenced against

27 Countrywide, including shareholder actions challenging the accuracy and

28 completeness of Countrywide's statements in and around the period between 2004

1  and 2007.  These actions contain allegations that Countrywide failed to disclose the

2  expansion of its origination of subprime and other higher-risk mortgage loans; and

3  consumer actions challenging Countrywide's lending practices.

4      75.    Finally, in Zachary v. Countrywide Financial et al., a former manager

5  of Countrywide Financial filed a civil action in the Southern District of Texas

6  against Countrywide Financial, Countrywide Home Loans, and Countrywide

7  Mortgage Ventures, LLC alleging that he was terminated after bringing

8  Countrywide's fraudulent activities to the attention of his superiors.  Zachary alleges

9  that Countrywide had a regular practice of flipping a loan application from a "full

10 doc" loan to a "stated income" or "no income, no asset" loan.  In so doing,

11 Countrywide was aware that the applicant would not be eligible for any loan based

12 on their income and/or employment.  The loan officer would then coach the

13 applicant to state a false income so that they would successfully obtain a loan under

14 false pretenses.  Zachary also alleges that his superiors instructed him to approve

15 10% of the backlog of loan applications every day, with an unconditional final

16 approval, regardless of the quality of these loan applications.

17 IX.   COUNTRYWIDE AGREES TO SETTLE THE ACTIONS BROUGHT BY

18      ELEVEN ATTORNEYS GENERAL.

19      76.    On October 6, 2008, Countrywide – through Bank of America –

20 announced a proposed multistate settlement of all pending actions by the Attorneys

21 General ("Settlement").  Beginning on June 24, 2008, the Attorneys General for

22 eleven states filed actions against Countrywide.  These actions included allegations

23 such as:

24          Countrywide's deceptive scheme had one primary goal – to supply the

25          secondary market with as many loans as possible, ideally loans that

26          would earn the highest premiums.  Over a period of several years,

27          Defendants constantly expanded Countrywide's share of the consumer

28          market for mortgage loans through a wide variety of deceptive

1   practices, undertaken with the direction, authorization, and ratification

2   of Sambol and Mozilo, in order to maximize its profits from the sale of

3   those loans to the secondary market.

4   77.   In its announcement, Countrywide estimated the total cost of the

5   Settlement to be about $8.6 billion.  The term sheet for the Settlement further

6   provided that Countrywide would agree not to offer subprime loans for a certain

7   period, and that Countrywide would strictly limit its offering of low-documentation

8   and no-documentation loans.

9   78.   Countrywide's announcement of the Settlement came about four

10  months after the first state attorney general action was filed against it.  Based on

11  publicly available docket sheets, there does not appear to have been any discovery

12  prior to settlement of the state attorney general actions.  For some actions, the

13  settlement came only weeks after the action was filed.

14  79.   The proposed terms of the Settlement provide that it would not

15  constitute an admission of liability by Countrywide with respect to Countrywide's

16  mortgage origination.  However, Bank of America acknowledged in its

17  announcement that, when it acquired Countrywide, it anticipated a settlement of this

18  magnitude: "The cost of restructuring these loans is within the range of losses we

19  estimated when we acquired Countrywide."

20  X.   UNITED GUARANTY HAS BEEN SUBSTANTIALLY DAMAGED BY

21       COUNTRYWIDE'S PRACTICE OF SECURITIZING ITS WORST

22       SUBPRIME LOANS.

23  80.   United Guaranty has been substantially damaged by Countrywide's

24  fraud.  Because Countrywide originated and sold to the Securitizations an extremely

25  large number of Mortgage Loans that materially failed to comply with its

26  underwriting guidelines and that contained other material misrepresentations, the

27  number of defaults in those Securitizations has been extremely high, as those loans

28  were made to borrowers who were unlikely to be able to repay.  As a direct

1  consequence, United Guaranty has been forced through the Insurance Policies to pay
2  those defaults to the Trusts, resulting in millions of dollars of losses to United
3  Guaranty. United Guaranty's losses bear no reasonable relationship to the risks that
4  it agreed to assume. By its misrepresentations, Countrywide led United Guaranty to
5  accept a much greater risk than it would have accepted had Countrywide truthfully
6  represented the Mortgage Loans.

7      81.  As a direct result of Countrywide's material misrepresentations and
8  breaches of contract, United Guaranty is exposed to enormous risks of payments
9  under the Insurance Policies for which it is not being adequately compensated. This
10  exposure has decreased United Guaranty's revenues significantly, forced it to take
11  substantial reserves, and caused it to suffer other losses.

12      82.  On information and belief, Countrywide's fraud is the product of its
13  undisclosed practice of keeping the best loans for its own portfolio, while
14  securitizing the rest. In accordance with this practice of keep the best and sell the
15  rest, Countrywide packaged into the Securitizations those subprime loans it deemed
16  likely to default. These were the loans that contained a high rate of material errors
17  or failed to comply with Countrywide's underwriting guidelines.

18      83.  So long as it was able to successfully market the Securitizations – with
19  the help of United Guaranty's mortgage insurance – Countrywide could shift the
20  risk of default in the worst subprime loans onto investors and mortgage insurers. As
21  a result, Countrywide had no incentive to be concerned about the high risk entailed
22  in originating or buying these loans.

23      84.  On information and belief, Countrywide's confidence in its ability to
24  securitize the worst subprime loans led it to disregard material errors in loan
25  applications as well as its own underwriting guidelines. However these
26  securitizations turned on Countrywide's misrepresentations to United Guaranty and
27  others about the underlying Mortgage Loans.

28

85.     United Guaranty now seeks to rescind the Insurance Policies and recover damages on the basis of Countrywide's material misrepresentations and other misconduct.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

86.     United Guaranty incorporates by reference all the foregoing allegations as though fully set forth herein.

87.     This is a claim for breach of contract against Countrywide Home and Bank of New York Trust.

88.     The Commitment Letters and Insurance Policies for the eleven CWABS are valid and enforceable contracts that give rise to certain obligations on the part of Countrywide and Bank of New York Trust with respect to the Mortgage Loans.

89.     United Guaranty has performed and continues to perform all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Commitment Letters and Policies.

90.     Countrywide and Bank of New York Trust's express representations and warranties in the Commitment Letters, and representations and warranties incorporated by reference within the Commitment Letter, are untrue and inaccurate in material ways as of the date of each Commitment Letter.  Therefore, Countrywide and Bank of New York Trust are in breach of each Commitment Letter.  The untrue and inaccurate representations and warranties materially and adversely affect United Guaranty's interests and include those alleged above.

91.     Additionally, Bank of New York Trust's express representations and warranties in the Insurance Policies, and representations and warranties incorporated by reference within the Insurance Policies, are untrue and inaccurate in material

1   ways as of the date of each of the Insurance Policies.  Therefore, Bank of New York

2   Trust is in breach of each Insurance Policy.  The untrue and inaccurate

3   representations and warranties materially and adversely affect United Guaranty's

4   interests and include the representation that all Mortgage Loans complied with

5   Countrywide's subprime underwriting guidelines and "prudent underwriting

6   judgment."

7       92.    Countrywide and Bank of New York Trust's representations and

8   warranties in the Commitment Letters and Insurance Policies were material to each

9   decision by United Guaranty to issue the Insurance Policies.  United Guaranty relied

10  on Countrywide and Bank of New York Trust's express and incorporated

11  representations and warranties, and was induced thereby to enter into each Insurance

12  Policy and to perform its obligations and covenants thereunder.

13      93.    United Guaranty has suffered damages due to Countrywide and Bank

14  of New York's breaches of the Commitment Letters and Insurance Policies,

15  including, but not limited to, paying out claims caused by the excessively high

16  default rates within the pools of Mortgage Loans.

17

18                      **SECOND CAUSE OF ACTION**

19      **(BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING)**

20      94.    United Guaranty incorporates by reference all the foregoing allegations

21  as though fully set forth herein.

22      95.    This is a claim for breach of the implied covenant of good faith and fair

23  dealing against Countrywide Home.

24      96.    Countrywide has breached the implied covenant of good faith and fair

25  dealing implicit in the Commitment Letters and the Insurance Policies for each

26  CWABS.

27      97.    United Guaranty has performed and continues to perform all

28  conditions, covenants, and promises required on its part to be performed in

1 | accordance with the terms and conditions of the Commitment Letters and Insurance
2 | Policies.

3 |      98.    The conditions required for Countrywide's performance under the
4 | contracts have occurred.

5 |      99.    Countrywide has unfairly interfered with United Guaranty's rights to
6 | receive the benefits of these contracts.  Countrywide affirmatively represented that
7 | the Mortgage Loans had been evaluated consistently with the underwriting standards
8 | that led Countrywide to be an industry leader.  These representations have turned
·9 | out to be false and have caused United Guaranty to suffer losses it would not have
10 | otherwise suffered but for the breach.

11 |      100.   Countrywide's breach has caused substantial harm and damages to
12 | United Guaranty, including, but not limited to, paying out claims caused by the
13 | excessively high default rates within the pools of Mortgage Loans.

14 |

15 | **THIRD CAUSE OF ACTION**
16 | **(FRAUD)**

17 |      101.   United Guaranty incorporates by reference all the foregoing allegations
18 | as though fully set forth herein.

19 |      102.   This is a claim for fraud against Countrywide Home and Countrywide
20 | Financial.

21 |      103.   As set forth above, Countrywide has made untrue statements of
22 | material fact and has omitted to state material facts necessary in order to make the
23 | statements not misleading in light of the circumstances under which they were
24 | made.  Countrywide made these statements with knowledge of their falsity, with
25 | knowledge that facts omitted were material, and with reckless disregard as to their
26 | falsity.  Countrywide made these statements with the intent that United Guaranty
27 | rely on them to their detriment and United Guaranty did justifiably rely on them.  As
28 | a result of Countrywide's fraud, United Guaranty has suffered damages.

1     104. For each CWABS securitization, Countrywide made the following

2 misrepresentations to fraudulently induce United Guaranty to provide insurance

3 coverage for the Mortgage Loans underlying the transaction:

4         *(a) The Loan Tapes*

5     105. Countrywide knowingly or recklessly, with intent to defraud, caused its

6 employees and agents to submit materially false and misleading mortgage loan

7 documentation to United Guaranty in the form of loan tapes. These loan tapes

8 included material information about the Mortgage Loans for which Countrywide

9 sought coverage, including each borrower's loan-to-value ratio, debt-to-income

10 ratio, and FICO score. This data was materially inaccurate and incomplete. In

11 addition, Countrywide knowingly or recklessly failed to underwrite these loans

12 according to its own underwriting standards. As a result, the loan tapes did not

13 accurately reflect information about the borrower or the true risk profile of the

14 Mortgage Loan. Countrywide failed to disclose to United Guaranty that these loans

15 were not underwritten in accordance with its own underwriting standards.

16 Countrywide sent United Guaranty a loan tape for each CWABS transaction as

17 follows:

18     (a) Countrywide sent United Guaranty materially false and misleading

19 loan tapes by email for the following CWABS transactions: CWABS 2006-20

20 transaction, CWABS 2006-21 transaction, CWABS 2006-22 transaction, CWABS

21 2006-23 transaction, CWABS 2006-26 transaction, CWABS 2007-01 transaction,

22 CWABS 2007-02 transaction, CWABS 2007-03 transaction, CWABS 2007-05

23 transaction, CWABS 2007-06 transaction, and CWABS 2007-07 transaction. For

24 each CWABS transaction, Countrywide sent United Guaranty a loan tape before the

25 parties signed a Commitment Letter.

26     106. Countrywide was aware that United Guaranty relied on the data

27 contained in the loan tapes to set the price of the insurance that would cover each

28 loan, and United Guaranty did in fact use its pricing models on this data to generate

1   risk profiles for the Mortgage Loans and price premiums for the insurance.

2   Countrywide's material misrepresentations and omissions caused United Guaranty

3   to insure Mortgage Loans that it would otherwise have refused to insure and cover

4   Mortgage Loans that it would otherwise have refused to cover. As a result, United

5   Guaranty has suffered damages because it has paid claims for loans it would have

6   refused to cover had it known the true nature of the loans, and has also suffered

7   damage because it did not charge sufficient premium to cover the true risk inherent

8   in the Mortgage Loans.

9            *(b)  The Commitment Letters*

10          107.  Countrywide, knowingly and with intent to defraud, signed a

11  Commitment Letter for each CWABS that contained false and misleading

12  information. In each of these letters, Countrywide represented that: (i) the Mortgage

13  Loans were underwritten in accordance with Countrywide's subprime underwriting

14  guidelines; (ii) the electronic data files prepared by Countrywide and delivered to

15  United Guaranty were true and correct; (iii) none of the Mortgage Loans were in

16  default as of the date of execution; (iv) none of the Mortgage Loans negatively

17  amortize; and (v) none of the Mortgage Loans has been more than thirty days

18  delinquent and that no loan has been thirty days delinquent more than once in the

19  last twelve months. In actuality, as uncovered by United Guaranty's claims process

20  and its investigation described above, enormous numbers of Mortgage Loans in each

21  CWABS were not underwritten according to Countrywide's guidelines.

22          108.  Countrywide executed a Commitment Letter containing false and

23  misleading information for each of the following CWABS transactions: CWABS

24  2006-20 transaction, CWABS 2006-21 transaction, CWABS 2006-22 transaction,

25  CWABS 2006-23 transaction, CWABS 2006-26 transaction, CWABS 2007-01

26  transaction, CWABS 2007-02 transaction, CWABS 2007-03 transaction, CWABS

27  2007-05 transaction, CWABS 2007-06 transaction, and CWABS 2007-07

28  transaction.

1      109.  Countrywide was aware that United Guaranty would rely on the

2 representations in each of these Commitment Letters in pricing and issuing

3 insurance policies to cover the Mortgage Loans, and that without these

4 representations, United Guaranty would not have issued the Insurance Policies.

5 United Guaranty would not have engaged in the Commitment Letter and would not

6 have insured the Mortgage Loans for each CWABS had it known that the

7 representations made by Countrywide were false, including the representation that

8 Countrywide had underwritten the Mortgage Loans according to its subprime

9 underwriting guidelines.  As a result of Countrywide's misrepresentations in the

10 Commitment Letters, United Guaranty has suffered damages because it has paid

11 claims for loans it would have refused to cover had it been aware of the falsity of

12 Countrywide's representations.

13      110.  United Guaranty also relied upon the public statements made by

14 Countrywide, described above, that Countrywide adhered to sound underwriting

15 practices, carefully screened borrowers based on their ability to repay loans, and

16 enacted rigorous fraud screening procedures meant to minimize risk of default.

17 Countrywide's executives made these statements to the public with the expectation

18 that market participants would rely on them in choosing to do business with

19 Countrywide.  However, as described above, in actuality, Countrywide had

20 systematically disregarded its underwriting practices and these public statements

21 were in fact false.  Had United Guaranty been aware of the falsity of these

22 statements, it would have refused to do business with Countrywide, and would not

23 have entered into any of the Insurance Policies in question.  As a result of these false

24 statements, United Guaranty has been damaged, because it has suffered losses on

25 Insurance Policies it would have refused to issue had it known these statements to be

26 false.

27      111.  Countrywide's misrepresentations of facts, and omissions of fact that

28 caused other statements of fact to be misleading, related to contemporaneous matters

1   and to the state of affairs as of and then existing at the time United Guaranty was
2   induced to enter into the Insurance Policies.

3       112.   Countrywide's misrepresentations of facts, and omissions of fact that
4   caused other statements of fact to be misleading, relate to its own acts and
5   omissions, and it was only by making such representations that Countrywide was
6   able to obtain the mortgage insurance from United Guaranty for the Securitizations.

7       113.   Countrywide knew at the time it entered into each Commitment Letter
8   that the above statements were false or, at the very least, made recklessly, without
9   any belief in the truth of the statements.

10       114.   Countrywide intended to defraud United Guaranty and induce reliance
11   by United Guaranty in this regard, as Countrywide sought to securitize the Mortgage
12   Loans and transfer the risk of such loans to other parties, including (as described
13   above) United Guaranty. Countrywide knew that the securities issued by the Trusts
14   would be rated higher by rating agencies and would be more attractive to investors,
15   and therefore would likely be sold at a higher price and/or lower cost to
16   Countrywide, if United Guaranty agreed to insure the Mortgage Loans.

17       115.   United Guaranty justifiably, reasonably and foreseeably relied on all
18   the above representations and false statements. Countrywide knew that United
19   Guaranty was relying on Countrywide's expertise, and Countrywide encouraged
20   such reliance. Countrywide knew that its representations described above would be
21   relied upon by United Guaranty in connection with its decision to issue each
22   insurance policy. Based on its expertise and specialized knowledge, and in light of
23   its false and misleading representations, Countrywide owed a duty to United
24   Guaranty to disclose material facts about the Securitizations.

25       116.   Countrywide's representations substantially influenced United
26   Guaranty's decision to issue a policy for the Mortgage Loans included in each
27   CWABS. United Guaranty would never have agreed to provide any of the Policies
28

1 had it known that Countrywide's representations about the Mortgage Loans were
2 false and that Countrywide had omitted material information.

3     117. As a result of Countrywide's false and misleading statements and
4 omissions as alleged herein, United Guaranty has suffered, and is reasonably certain
5 to continue suffering, damages, including, but not limited to, paying out claims on
6 the Insurance Policies caused by the excessively high default rates within the pools
7 of Mortgage Loans.

8     118. Because Countrywide committed these acts and omissions maliciously,
9 wantonly and oppressively, and because the consequences of Countrywide's acts
10 knowingly affected the general public, including but not limited to all persons with
11 interests in the Securitizations, United Guaranty is entitled to recover punitive
12 damages.

13

14                **FOURTH CAUSE OF ACTION**
15          **(NEGLIGENT MISREPRESENTATION)**

16     119. United Guaranty incorporates by reference all the foregoing allegations
17 as if fully set forth herein.

18     120. This is a claim for negligent misrepresentation against Countrywide
19 Home, Countrywide Financial, and Bank of New York Trust.

20     121. Countrywide and Bank of New York Trust represented that the
21 Mortgage Loans underlying each CWABS were underwritten according to
22 Countrywide's subprime underwriting guidelines, and in accordance with prudent
23 underwriting judgment.

24     122. These representations were materially false and misleading, and neither
25 Countrywide nor Bank of New York Trust had reasonable grounds for believing this
26 information to be true.

27     123. Countrywide's specific misrepresentations are described above.

28

1     124.  Bank of New York Trust's material misrepresentations are contained in
2 the Insurance Policies for the following CWABS transactions: CWABS 2006-20
3 transaction, CWABS 2006-21 transaction, CWABS 2006-22 transaction, CWABS
4 2006-23 transaction, CWABS 2006-26 transaction, CWABS 2007-01 transaction,
5 CWABS 2007-02 transaction, CWABS 2007-03 transaction, CWABS 2007-05
6 transaction, CWABS 2007-06 transaction, and CWABS 2007-07 transaction.

7     125.  Bank of New York Trust's specific material misrepresentations are
8 contained in the Insurance Policies issued to Bank of New York Trust to cover
9 Mortgage Loans for the CWABS transactions, stating that "[t]he Insured covenants
10 and agrees that all Loans shall be reported by it in accordance with the terms and
11 conditions of the Reporting Acceptance Program Manual and underwritten in
12 accordance with prudent underwriting judgment." Each Insurance Policy further
13 states, "that each Loan was accurately and completely described in all material
14 respects in the Reporting Acceptance Program Reporting Form submitted in
15 connection with the respective Loan."

16     126.  The Commitment Letter for each CWABS expressly substitutes
17 Countrywide's underwriting guidelines for those in the Reporting Acceptance
18 Program Manual. As a result, Bank of New York Trust covenants in each Insurance
19 Policy that all Mortgage Loans were underwritten in accordance with these
20 subprime guidelines and with prudent underwriting judgment. As described above,
21 the Mortgage Loans did not adhere to either Countrywide's guidelines or prudent
22 underwriting judgment, and therefore Bank of New York Trust's representations in
23 each Insurance Policy are false.

24     127.  The Insurance Policies define the Reporting Acceptance Program
25 Reporting Form as a form that, when properly completed, directs United Guaranty
26 to issue coverage for the loan identified therein. The loan data tapes fall within the
27 scope of this definition, and as a result Bank of New York Trust covenants in each
28 Insurance Policy that the loan data tapes accurately and completely describe each

1 Mortgage Loan in all material respects.  As described above, the tapes did not

2 accurately and completely describe the Mortgage Loans, and therefore Bank of New

3 York Trust's representations in each Insurance Policy are false.

4     128.   Both Countrywide and Bank of New York Trust intended for United

5 Guaranty to rely on these representations in making the decision to issue a Policy to

6 cover the Mortgage Loans and United Guaranty did justifiably rely on these

7 representations in making the choice to issue insurance policies to cover the

8 Mortgage Loans.  United Guaranty was unaware of the falsity of these

9 representations when they were made.

10     129.   As a result of these misrepresentations, United Guaranty has suffered

11 and continues to suffer damages, including, but not limited to, paying out claims

12 caused by the excessively high default rates within the pools of Mortgage Loans.

13

14                    **FIFTH CAUSE OF ACTION**

15                          **(NEGLIGENCE)**

16     130.   United Guaranty incorporates by reference all the foregoing allegations

17 as if fully set forth herein.

18     131.   This is a claim for negligence against Countrywide Home and

19 Countrywide Financial.

20     132.   Countrywide applied to United Guaranty for insurance coverage on

21 behalf of Bank of New York Trust for the Mortgage Loans underlying the CWABS.

22 Countrywide had a duty to exercise reasonable care in applying for insurance

23 coverage, which included disclosing material information for the purpose of

24 obtaining insurance coverage in an honest, truthful, and accurate manner and fully

25 divulging in good faith to United Guaranty all facts within its knowledge material to

26 insurance coverage.

27     133.   Countrywide breached its duty in preparing insurance applications for

28 mortgage loans underlying the following CWABS transactions:  CWABS 2006-20

1  transaction, CWABS 2006-21 transaction, CWABS 2006-22 transaction, CWABS

2  2006-23 transaction, CWABS 2006-26 transaction, CWABS 2007-01 transaction,

3  CWABS 2007-02 transaction, CWABS 2007-03 transaction, CWABS 2007-05

4  transaction, CWABS 2007-06 transaction, and CWABS 2007-07 transaction.

5        134.   As a result of Countrywide's negligence, United Guaranty has suffered

6  and continues to suffer damages, including, but not limited to, paying out claims

7  caused by the excessively high default rates within the pools of Mortgage Loans.

8

9  **SIXTH CAUSE OF ACTION**

10 **(RESCISSION)**

11       135.   United Guaranty repeats and incorporates by reference all the foregoing

12 allegations as if fully stated herein.

13       136.   This is a claim for rescission of the Insurance Policies.

14       137.   Section 359 of the California Insurance Code provides, "If a

15 representation is false in a material point, whether affirmative or promissory, the

16 injured party is entitled to rescind the contract from the time the representation

17 becomes false."

18       138.   Countrywide made material misrepresentations and omissions

19 regarding the Mortgage Loans as well as the application of its underwriting

20 guidelines.  These misrepresentations were material to United Guaranty in issuing

21 the insurance, in estimating the degree and character of the risk inherent in the

22 Mortgage Loans, and in pricing the Policies' premiums.  Had United Guaranty been

23 aware of Countrywide's misrepresentations, it would never have issued the

24 Insurance Policies.

25       139.   Countrywide's misconduct rendered false Bank of New York Trust's

26 representations made in the Insurance Policies.  These misrepresentations were

27 material to United Guaranty in issuing the insurance, in estimating the degree and

28 character of the risk inherent in the Mortgage Loans, and in pricing the Policies'

1  premiums.  Had United Guaranty been aware of Bank of New York Trust's

2  misrepresentations, it would never have issued the Insurance Policies.

3      140.   United Guaranty is therefore entitled to rescission of the policies

4  because of material misrepresentations by Countrywide and Bank of New York

5  Trust.

6

7                    **SEVENTH CAUSE OF ACTION**

8    **(Unfair Competition and Business Practices Under California Business and**

9                   **Professions Code § 17200)**

10     141.   United Guaranty repeats and incorporates by reference all the foregoing

11 allegations as if fully stated herein.

12     142.   This is a claim against Countrywide Home and Countrywide Financial

13 for Unfair Competition and Business Practices under California Business and

14 Professions Code § 17200 and acts of unfair competition in violation of common

15 law.  The Insurance Policies contain choice of law clauses providing that California

16 law applies.

17     143.   By reason of the foregoing, Countrywide has been and is engaged in

18 "unlawful, unfair or fraudulent business practices" in violation of Sections 17200 et.

19 seq. of the California Business and Professions Code and acts of unfair competition

20 in violation of common law.

21     144.   United Guaranty has suffered injury in fact and has suffered monetary

22 damage, among other things, due to Countrywide's unfair and fraudulent business

23 practices.

24     145.   As a result of Countrywide's unfair and fraudulent business practices,

25 United Guaranty is entitled to restitution.

26

27

28

1

## **PRAYER FOR RELIEF**

2      WHEREFORE United Guaranty prays for relief as follows:

3      a.      Rescission of the Insurance Policies;

4      b.      United Guaranty's payments on current and future claims under the

5  Policies, including draw downs on guarantees;

6      c.      United Guaranty's losses, including lost profits and opportunities;

7      d.      Indemnification for United Guaranty's attorneys' fees and costs

8  associated with enforcing its legal rights under the Commitment Letters and

9  Insurance Policies;

10     e.      Punitive damages;

11     f.      Prejudgment interest at the maximum legal rate; and

12     g.      Such other and further relief as the Court may deem just and proper.

13

14

15

16  DATED: March 19, 2009            QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
17

18

19                                   By _____
20                                      John S. Purcell
                                        Attorneys for United Guaranty Mortgage
21                                      Indemnity Company

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

United Guaranty Mortgage Indemnity Company

**PLAINTIFF(S)**

v.

Countrywide Financial Corp., Countrywide Home Loans, Inc., The Bank of New York Trust Company, N.A.

**DEFENDANT(S).**

CASE NUMBER

**CV09-1888 RZ**

**SUMMONS**

TO: DEFENDANT(S): Countrywide Financial Corp., Countrywide Home Loans, Inc., The Bank of New York Trust Company, N.A.

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached [X] complaint [ ] _____ amended complaint [ ] counterclaim [ ] cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, ___John S. Purcell___ , whose address is ___Quinn Emanuel, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017___ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __MAR 19 2009__

By: __NATALIE LONGORIA__

Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1198

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| United Guaranty Mortgage Indemnity Company | Countrywide Financial Corp., Countrywide Home Loans, Inc., The Bank of New York Trust Company, N.A., |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| A. William Urquhart, John S. Purcell, Richard A. Schirtzer Quinn Emanuel Urquhart Oliver & Hedges, LLP 865 South Figueroa St., 10th Floor, Los Angeles, CA 90018.  PH: 213-443-3000 | |

### II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

### V. REQUESTED IN COMPLAINT:   JURY DEMAND: ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

CLASS ACTION under F.R.C.P. 23: ☐ Yes   ☒ No        ☒ MONEY DEMANDED IN COMPLAINT: $ 30,000,000

### VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. §1332(a) Diversity Action

### VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS — PERSONAL INJURY | TORTS — PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☒ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## CV09-1888

FOR OFFICE USE ONLY:     Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.   Arise from the same or closely related transactions, happenings, or events; or

                             ☐ B.   Call for determination of the same or substantially related or similar questions of law and fact; or

                             ☐ C.   For other reasons would entail substantial duplication of labor if heard by different judges; or

                             ☐ D.   Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | United Guaranty Mortgage Indemnity Company is a North Carolina corporation with its principal place of business in Greensboro, North Carolina. |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Bank of New York Trust Company, N.A., is a national banking association organized under the laws of the United States and located in Los Angeles County. | Countrywide Financial Corporation is a Delaware corporation; Countrywide Home Loans is a New York Corporation, both have principal executive offices in Calabasas, California. |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   3/19/09

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |