# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **United Guaranty Mortgage Indemnity Co.,**<br><br>Plaintiff,<br>v.<br><br>**Countrywide Financial Corp.,** *et al.***,**<br>Defendants. | **Case Nos.**<br>**CV-09-1888-MRP (JWJx)**<br>**CV-09-2732-MRP (JWJx)**<br><br>**OMNIBUS ORDER Resolving Three Jurisdiction-Related Motions** |
| **Countrywide Bank, FSB,** *et al.***,**<br><br>Plaintiffs,<br>v.<br><br>**United Guaranty Mortgage Indemnity Co.,** *et al.***,**<br>Defendants. | |

This Order applies to two cases arising from a mortgage-insurance dispute. The dispute led to three case filings—one in California state court, one in this California federal court, and one in a North Carolina federal court. The dispute also triggered at least three pending arbitrations. Further, the dispute implicates thirty-eight insurance policies and may also require considering numerous related agreements to which the insurance company is not a party.

1      The California federal case began in this District as number 09-1888 (the
2  "09-1888 federal case"). The California state court case was removed to this
3  District as number 09-2732 (the "09-2732 removal case"). Neither case yet has an
4  answer or counterclaim.

5      This Order resolves factually related motions in both cases. It concludes that
6  all parties required under the Federal Rules are joined in the 09-1888 federal case.
7  It holds that there is complete diversity between the real and substantial parties to
8  the controversy on each side of the 09-2732 removal case. The final motion—to
9  stay the 09-1888 federal case in favor of the 09-2732 removal case if the 09-2732
10  removal case is remanded to state court—is denied as moot in light of these
11  holdings.

12  **I.**

13  **BACKGROUND**

14  **A. The parties and transactions.**

15      <u>Parties.</u> The present motions turn on various entities' citizenship and their
16  roles in the transactions. All the defendants are North Carolina citizens. The key
17  issues revolve around whether any relevant plaintiffs have North Carolina
18  citizenship.

19      Most entities have undergone structural, ownership, or name changes since
20  the transactions at issue. Many are affiliated. Despite these complexities, the
21  entities can be divided into three simple categories: (1) mortgage company parties;
22  (2) insurance company parties; (3) and securitization trustees. These categories are
23  defined below. Footnotes provide additional details about the entities in these
24  categories.

25      The mortgage company parties are Countrywide affiliates. They were
26  involved in holding and securitizing residential mortgages. One mortgage company
27  party, the Countrywide servicing entity ("Servicing") is a North Carolina citizen
28  and was a North Carolina citizen at the times of filing and removal. No other

mortgage company party had North Carolina citizenship at the time a complaint was filed or removed. Servicing and the other mortgage company parties must be distinguished. It is also useful to distinguish Countrywide Home Loans, Inc. ("CHL"), a Countrywide affiliate that has never been a North Carolina citizen. "Countrywide" refers to all mortgage company parties collectively, except Servicing. Servicing is a party to the 09-2732 removal case. It is not a party to the 09-1888 federal case.[1]

---

[1]     In the 09-1888 federal case, the mortgage company parties are (1) Countrywide Financial Corporation and (2) Countrywide Home Loans, Inc.
 In the 09-2732 removal case, the mortgage company parties are: (1) Countrywide Bank, FSB; (2) Countrywide Home Loans, Inc.; and (3) Countrywide Home Loans Servicing, LP. (Emphasis added to aid distinguishing the parties.)

All these parties are affiliates. Their affiliations, ownership, or names may have changed since the transactions in issue. For example, Countrywide Financial was recently acquired by Bank of America Corp. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1142 n.1 (C.D. Cal. 2008).

Countrywide Bank recently underwent several changes and, after the 09-2732 case was filed and removed, merged into Bank of America, N.A. *See* Off. Thrift Supervision Order No. 2007-08 (Mar. 5, 2007) (approving new ownership structure and federal charter changes); Off. Comp. Curr. Cond'l Approv. No. 900 (April 23, 2009) (approving merger into Bank of America, N.A.). Since diversity is tested at the complaint's original filing and again at removal, this post-removal change in citizenship is inconsequential. *Strotek Corp. v. Air Trans. Assoc. of Am.*, 300 F.3d 1129, 1131-32 (9th Cir. 2002).

Most important for the present motions is Countrywide Servicing LP ("Servicing"), which recently changed its name to "BAC Home Loans Servicing, LP." Servicing has two partners, both of which are single-member LLCs. The LLCs' membership recently changed as well. Lindgren Decl. Pursuant to Minute Order.

The result is that Servicing has North Carolina citizenship—and had North Carolina citizenship at the time of filing and removal. At the time of filing and removal, the other Countrywide parties had various citizenships—including California, Colorado, and New York—but none had North Carolina citizenship. 09-2732 Compl. ¶¶ 2-4.

1    The insurance company parties are United Guaranty affiliates (collectively,

2 "United Guaranty"). United Guaranty insured mortgages that Countrywide held or

3 securitized. All the insurance company parties are citizens of North Carolina and

4 only North Carolina.[2]

5    Securitization trustees manage or hold securitization assets on others' behalf.

6 The most important securitization trustees for the transactions at issue were Bank

7 of New York affiliates. Only one securitization trustee ("BNY Trust") is a party—

8 and only in the 09-1888 federal case. BNY Trust is a California citizen. It is

9 aligned with Countrywide as a defendant in the 09-1888 federal case. Bank of New

10 York and BNY Trust are affiliates, but they must be distinguished. Additional

11 securitization trustees are relevant to some issues in the 09-2732 removal case.

12

13

14

15    Following its post-complaint and post-removal merger into Bank of

16 America, N.A., Countrywide Bank now has North Carolina citizenship. Off.
Comp. Currency Cond'l Approv. #900 (April 23, 2009).

17    All Countrywide parties, in both cases, are represented by the same counsel.

18    Given this state of affairs, the Court refers to these affiliates collectively as

19 "Countrywide." Distinctions will be made among the affiliates only when
necessary.

20 [2]    In the 09-1888 federal case, the sole insurance company party is "United

21 Guaranty <u>Mortgage</u> Indemnity Company."

22    The 09-2732 removal case names (1) United Guaranty <u>Mortgage</u> Indemnity
Company; (2) United Guaranty <u>Residential</u> Insurance Company; (3) United

23 Guaranty <u>Residential</u> Insurance Company <u>of North Carolina</u>; and (4) fictional

24 defendants "Does 1 through 100, inclusive." (Emphasis added to aid distinguishing
the parties.)

25    The nonfictional parties are affiliates. They are all North Carolina citizens.

26 They lack any other citizenship. *See* 09-2732 Compl. ¶¶ 5-7.

    All United Guaranty affiliates are represented by the same counsel.

27    Given this state of affairs, the Court refers to these affiliates collectively as

28 "United Guaranty." Distinctions will be made among the affiliates only when
necessary.

1    They are identified and discussed, as necessary, below.[3]

2       Held mortgages. Countrywide held some mortgages on its own books. Such

3 mortgages could be held as long-term investments; or they could be held for the

4 short term, for example until sale or securitization.

5       Securitized mortgages. Many mortgages were securitized. A simplified

6 account of a typical mortgage securitization follows: Countrywide owns

7 mortgages. It conveys a pool of those mortgages to a trustee. In exchange for the

8 mortgages, the trustee issues debt instruments to Countrywide. These instruments

9 represent a right to proceeds from trust assets (principally the mortgages, though

10 perhaps also proceeds from related swap or insurance contracts). Countrywide

11

---

12   [3]    The 09-1888 federal case's complaint names this party as "The Bank of New

13 York Trust Company, N.A." This name, or a close variation of it, appears on the

14 relevant policies and policy-related documents. This party has appeared as "The

15 Bank of New York Mellon Trust Company, N.A." This party represents that it was

16 formerly known by the name under which it is sued. *See* BNY Trust Mot. to

Dismiss at 4:7-8.

17      BNY Trust is denominated "Co-Trustee" in all securitization agreements

18 related to the policies in the 09-1888 federal case. "The Bank of New York" (a

BNY Trust affiliate) is denominated "Trustee" in all securitization agreements

19 related to the policies in the 09-1888 federal case. The securitization agreements

assign different rights and responsibilities to the two types of trustees. The

20 distinctions are noted where relevant to the present motions.

21      All parties have agreed that the complaint erroneously omits that BNY Trust

is sued solely in its capacity as a trustee. By minute order following this agreement

22 on the record at a hearing, the Court corrected this omission by deeming the

complaint to name BNY Trust solely in its capacity as a trustee under the relevant

23 securitization agreements. BNY Trust is not sued in its individual capacity. Minute

24 Order (June 16, 2009).

25      Bank of New York and BNY Trust appear to have only New York and

California citizenship, respectively. 09-1888 Compl. ¶ 18; Off. Comp. Currency

26 Charter No. 24526; Off. Comp. Currency Conditional Approval #859 (June 13,

27 2008).

     BNY Trust is a party in the 09-1888 federal case. It is not a party in the 09-

28 2732 removal case.

1    could then sell or retain the debt instruments.

2           In the transactions implicated by the 09-1888 federal case, three

3    Countrywide affiliates—"Countrywide Home Loans, Inc." ("CHL"), "Park

4    Monaco," and "Park Sienna"—held mortgages. *See* Countrywide Fin. Corp., Form

5    8-K (Aug. 6, 2007) (indicating that the two "Park" entities were vehicles of, and

6    liquidity sources for, CHL). These three Countrywide affiliates conveyed

7    mortgages to another Countrywide affiliate called "CWABS," presumably short

8    for "Countrywide Asset-Backed Securities." CWABS immediately conveyed those

9    mortgages to a trustee. In exchange, a trustee conveyed debt instruments to

10   CWABS.[4]

11          The securitizations implicated by the 09-2732 removal case are quite similar,

12   though some securitization parties and some securitization structures differ

13   slightly. Because the 09-2732 removal case involves several different classes of

14   securitizations, the distinctions between them are discussed below, where relevant.

15          Mortgage insurance. United Guaranty insures mortgages against the risk of

16   homeowner default. Both cases involve United Guaranty policies for mortgages

17   that Countrywide held or securitized. The policies at issue in the 09-1888 federal

18   case appear to have been written between 2006 and 2007; in the 09-2732 removal

19   case, between 2002 and 2007.

20          Servicing mortgages. Behind each residential mortgage lies a piece of real

21   property with a homeowner. A servicing entity, such as Servicing, interacts with

22   the property and homeowner. Servicing's main function is to collect and transfer

23

24   ─────────────────
     [4]       For further background on mortgage securitizations and their mechanics, see
25   *In re Countrywide Financial Securities Litigation*, 588 F. Supp. 2d 1132, 1151-52
     (C.D. Cal. 2008). The cited excerpt from *Countrywide Securities* discusses some
26   assumed facts and generalizations about mortgage securitization. The securitization
     transactions discussed in *Countrywide Securities* share rough contours with the
27   securitizations in the present two cases. However, the particular allegations in
     *Countrywide Securities* are irrelevant to the present cases.
28

mortgage income, net of servicing fees, to the securitization trust. Such mortgage income might include regular mortgage payments, foreclosure proceeds, or mortgage insurance proceeds.

<u>Securitization parties' relationships.</u> Note that most parties to the implicated securitizations are affiliated. In particular, Servicing and CHL are affiliates of the other Countrywide entities. *See supra* n.1 (discussing the mortgage company parties' relationships).

The securitization trustees were repeat players in the transactions, but they are not Countrywide affiliates. Bank of New York, a BNY Trust affiliate, is a trustee in every securitization agreement implicated in the present two cases. Bank of New York was an original trustee in all but seven of those securitizations; in the remaining seven, Bank of New York became a trustee through acquisition.[5] For every securitization involved in the 09-1888 federal case, Bank of New York is the "Trustee" and BNY Trust serves as "Co-Trustee." *See supra* n.3 (discussing these entities).

**B. Factual background.**

<u>Factual background as alleged by United Guaranty.</u> United Guaranty alleges that, beginning in summer 2007, the mortgage loans underlying the Countrywide securitizations "began to show a high number of delinquencies." 09-1888 Compl. ¶ 59. BNY Trust allegedly submitted mortgage insurance claims to United

---

[5]     All other securitizations—including all the securitizations in the 09-1888 federal case—use the "Trustee"-"Co-Trustee" structure discussed above. But these seven differently structured transactions—implicated only in the 09-2732 removal case—use a statutory trust, an Indenture Trustee, and a Co-Trustee. Bank of New York became the Indenture Trustee on these securitizations after it acquired some JP Morgan Chase assets; and a Bank of New York affiliate became Co-Trustee through the same acquisition. Joint Stip. re Standard Nomenclature Tabs 21-27; 09-1888 federal case, Shirtzer Decl. (May 26, 2009); 09-2732 removal case, Objection of Nonparties BNY Mellon Trust and BNY Mellon Trust of Del., at 2-3 (June 18, 2009).

Guaranty. *Id.*[6] United Guaranty allegedly rejected "almost 50%" of the claims for the relevant Countrywide-securitized first-lien mortgages, compared to "about 11% for claims made under all other first lien insurance policies." *Id.* ¶ 62. United Guaranty alleges that it "reserve[ed] its rights" when paying claims under the Countrywide securitizations. *Id.* ¶ 60. Meanwhile, United Guaranty allegedly began investigating the loans it insured under Countrywide securitizations. *Id.* ¶ 63. United Guaranty allegedly found numerous problems and misrepresentations associated with the loans. *Id.* ¶¶ 63-67.

Factual background as alleged by Countrywide. Countrywide alleges that it fully complied with the insurance policies' terms. 09-2732 Compl. ¶ 28. But, to the extent that Countrywide may not have complied, Countrywide alleges that United Guaranty cannot, due to estoppel or waiver, argue the contrary. *Id.* United Guaranty allegedly "conducted regular audits" of detailed loan information that Countrywide was required to provide under policy agreements. *Id.* ¶ 91-93. Countrywide alleges that United Guaranty is a sophisticated insurer with a great amount of knowledge of the mortgage market in general and Countrywide in particular. *Id.* ¶¶ 78-90. As a result, Countrywide alleges, United Guaranty was, all along, aware of any underwriting issues that United Guaranty now alleges were associated with the loans. *Id.* ¶¶ 90-96. Countrywide's allegations conclude that, because of United Guaranty's losses caused by negative trends in the overall real estate market, and because of happenings at United Guaranty's parent, American International Group ("AIG"), *id.* ¶120, United Guaranty began wrongfully denying claims. *Id.* ¶¶ 111-20.

Events immediately preceding the suits. United Guaranty is alleged, at some point, to have "announced" it would cease paying any claims under some policies.

---

[6]    It is unclear whether this is a fact allegation (that BNY Trust submitted the claims) or a legal characterization (under the theory that another entity acted as BNY Trust's agent).

-8-

1    *Id.* at ¶ 114.

2       Countrywide and United Guaranty apparently agree that they began

3 negotiating about some or all of the policies implicated in the present cases. *Id.*

4 ¶ 115; 09-1888, Gaines Decl. ¶¶ 11-14 (May 18, 2009).

5       During or after these negotiations, both sides filed lawsuits less than one day

6 apart. 09-2732 Compl. ¶ 117; Gaines Decl. ¶¶ 11-14.

7       <u>Events subsequent to the suits.</u> It seems that the dispute between United

8 Guaranty and Countrywide is more nuanced than appears from the complaints'

9 scope. Counsel for both sides have represented that United Guaranty continues to

10 pay at least some individual claims under some policies and has refused to pay any

11 claims under others. 09-2732, Hearing Tr. at 21:22-22:22 (June 29, 2009) (counsel

12 for Countrywide); *id.* at 46:5-22 (counsel for United Guaranty).

13 **C. The pending proceedings.**

14       <u>Countrywide's 09-2732 removal case.</u> Countrywide on March 18, 2009 filed

15 the 09-2732 removal case in Los Angeles County Superior Court. Servicing joined

16 as a plaintiff in this case.

17       Countrywide sues United Guaranty on policies covering securitized

18 mortgages and mortgages that Countrywide held. Countrywide's 09-2732 removal

19 case involves thirty-eight policies. These policies cover both first- and second-lien

20 mortgages; and those second-lien mortgages include some revolving home equity

21 loans. Joint Stip. re Standard Nomenclature [hereinafter "Joint Stip."].

22       Documents for some policies have arbitration clauses. However, these

23 clauses appear to make an exception for some declaratory judgments. Therefore, in

24 the 09-2732 removal case, Countrywide's claims vary by policy type. Countrywide

25 seeks declaratory judgment (1) that United Guaranty must pay valid claims and

26 that its decision to cease paying claims violates some policy agreements; and (2)

27 regarding numerous "rights and obligations of the parties." 09-2732 Compl. ¶¶

28 127-44. And, on some policies, Countrywide asserts (3) breach of contract; and (4)

1    breach of implied covenant of good faith and fair dealing. *Id.* ¶¶ 145-58.

2         United Guaranty timely filed its notice of removal to this federal District

3    Court approximately one month after Countrywide filed its case.

4         <u>United Guaranty's 09-1888 federal case.</u> The morning after Countrywide

5    filed in Superior Court, United Guaranty filed the 09-1888 federal case in this

6    federal District Court. United Guaranty named several Countrywide entities, but

7    not Servicing.

8         United Guaranty in this case sues on eleven policies, all of which are also at

9    issue in the 09-2732 removal case. ¶ 40. The policies insure first-lien mortgages

10   underlying particular securitizations.

11        In 09-1888 federal case, United Guaranty asserts the following claims

12   against Countrywide: (1) breach of contract; (2) breach of implied duty of good

13   faith and fair dealing; (3) fraud; (4) negligent misrepresentation; (5) negligence; (6)

14   rescission; and (7) California statutory unfair competition and unfair business

15   practices. 09-1888 Compl. ¶¶ 86-145. Claims 1, 4, and 6 are asserted against BNY

16   Trust as well.

17        <u>United Guaranty's North Carolina federal case.</u> A day after filing the 09-

18   1888 federal case, United Guaranty—citing a forum selection clause in some

19   policies—filed another federal case in a North Carolina District Court. That case

20   involves nine policies. Joint Stip. Exh. A at 6; North Carolina Compl. M.D.N.C.

21   CV-09-00203 Compl. ¶ 38. These nine policies are not at issue in United

22   Guaranty's 09-1888 federal case. Countrywide includes these nine policies in the

23   09-3723 removal case. Joint Stip. Exh. A.[7]

24

25   _____

26   [7]    Countrywide has represented to the North Carolina federal court that it
     "obviously is willing to waive the North Carolina choice of forum clause in

27   particular Commitment Letters to allow the comprehensive [09-2732 removal case]
     to proceed in California." M.D.N.C. 09-CV-00203, Countrywide's Reply to United

28   Guaranty's Mot. to Dismiss, 5 n.2 (May 26, 2009).

1    _Arbitrations initiated by both sides._ At some point, Countrywide initiated

2  two arbitrations for some policies involved in the dispute. _Id._ at 2. United Guaranty

3  also initiated one arbitration. _Id._ Together, these arbitrations implicate at least

4  twenty-two of the policies involved in the dispute. Joint Stip. Exh. A. Further,

5  United Guaranty has moved to compel arbitration on some issues in the 09-2732

6  removal case. Docket no. 31. And, in North Carolina, Countrywide has moved to

7  compel arbitration on some issues. M.D.N.C. 09-CV-00203, docket no. 14.[8]

8    _Motions and related documents._ The parties filed numerous motions in both

9  cases. The Court rules on three at this time: (1) Countrywide's motion to dismiss

10 the 09-1888 federal case; (2) Countrywide's motion to remand the 09-2732

11 removal case; and (3) Countrywide's motion to stay the 09-1888 federal case.[9]

12

13  ────────────────

14  [8]    At several hearings, the Court has broached the issue why each side is
opposing a motion to compel arbitration, despite both sides' having initiated

15  arbitrations. Each side contends the other resists arbitrating the full scope of

16  arbitrable claims. _See, e.g._, 09-2732 & 09-1888, Hearing Tr. at 37:4-11, 44:25-45:6
(counsel for United Guaranty); _id._ at 42:14-43:25 (counsel for Countrywide) (June

17  1, 2009).  _See also_ 09-2732, Hearing Tr. at 11:10-12:21 (counsel for United
Guaranty) (June 29, 2009); _id._ at 28:14-29:25 (counsel for Countrywide).

18
[9]    These motions turn on entities' citizenship and interests in the controversy,

19  implicating diversity jurisdiction. A court may always "insist that the jurisdictional

20  facts be established or the case be dismissed, _and for that purpose the court may
demand that the party alleging jurisdiction justify his allegations by a_

21  _preponderance of evidence_." _Gaus v. Miles, Inc._, 980 F.2d 564, 567 (9th Cir. 1992)
(emphasis in original). _See also Strotek Corp. v. Air Trans. Assoc. of Am._, 300 F.3d

22  1129, 1132 ("[J]urisdictional _facts_, not fiction even if truly believed, are
dispositive." (emphasis in original)) (9th Cir. 2002); _Attorneys Trust v. Videotape_

23  _Comp. Prods., Inc._, 93 F.3d 593, 599 (9th Cir. 1996) (noting that it is "proper for

24  the district court to look at the true jurisdictional facts" to assess diversity
jurisdiction). This is true even at the pleading stage. _White v. Lee_, 227 F.3d 1214,

25  1242 (9th Cir. 2000).

26      The complaints, moving, and opposition papers did not clearly explain how

27  the relevant documents relate to one another, which entities were parties to which
agreements, and what is at issue in the various proceedings. Further, a declaration

28

**D. The present legal issues.**

filed by Countrywide combined several important propositions in a single, terse paragraph.

The Court therefore took the unusual step of ordering the parties (1) to file the documents in issue; (2) to stipulate a standard nomenclature for the documents; and (3) to use this standard nomenclature and cite this filing in future papers. The Court also (4) ordered Countrywide to supplement the deficient declaration. Finally, (5) United Guaranty was ordered to lodge the North Carolina record with this Court and to keep this Court apprised of significant developments in North Carolina. 09-1888 & 09-2732, Minute Order (May 20, 2009).

The parties complied, filing (or incorporating by reference) the same documents under both case numbers. 09-1888 & 09-2732, Joint Stip.

Concurrently, United Guaranty filed some "updated" declaration pages. These "updates" would apply to a small number of policies in the 09-2732 removal case; they have no bearing on the 09-1888 federal case, at least as it stands before any counterclaims. BNY Trust, which is not a party in the 09-2732 removal case, objected on the grounds that these purported updates contain inaccuracies. BNY Trust "does not dispute that it is the current named insured on each of these . . . policies"; nor does it dispute that it succeeded in interest to the original named insured. 09-2732, Objection of Nonparties BNY Mellon Trust and BNY Mellon Trust of Del., at 2-3 (June 18, 2009). Thus, all parties appear to agree on the identity of each document as originally filed, though BNY Trust disputes the accuracy of the purported updates and, perhaps, their legal effect. *Id.*; 09-1888, Shirtzer Decl. ¶ 2 (May 26, 2009).

A week later, the parties filed a notice of errata regarding original filing. 09-1888 & 09-2732, Notice of Errata (June 2, 2009).

All "Tab" citations refer to the relevant documents according to their originally-filed binder tabs, as corrected by the notice of errata. The documents to which BNY Trust objects are not referenced by Tab citations.

The Court later identified issues regarding some parties denominated "insureds" under some policies in the 09-2732 removal case. United Guaranty's remand opposition mentioned the parties, but did not discuss them in detail or identify their citizenship. Opp. at 3-4; Gaines Decl. in Opp. The Court therefore ordered, and the parties provided, factual information regarding the citizenship of those "insureds." The two sides made separate submissions. These submissions differ slightly in presentation and suggested legal conclusions, but state the same facts. Joint Submission of Countrywide and BNY Trust (June 18, 2009); United Guaranty's Statement re Citizenship (June 18, 2009).

1    The two cases before this Court assert only state claims. The only possible

2    basis of jurisdiction is the diversity statute. 28 U.S.C. § 1332.

3    The facts regarding the parties' citizenship are not disputed. The parties

4    dispute whether Servicing is a potential impediment to the required "complete

5    diversity" between the two sides. *In re Digimarc Corp. Deriv. Litig.*, 549 F.3d

6    1223, 1234 (9th Cir. 2008). It is undisputed that United Guaranty and Servicing are

7    North Carolina citizens—and were North Carolina citizens at the time of both

8    cases' filing and the 09-2732 case's removal. *See supra* nn.1-3 (discussing the

9    many parties and their relationships).

10   United Guaranty did not make Servicing a defendant to the 09-1888 federal

11   case. Countrywide moves to dismiss the case for failure to join Servicing as a

12   required party that must be joined under the Federal Rules. Fed. R. Civ. Proc. 19;

13   *id.* 12(b)(7) (allowing dismissal under Rule 19).[10] If Servicing must be joined for

14   the case to proceed, there might be a potential diversity problem in the 09-1888

15   federal case.

16   Servicing is a plaintiff with Countrywide in the 09-2732 removal case.

17   United Guaranty removed on the basis that Servicing is not a real and substantial

18   party in interest; and that, therefore, Servicing should be ignored in determining

19   diversity. Countrywide moves to remand on the ground that Servicing must be

20   counted for diversity because it is a real and substantial party to the controversy. If

21   Countrywide were correct, the Court would lack jurisdiction.

22   The parties do not dispute that the policies (and related securitization

23   agreements to which United Guaranty is not a party, but which the United

24   Guaranty policies acknowledge) contemplate some role for Servicing. The key

25   arguments involve what role Servicing plays; and how that role contributes to the

26   analyses under the Federal Rules and diversity jurisdiction statute.

27

28   [10]    Countrywide moves to dismiss on other grounds in the same motion. Those grounds will be addressed in a separate order.

-13-

Finally, if the 09-1888 case is not dismissed, and the 09-2732 removal case returns to state court, Countrywide also moves for 09-1888 federal case to be stayed pending the state court's decision under the *Colorado River* doctrine. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

For the reasons that follow, the Court concludes:

- in the 09-1888 federal case, Servicing is not a required party, and therefore Countrywide's motion to dismiss on that ground is denied;
- in the 09-2732 removal case, the real and substantial parties to the controversy are completely diverse, and therefore remand is denied;
- in the light of the foregoing, Countrywide's motion in the 09-1888 federal case for a stay under the *Colorado River* doctrine pending the state court's decision is denied as moot.

Regarding forum shopping. Each side accuses the other of forum shopping. This would be a relevant consideration under the *Colorado River* doctrine and it has been mentioned by some courts in evaluating whether required parties must be joined—at least under some limited circumstances. *See Virginia Surety Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1248 (9th Cir. 1998) (mentioning forum shopping in the required party inquiry); *In re Countrywide Deriv. Litig.*, 542 F. Supp. 2d 1160, 1170, 1173 (C.D. Cal. 2008) (discussing the forum shopping factor under the *Colorado River* doctrine and citing *Holder v. Holder*, 305 F.3d 854, 868 (9th Cir. 2002)).

Forum shopping concerns favor neither party. Forum shopping would not be a factor in this case, even if it could appropriately be considered on the motions discussed. The Court has no opinion about the events leading up to the present cases, but it notes: (1) an inflexible first-filed preference would favor the party that interrupts negotiations first to race to the courthouse; (2) the present cases may not present the typical reactive lawsuit fact pattern—where one party files in its preferred forum in response to another party's filing—due to the speed with which

United Guaranty filed its federal complaint;[11] (3) it is possible that United Guaranty sues on a subset of policies because it seeks to limit the number of parties to make diversity easier to establish; (4) it is equally possible that Countrywide sues on a large number of policies because it seeks to make the dispute appear broader than it is, thereby making the diversity inquiry more complicated; and (5) both sides may have acted precipitously, with little regard for manageability and organization.

## II.

## LEGAL DISCUSSION

For Rule 19's "required party" inquiry under Rule 12(b)(7) in the 09-1888 federal case, the Court may look beyond the complaint. *Burkhart v. United States*, 2008 WL 4067429, at *2, 2008 U.S. Dist. LEXIS 65893, at *5-6 (N.D. Cal. Aug. 26, 2008) (citing *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960)); *Behrens v. Donnelly*, 236 F.R.D. 509, 512 (D. Haw. 2006)). *See also* 7 WRIGHT & MILLER § 1609 (discussing the Rule 19 inquiry's factual underpinnings).

The same is true for the jurisdictional inquiry in the 09-2732 remand case. *Strotek Corp. v. Air Trans. Assoc. of Am.*, 300 F.3d 1129, 1132 (9th Cir. 2002); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *Burkhart v. United States*, 2008 WL 4067429, at *2, 2008 U.S. Dist. LEXIS 65893, at *5. *See also* 5B WRIGHT & MILLER § 1350 (at the pleading stage); 14C WRIGHT & MILLER § 3739 p.472 (on motion to remand).

In making these determinations, the Court may need to find <u>jurisdictional</u> facts. *Dredge Corp. v. Penny*, 338 F.2d 456, 463 (9th Cir. 1964) (Rule 19); *Gaus v.*

---

[11]     The time stamp from the state court on the 09-2732 removal case's complaint is illegible, but the 09-1888 case was filed at 10:28am the morning after the 09-2732 removal case was filed. United Guaranty's counsel represents that it filed its 09-1888 federal case within "literally twelve hours" of the 09-2732 removal case. Hear Tr. at 64:5-6.

*Miles, Inc.*, 980 F.2d 564, 567 (9th Cir. 1992) (diversity). Further, the Court must interpret some contractual provisions. The interpretations shall not be read more broadly than their text indicates.

In sum, the following discussion shall not prejudice the parties' right to argue their positions on the merits.

**A. 09-1888 Federal Case: Required Joinder.**

Countrywide moves to dismiss the 09-1888 federal case on the grounds that the case cannot proceed without Servicing and that joining Servicing would destroy diversity. The motion is denied because Servicing is not required.

**1. The relevant contracts.**

United Guaranty sues on eleven insurance policies. Each policy contains a declaration page, which states the name of the insured, the policy number, and the standard forms the policy incorporates. Joint Stip., Exh. A, Tabs 5-15(A) [hereinafter "Tabs"].

<u>Standardized forms.</u> All eleven policies incorporate the same two standardized forms. The standardized forms are (1) the base "terms and conditions" form—for these policies, called the "Master Policy"; (2) an "amendatory endorsement," another form which modifies some paragraphs in the Master Policy; and (3) a "declaration page," which contains some fields for information customized to each transaction. Joint Stip. at 6. *See generally Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1207-08 (2004) (discussing form insurance agreements and amendatory endorsements).

<u>Commitment letters.</u> Before each policy became effective, United Guaranty wrote a "commitment letter" to explain its understanding of the putative policy and the mortgages to be insured. CHL and BNY Trust then signed the commitment letters. After that, United Guaranty signed an "Accepted by" line. No other party

1    signed the commitment letters. Tabs 5-15(C).[12]

2        By the Master Policy's terms, the commitment letters became part of the

3    policy. Tabs 5-15(A) § 1.31. The commitment letters have integration clauses.

4    Tabs 5-15(C) ¶ 22. The commitment letters are, by far, the most detailed and

5    customized component of the policies.

6        <u>Pooling and servicing agreements.</u> The commitment letters acknowledge that

7    the policies would cover mortgages underlying particular securitizations. Tabs 5-

8    15(C) ¶ 1. Each letter also notes the name of a particular securitization

9    agreement—for these policies, called a "pooling and servicing agreement"

10   ("PSA"). *Id.*; Tabs 5-15(B).

11       United Guaranty is not a party to any PSA. Nor is it an express third-party

12   beneficiary.[13]

13       United Guaranty is, however, mentioned by name in the PSAs: "Mortgage

14   Insurance Policy" is defined as "[e]ither of the Mortgage Insurance Policy issued

15   by United Guaranty Mortgage Indemnity Corporation or [the policy issued by

16   another company] with respect to certain Mortgage Loans identified in the

17   Mortgage Loan Schedule. Tabs 5-15(B) § 1.01. Further, "[t]he Co-Trustee shall

18   pay the applicable Mortgage Insurance Premium to the related Mortgage Insurer in

19   accordance with the following wiring instructions [wiring instructions identifying

20   "United Guaranty Mortgage Indemnity Company," together with routing and other

21   identifying information]." *Id.* § 3.08(b)(vii).

22

23   [12]    The copy of the commitment letter provided for one of the policies in issue
     has blank signature lines for BNY Trust and CHL. Tab 9(C).

24   [13]    The PSAs identify two express third-party beneficiaries—the swap
25   counterparty, Tabs 5-15(B) § 3.21, and the "NIM Insurer." *Id.* § 10.11.

26       United Guaranty is not the NIM Insurer. *Id.* § 1.01 (defining "Mortgage
     Insurance Policy" and "NIM Insurer"). The PSAs contemplated debt instruments
27   known as Net Interest Margin Securities, or "NIM Securities"; and NIM insurance
     relates to these securities. *See generally*, Keith L. Krasney, *Legal Structure of Net
28   Interest Margin Securities*, 13 J. STRUCTURED FINANCE 1 (Spring 2007).

-17-

1    Declaration page. After Countrywide Home Loans and BNY Trust signed

2 the commitment letters, United Guaranty issued a declaration page stating (1) an

3 effective date; (2) the standard forms constituting the policy; and (3) the

4 "INSURED." *Compare* Tabs 5-15(A) (declaration pages) *with id.* at 5-15(C)

5 (signed commitment letters).

6    Summary regarding policies and related PSAs. Servicing and other entities

7 (CWABS, CHL, Park Sienna, Park Monaco, Bank of New York, and BNY Trust)

8 were parties to the PSAs. Tabs 5-15(B). But only BNY Trust and CHL signed

9 policy documents. Neither Servicing nor any other securitization party signed a

10 policy document. CWABS is the only other securitization party mentioned by its

11 corporate name on a policy document; a generic "servicer" or "master servicer" is

12 referred to, but Servicing's corporate name never appears. Tabs 5-15(A), (C).

13    Choice of law. The commitment letters and policies contain California

14 choice of law provisions. Tabs 5-15(A) § 6.8 (choosing "the laws of the

15 jurisdiction in which the original Insured is located as shown on the face of this

16 policy," where the declaration page indicates a California address for the

17 "INSURED"); Tabs 5-15(C) ¶ 11 (choosing "the laws of the State of California").

18    The PSAs choose New York law. *Id.* at 5-15(B) § 10.03.[14]

19    General interpretive principles. "While insurance contracts have special

20 features, they are still contracts to which the ordinary rules of contractual

21 interpretation apply." *Powerine Oil Co., Inc v. Super. Court*, 37 Cal. 4th 377, 390

22

23 ─────────────────────

24 [14]    A court sitting in diversity applies the choice of law rules of the forum state.
*Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009). California choice of law

25 rules therefore govern whether this choice is valid. California respects choice of

26 law provisions where both (1) there is a reasonable basis for the parties' choice and
(2) the chosen law does not violate a "strong policy of California law." *Nedllyod*

27 *Lines B.V. v. Super. Court*, 3 Cal. 4th 459, 479 (1992). The Court sees no reason
why California courts would not apply the chosen New York law to interpret the

28 PSAs.

1   (internal quotations omitted). Contracts will be interpreted, "if possible, solely

2   from the written provisions of the contract." *Id.*

3         "[A]n insurance policy must be interpreted as a whole and in context."

4   *Mirpad, LLC v. Cal. Ins. Guarantee Assoc.*, 132 Cal. App. 4th 1058, 1070 (2005).

5         As a general rule, terms are given their "ordinary and popular sense." *Id.* at

6   1069. Words are also presumed to have the same meaning when they appear in the

7   same instrument. *Id.*[15]

8         <u>Resolving ambiguity.</u> Where an ambiguity arises in contracts that involve

9   both standardized form and customized components, the customized components

10   generally control. Cal. Civ. Code § 1651.

11        If, after reading a policy this way, "an asserted ambiguity is not eliminated .

12   . . courts then invoke the principle that ambiguities are generally construed against

13   the party who caused the uncertainty to exist (i.e., the insurer) in order to protect

14   the insured's reasonable expectation of coverage." *Powerine*, 37 Cal. 4th at 391.

15        In policies that consist of form contracts and endorsements, the declaration

16   page is often the most specific and customized policy document. Each states a

17   name under the heading "INSURED" and lists which forms constitute the policy.

18   As such, California courts emphasize that the declaration page is particularly

19   useful for determining an insured's reasonable expectations. *Haynes*, 32 Cal. 4th at

20   1206-07, 1210.

21        Some policy documents in issue refer to securitization agreements but do not

22   expressly incorporate them by reference. Where policy documents incorporate or

23   refer to other documents, California courts may look to the referenced documents

24

25   ───────────────────

26   [15]    Of course, policies, including those in issue, often consist of more than one
     "instrument." For instance, even though "two forms are part of the same policy,"
27   the two forms may use the same term somewhat differently, yet not create an
     ambiguity or inconsistency. *Century Surety v. Polisso*, 139 Cal. App. 4th 922, 944-
28   46 (2006). This follows from reading the policy as a whole and in context.

1   for guidance on the insured's reasonable expectations, either (1) because those

2   documents constitute part of the contract (if incorporated by reference) or (2) as an

3   application of the parol evidence rule (if merely referenced but not incorporated).

4   *See Palacin v. Allstate Ins. Co.*, 119 Cal. App. 4th 855, 864 (2004); *Qualcomm,*

5   *Inc. v. Certain Underwriters at Lloyd's, London*, 161 Cal. App. 4th 184, 191-92

6   (discussing *Palacin*).[16]

7   <u>Choice of law.</u> United Guaranty sues on California law-governed insurance

8   policies. California law controls both substantive claims involving the policies and

9   the policies' interpretation. However, the PSAs expressly choose New York law

10  for interpreting the PSAs. The relevant portions of the PSAs are unambiguous and

11  written in plain language. Therefore, their text controls. *See White v. Continental*

12  *Casualty Co.*, 9 N.Y.3d 264, 267 (2007) (stating the "plain and ordinary" meaning

13  rule).

14  **2. Rule 19.**

15  Rule 19 guides the "pragmatic" decision whether a case may continue

16  without joining a party. *Provident Tradesmen Bank & Trust Co. v. Patterson*, 390

17  U.S. 102, 107, 118 n.12 (1968). Rule 19's pragmatic approach means that "the

18  issue of joinder can be complex and determinations are case specific." *Republic of*

19  *Philippines v. Pimentel*, 128 S. Ct. 2180, 2188 (2008).

20  "The moving party has the burden of persuasion in arguing for dismissal"

21  under Rule 19. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

22  In the 09-1888 federal case, which does not name Servicing as a party, the

23  questions are whether Servicing is (1) a "required" party that (2) cannot be joined

24

25

26  [16]    In California, the parol evidence rule is a rule of substantive contract law,
    despite the name. *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 345-46 (2004).

27  *Accord L.K. Comstock & Co. v. United Engineers & Constructors, Inc.*, 880 F.2d

28  219, 224 (9th Cir. 1989) (recognizing that some states treat the parol evidence rule
    as substantive).

1 (3) but that must be joined for the case to proceed "in equity and good conscience."

2 *Wilbur v. Locke*, 423 F.3d 1101, 1111-12 (9th Cir. 2005) (framing these as three

3 "successive inquiries" derived from Rule 19 (internal quotations and citation

4 omitted)), *cert. denied*, 546 U.S. 1173 (2006); Fed. R. Civ. Proc. 19.[17]

5       Servicing is not required; even if it were, Servicing need not be joined for

6 this case to proceed in equity and good conscience.

7 **a. Contract decimation rule.**

8       Before engaging in the standard Rule 19 multistep inquiry, the Court must

9 address a black-letter rule in the Ninth Circuit: A suit seeking to "decimate" a

10 contract must join all parties to the contract. *Dawavendewa v. Salt River Project*

11 *Agricultural Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002),

12 *cert. denied*, 528 U.S. 1098 (2000). This rule deems each contracting party

13 required and holds that the case cannot proceed in equity and good conscience

14 without all parties. *Id.*

15       United Guaranty must therefore join all parties to the relevant contracts. The

16 dispute involves the insurance policies; not the securitization agreements or

17 Servicing's role in the securitizations. Therefore, the parties potentially required by

18 the decimation rule are the parties to the insurance policy documents—United

19 Guaranty, BNY Trust, and CHL. United Guaranty has joined these parties.

20       To reach this conclusion, however, the Court must navigate a series of

21 policy and policy-related documents.

22       <u>Declaration page.</u> The declaration page is customized to each particular

23 transaction. The page is therefore presumed to control over policy components

24 printed on standardized forms. Cal. Civ. Code. § 1651. The declaration page for

25

26 ───────────────

27 [17]    The old version of the Rule, and the case law under it, used the terms
"necessary" and "indispensable" to refer to the inquiry's first and last steps,

28 respectively. New stylistic revisions eliminate those terms. *Republic of Philippines*,
128 S. Ct. at 2184-85, 2188-89.

1   these policies also serves as a rough table of contents, listing other documents that
2   constitute the policy. The inquiry therefore begins at the declaration page.

3   The declaration page for each policy names only BNY Trust—together on
4   the same line as a securitization transaction identification number—under the
5   heading "INSURED." Tabs 5-15(A).

6   Therefore, the only parties apparent from the declaration page are United
7   Guaranty and BNY Trust (with BNY Trust listed in connection with a particular
8   securitization transaction).

9   <u>Master Policy.</u> Continuing to read the entire policy, the next portion is the
10  "Master Policy"—the standardized terms and conditions form for these policies.

11  The Master Policy is expressly a first-party contract. Tabs 5-15(A) § 6.9.

12  A first party is defined as the "<u>Insured</u>, any officer, employee or <u>agent of the</u>
13  <u>Insured</u>, or any broker or intermediary originating the Loan, or anyone under
14  contract with such Persons in connection with such origination, such as an
15  appraiser or escrow agent." *Id.* at § 1.19 (emphasis added).

16  Servicing is not involved in origination. CHL could be a "first party"
17  because it might meet the "any broker or intermediary originating the Loan, or
18  anyone under contract with such Persons in connection with such origination."
19  Tabs 5-15(A) § 1.19. But CHL is already joined.

20  If Servicing is a party to the Master Policy, it must be as the Insured or the
21  "agent of the Insured."

22  However, the "decimation" cases require the parties to the contracts, not
23  their agents. Whether an agent is required will be determined in the ordinary Rule
24  19 pragmatic inquiry. *Behrens v. Donnelly*, 236 F.R.D. 509, 514 (D. Haw. 2006)
25  (citing *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759 (6th Cir.
26  1999)).

27  Therefore, for Servicing to be potentially required under the contract
28  "decimation" rule, Servicing must be an Insured.

-22-

The Master Policy defines the "Insured" as

> (a) the Person designated on the face of this policy or
>
> (b) if the Loan is sold, assigned, or transferred, the Beneficiary, upon request by the Beneficiary to become the Insured, or
>
> (c) if the servicing of the Loan is sold, assigned, or transferred, the Servicer, if the Beneficiary is not the Insured.

*Id.* at § 1.23.

Under § 1.23(a), the Insured is BNY Trust. The declaration page must be the "face" of the policies in issue. Only BNY Trust (and a securitization identification number) appears on the declaration page under "INSURED."

Commitment letters. If this did not settle the matter of who is the Insured under § 1.23(a), the commitment letters—which the Master Policy makes a part of the "policy," *id.* at § 1.33—also identify BNY Trust, and only BNY Trust, as the "Insured" (in its capacity "as Co-Trustee"). Tabs 5-15(C) ¶ 1. The commitment letters state that they are an "agreement between [CHL] (Seller) and United Guaranty." *Id.* Again, CHL is already joined.

BNY Trust and CHL signed the commitment letters, but Servicing did not. *Id.* Servicing, the unjoined entity, is nowhere mentioned by name in the commitment letters, though there is a form provision that mentions a "servicer." *Id.* ¶ 6 (requiring written approval of United Guaranty for a "change in servicer"). There is also a paragraph that quotes some representations and warranties provisions from the relevant PSA, a sentence in which mentions a party with the title "Master Servicer," but does not identify Servicing by name. *Id.* ¶ 4 ("[I]f it is discovered by any of the Depositor, the Master Servicer, the Sellers, or Trustee that the substance of such representation and warranty is inaccurate . . . .").

Of course, the foregoing only determines who is an Insured under § 1.23(a); it says nothing about whether the contingencies of (b) or (c) have occurred.

The contingency in § 1.23(b) does not appear to have occurred. The Master

1   Policy defines "Beneficiary" as "the owner of a Loan." Ex. A, Tabs 5-15(A) § 1.3.
2   The Beneficiary is not the "Servicer"; rather, the Servicer "<u>acts as the agent of the</u>
3   <u>Beneficiary for all purposes</u>." *Id.* at § 1.40 (emphasis added). The Master Policy
4   includes no further useful information for interpreting "Beneficiary." But each
5   declaration page references a particular securitization transaction. *Id.* So does each
6   commitment letter, which also references a particular PSA in connection with the
7   transaction. ¶ 1. Therefore, the Court turns to the PSAs to determine who is the
8   "owner of a Loan," and hence the "Beneficiary."

9   Under the PSAs, "Trustee" Bank of New York took legal title to the
10  mortgages and "Co-Trustee" BNY Trust took possession of the mortgage
11  documentation. Tabs 5-15(B) §§ 2.01-2.02, 10.04 ("It is the express intent of the
12  parties hereto that the conveyance of the Mortgage Notes, Mortgages, assignments
13  of Mortgages . . . and private mortgage insurance policies relating to the Mortgages
14  Loans by the Depositor to the Trustee be, and be construed as, an <u>absolute sale</u>
15  <u>thereof to the Trustee</u>."). Bank of New York would seem to be the Beneficiary, but
16  it could only be the Insured if it made a request to become the Insured. Tabs 5-
17  15(A) § 1.23(b).

18  Indeed, the PSAs confirm that BNY Trust remains the Insured. The PSAs
19  impose obligations on Servicing by referring to its duties under the title "Master
20  Servicer." The PSAs state that "<u>Co-Trustee shall act as the insured</u> . . . <u>and hereby</u>
21  <u>directs Master Servicer</u>, <u>on behalf of the Co-Trustee</u>, to take all actions appropriate
22  or required of the Co-Trustee <u>under each Mortgage Insurance Policy</u>, other than the
23  payment of each Mortgage Insurance Premium and obtaining the approval of each
24  Mortgage Insurer with respect to the appointment of a successor servicer."
25  § 8.12(a)(2) (emphasis added). Further, the assignment of coverage is limited
26  under the Master Policy and requires United Guaranty's approval. *Id.* § 2.14(2).
27  *See also* Hearing Tr. at 28:24-29:9 (counsel for United Guaranty stating that
28  nothing suggests a transfer to trigger Master Policy § 1.23(b)).

The last contingency in the Master Policy's definition of "Insured," contingency (c), would make the Servicer the Insured if contingency (b) were satisfied <u>and</u> the Beneficiary were not the Insured. The contingency in (b) did not occur. Contingency (c) therefore cannot have occurred. *See id.*

The amendatory endorsement, the only part of the contract not yet discussed, makes no relevant modifications to the Master Policy. *See* Tabs 5-15(A).

Therefore, the potentially required parties to the contract on which United Guaranty sues are United Guaranty, BNY Trust, and Countrywide Home Loans. All are joined.

The Court moves on to the ordinary Rule 19 pragmatic inquiry.

### b. Step 1: Required party.

<u>Legal standard.</u> The first step under Rule 19 asks whether a party is "required." Fed. R. Civ. Proc. 19(a)(1). The Rule contains two alternative tests. If either is met, then a party is required and the inquiry continues. If a party is not required, the inquiry ends and the case may proceed without that party. *Dawavendewa*, 276 F.3d at 1155.

The first alternative test asks whether a court can "accord complete relief among existing parties" in the party's absence. *Id.*

The second alternative test inquires whether the party "claims a legally protected interest in the subject matter of the suit such that a decision in its absence will" either (1) "as a practical matter, impair or impede" the absent party's ability to protect the claimed interest or (2) expose a joined party to a "substantial risk" of "inconsistent obligations" because of the absent party's claimed legal interest. *Id.*; Fed. R. Civ. Proc. 19(a)(1)(B).

#### i. Test A: Complete relief.

The first test asks whether a court can "accord complete relief among existing parties." Rule 19(a)(1)(A). This test looks to the relief the plaintiff seeks and asks whether available remedies could effectively resolve the entire dispute.

1   *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983). It is

2   usually implicated when a party seeks injunctive relief that would need to bind

3   nonparties to be effective. *Dawavendewa*, 276 F.3d at 1155-56 (discussing cases).

4   *See also MasterCard Int'l Inc. v. Visa Int'l Serv. Assoc.*, 471 F.3d 337 (2d Cir.

5   2006) (explaining that this test "is concerned only with those who are already

6   parties").

7          United Guaranty seeks contract, statutory, and tort remedies against

8   Countrywide and BNY Trust with respect to insurance contracts, not the

9   securitizations. These parties are allegedly liable in an individual capacity, in a

10  representative capacity, or as principals. Complete relief on these theories requires

11  no injunction that would need to bind nonparties for relief.

12         Servicing is therefore not a required party on this first test.

13                      *ii. Test B: Legally protected interest.*

14         The second test contains two steps. First, the absent party must "claim[] a

15  legally protected interest in the subject matter of the suit." Second, that interest

16  must either (1) "as a practical matter, impair or impede" the absent party's ability

17  to protect the claimed interest or (2) expose an already-joined party to the risk of

18  inconsistent obligations "because of the interest." Fed. R. Civ. Proc. 19(a)(1)(B).

19         <u>Claimed legally protected interest.</u> The terms "claim" and "interest" do not

20  require the absent party to have an actual or vested right, but they do require "more

21  than a financial stake, and more than speculation about future events." *Cachil Dehe*

22  *Band of Wintun Indians v. California*, 547 F.3d 962, 970 (9th Cir. 2008)

23  (emphasizing "interest"), *cert. denied*, 129 S. Ct. 1987 (2009); *Dawavendewa*, 276

24  F.3d at 1155 (emphasizing "claim"). Further, the Ninth Circuit has held that the

25  interest must be "substantial" if it "arises from terms in bargained contracts."

26  *Cachil*, 547 F.3d at 970 (citing *Am. Greyhound Racing*, 305 F.3d 1015, 1023 (9th

27  Cir. 2002)).

28         Because "speculation about future events" cannot give rise to a claim of a

1   legally protected interest under Rule 19, this discussion disregards the mere

2   possibility of Servicing becoming an "Insured" under Master Policy § 1.23(b)-(c).

3        Servicing may claim a legally protected interest in the suit's subject

4   matter—the insured mortgages and the insurance contracts at issue. The policy

5   documents anticipate that "Servicer [may] enter[] into an agreement with the

6   Beneficiary to issue billings, collect and account for payments of principal and

7   interest from the Borrower, and/or otherwise service the Loan for the Beneficiary."

8   Tabs 5-15(A) § 1.40. It appears that Servicing has done so; and that it collects fees

9   for its activities in that capacity. This minor financial stake, arising from a

10  bargained-for contract is not enough. *Cachil*, 547 F.3d at 970.

11       However, the PSAs also contemplate that the Master Servicer may need to

12  "administer each Mortgage Insurance Policy on behalf <u>of itself</u>, the Sellers, the

13  Depositor, and the Trustee for the benefit of the Certificateholders . . . ." Tabs 5-

14  15(A) *Id.* § 3.01 (emphasis added).

15       Together, (1) the policy documents' recognition of a servicing entity and (2)

16  the PSAs' recognition that Servicing may take some mortgage insurance-related

17  acts "on behalf of itself," may amount to a claim to a legally protected interest in

18  the subject matter of the suit.

19       <u>Absent party's interest.</u> The PSAs demonstrate that Servicing's legally

20  protected interest is minimal. First, the above-quoted line obligates "the Master

21  Servicer [to] administer each Mortgage Insurance Policy on behalf of itself" and

22  the rest of the securitization parties. *Id.* § 3.01. Some of those securitization

23  parties—the Park entities and CWABS—have few or no ongoing obligations after

24  securitization; and certainly no ongoing obligations with respect to mortgage

25  insurance. Second, given the Master Servicer's express role as agent acting "on

26  behalf of" the Co-Trustee, *id.*—and at the Co-Trustee's explicit "direct[ion]" in the

27  PSAs that "Master Servicer <u>take all actions appropriate or required of the Co-

28  Trustee under</u>" each policy, *id.* § 8.12—it seems that "on behalf of" the

-27-

securitization parties means on behalf of all parties to the securitization and in service of the obligations imposed by the securitization agreement. Last, this mortgage insurance-related obligation undertaken "on behalf of" the Master Servicer and the other parties occurs only "<u>when it is necessary to make claims and receive payments under each Mortgage Insurance Policy</u>." *Id.* § 3.01. Thus, it is a very limited duty to perform ministerial actions under the insurance policy; ministerial actions which follow naturally from Servicing's role as the party that interacts with underlying mortgages, properties, and homeowners.

The rest of the PSAs reiterate that Servicing serves solely as an agent with respect to the United Guaranty policies. Again, the PSAs state: (1) "For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans . . . including <u>taking all required and appropriate actions under each Mortgage Insurance Policy on behalf of the Co-Trustee</u>," § 3.01 (emphasis added); and (2) "<u>Co-Trustee shall act as the insured . . . and hereby directs the Master Servicer, on behalf of the Co-Trustee</u>, to take all actions appropriate or required of the Co-Trustee under each Mortgage Insurance Policy other than the payment of each Mortgage Insurance Premium and the obtaining the approval of each Mortgage Insurer with respect to the appointment of a successor servicer." § 8.12(a)(2) (emphasis added). *See also id* §§ 3.08, 4.06 (stating Co-Trustee duties with respect to United Guaranty).[18]

If the insurance contracts are impaired or rescinded, the Master Servicer might have to take additional actions under the PSAs. Those actions appear limited to "us[ing] its best efforts to obtain a comparable policy from an insurer that is

---

[18]    Note that "obligations under each" policy are delegated, such as the routine matters of claims handling and premium payments. This does not expressly contemplate any role for Servicing in insurance litigation. This treatment contrasts with the express role the agreements give Servicing in mortgage foreclosure litigation. Tabs 5-15(B) § 3.13 (providing that Servicing may prepare court pleadings and present them to the Trustee for the Trustee's signature).

acceptable to the Rating Agencies." *Id.* § 3.01. Indeed, this shows that the PSAs contemplate the possibility that the mortgage insurance contracts could be "decimated"; and that the PSAs already have measures that seek to protect the PSA parties' respective interests.

And the policies confirm that Servicing's interests in the policies sound entirely in agency. As noted above, nowhere do the policies mention Servicing, the Countrywide entity, by name; the policies refer to a fungible "servicer" or "Servicer." Under the Master Policy, Servicing is expressly an agent: "The Servicer acts as the agent of the Beneficiary for all purposes including receiving any notices and performing any acts under this Policy." Tabs 5-15(A) § 1.4 (emphasis added). A single provision in the Master Policy obligates United Guaranty to work with the Servicer as Servicer: United Guaranty "shall give the Servicer, if any and if known to [United Guaranty], notice of renewal premium dates." *Id.* § 2.5. All other provisions reference the Insured or Beneficiary directly.[19]

---

[19]   Of course, the policies also provide—immediately after the sentence expressly making the Insured an "agent of the Beneficiary"—that "Insured equally is a reference to the Servicer." *Id.* § 1.40. That is, § 1.40 allows any reference to the Insured to apply to the Servicer, where context makes such reference reasonable. The discussion of the § 1.23 contingencies, above, explains some circumstances in which it is reasonable for "Insured" to refer to the Servicer.

This provision also makes unambiguous that, for instance, the Servicer may submit claims and receive proceeds on the Insured's behalf under the Master Policy provisions that govern insurance claims and proceeds' handling. *See, e.g.*, Tabs 5-15(A) § 5.3. These Master Policy provisions nowhere mention the Servicer directly; instead, they might apply to the Servicer due to the "equally a reference" provision. Thus, the PSAs can delegate the Co-Trustee's insurance claims handling responsibilities to the Master Servicer without fear that United Guaranty will object because the "equally a reference" provision obligates United Guaranty to accept Servicer's performance on behalf of the Insured. Tabs 5-15(B) §§ 3.08, 4.06, 8.12. Were the situation otherwise, it would be unnecessary for the Master Policy to include distinguish the Servicer from the Insured at all.

-29-

1  <u>Protecting the absent party's interests.</u> A court should consider whether a

2  joined party "will undoubtedly make all of the absent party's arguments; whether

3  the party is capable of and willing to make such arguments; and whether the absent

4  party would offer any necessary element to the proceedings that the present parties

5  would neglect." *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999)

6  (internal citations and quotations omitted).

7      Servicing's interests appear well protected—even if those interests were

8  conceived as broader than Servicing's claimed interest in the insurance and insured

9  mortgages at issue.

10     First, Servicing's economic interests are aligned with the two other

11  Countrywide parties to the 09-1888 federal case. *See supra* n.1 (stating the parties

12  and their affiliations). Servicing is a limited partnership. It has one general and one

13  limited partner. Both partners are LLCs. Bank of America, N.A. has a 100%

14  membership interest in both LLCs. Lindgren Decl. (May 20, 2009). The two other

15  Countrywide entities named in this case are ultimately traceable to Bank of

16  America Corp. or Bank of America, N.A. *See supra* n.1. At the time of the

17  transactions, the Countrywide entities had common ownership; at the time of this

18  litigation, the Countrywide entities have common ownership, albeit a new owner.

19  Therefore, CHL and Countrywide Financial—both joined parties—have the same

20  ultimate economic interests as Servicing. It is reasonable to presume that they will

21  protect Servicing's interests.

22     Second, as explained above, the PSAs make Servicing BNY Trust's agent

23  with regard to the insurance policies. It appears that BNY Trust and Servicing's

24  interests are aligned to the extent that Servicing may have performed BNY Trust's

25  obligations. Moreover, the PSAs contain provisions requiring Servicing to

26  indemnify Bank of New York and BNY Trust under some circumstances. Tabs 5-

27  15(B) §§ 8.05 (Bank of New York), 8.12(f) (BNY Trust). Thus, it is reasonable to

28  presume that BNY Trust will bring forth any defensive arguments that might not

1    be in CHL's interests.[20]

2           Finally, Countrywide at the hearing on these motions argued several times

3    that BNY Trust's motion to dismiss already indicated that BNY Trust and

4    Servicing have adverse interests. Hearing Tr. at 15:15-21, 41:1-25, 52:13-24. This

5    is a great overstatement. BNY Trust's moving papers recite Servicing's agency

6    duties under the PSAs. BNY Trust Mot. to Dismiss at 4, 15. The papers note that

7    the Master Policy provides that the insured's rights and duties may also be

8    Servicing's rights and duties. *Id.* at 6:10-13 (mentioning the provision noted at

9    *supra* n.19). And, at the motion to dismiss hearing, BNY Trust observed that

10   Servicing "acts under the insurance policy as an agent to some degree for the

11   trustee." Mot. to Dismiss Hearing Tr. at 82:18-19. BNY Trust makes these

12   statements in the course of arguing that it had a limited role in the relevant

13   transactions—that it acts as "nominal insured"; that it does little or nothing else

14   with regard to obtaining mortgage insurance; that it plays no role in originating and

15   servicing mortgages; and that it cannot be liable for the commitment letters'

16   representations regarding the mortgages. Mot. to Dismiss at 4-6, 8, 15-16. No

17   argument thus far is adverse to Servicing's own corporate interests; though some

18   arguments are potentially adverse to Countrywide Financial and to CHL, a

19   commitment letter signatory.[21]

20          <u>Joined parties' interests.</u> The alternative showing that Servicing could make

21   focuses on the parties already joined. There should be a "substantial risk" that

22   ───────────────────

23   [20]    Indemnification may align BNY Trust's interests with Countrywide's; on the
24   other hand, it could complicate the parties' relations, causing the Countrywide
     affiliates and Bank of New York affiliates to find themselves in uncomfortable
25   positions, no matter which parties are joined.

26   [21]    And if BNY Trust and Servicing do have a dispute regarding Servicing's
     role in handling mortgage insurance, that dispute—which would turn on
27   Servicing's duties under the PSAs, to which United Guaranty is not a party and
     which are not substantively sued upon—would be between BNY Trust and
28   Servicing, not between United Guaranty and Servicing.

already-joined parties will face inconsistent obligations "because of" Servicing's interest. *MasterCard*, 471 F.3d at 388 (emphasizing these two phrases from the Rule); *Cachil*, 547 F.3d at 970 (emphasizing "because of").

But the joined parties will not have inconsistent obligations because of Servicing's claimed interest. Indeed, Servicing acts as the joined parties' agent in the relevant respects.[22]

Conclusion. Having determined that Servicing is not a "required" party, the inquiry could end and the case could continue under the Rules. Still, in the interest of process and completeness, the Court will continue to the Rule 19 analysis as if Servicing were required and could not be joined.

### c. Step 2: Whether joinder is possible.

The second step asks whether the required party can be joined. If it cannot be joined—either because the party is not subject to service of process or because joinder would defeat subject matter jurisdiction—the Rule 19 inquiry continues. *Wilbur*, 423 F.3d at 1111-12; Fed. R. Civ. Proc. 19(b). If the required party can be joined, it must be ordered to be made a party. Fed. R. Civ. Proc. 19(a)(2)-(3).

Servicing is not a required party.

### d. Step 3: Proceeding without a required party.

Legal standard. Finally, if a required party cannot be joined, then "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. Proc. 19(b).

---

[22]     The Rule focuses attention on the joined parties' risk of inconsistent obligations, but the Rule serves to guide—not necessarily to limit—a pragmatic inquiry.

Countrywide has argued that Servicing, the absent party, could have inconsistent obligations. Hearing Tr. at 19:17-20:2. But there would be nothing inconsistent between the insurance contract's rescission and the PSAs; instead, as earlier noted, the PSAs contemplate such a situation and provide for its resolution. Tabs 5-15(B) § 3.01 (stating procedures if the mortgage insurance policy "is terminated for any reason other than exhaustion of its coverage").

Rule 19 lists factors to consider:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
> > (A) protective provisions in the judgment;
> >
> > (B) shaping the relief; or
> >
> > (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.*

Discussion. Again, this issue need not be reached because Servicing is not a required party. However, the Court completes the analysis for the sake of process.

The first factor, the extent of possible prejudice to joined and absent parties, "largely duplicates" the required party inquiry, though a more granular analysis is suggested by inquiring into the "extent" of impairment and replacing the "substantial risk" of inconsistent obligations standard with a "might prejudice" standard. *See Wilbur*, 423 F.3d at 1114; *Behrens*, 236 F.R.D. at 515. The same considerations were discussed in detail above; prejudice is not likely in this situation.

As for the second factor, lessening any possible prejudice, the only possible prejudice that Servicing has identified could arise from rescission. Hearing Tr. at 19:17-20:2. United Guaranty seeks rescission under a California insurance statute that "entitle[s]" an injured party to rescind a contract under some circumstances. Cal. Ins. Code § 359. If rescission remains a viable remedy at the time of judgment, and at that time it appears rescission could prejudice Servicing, that prejudice could be avoided. The Federal Rules contemplate ongoing consideration

of Rule 19 issues and the Court may raise the issue *sua sponte* at any time. *UOP v. United States*, 99 F.3d 344 (9th Cir. 1996); Fed. R. Civ. Proc. 12(h)(2). United Guaranty has already represented that it would be willing to drop the rescission claim if Rule 19 would otherwise require dismissal. Opp. at 14.

On the third factor, adequacy of judgment in the party's absence, a judgment without rescission would be adequate. United Guaranty has already suggested as much in its own papers. *Id.*

Fourth and finally, United Guaranty would have an adequate remedy if the action were dismissed for nonjoinder. The remedy could be found in a state court.[23] But this is the only factor that favors Servicing.

### e. Conclusion.

The insurance policies contemplate a role for Servicing. But Servicing is not a party to the insurance contracts; nor is it insured under the contracts. Servicing's role with respect to insurance is ministerial and sounds in agency for BNY Trust (and ultimately Bank of New York as trustee and the debt instrument holders), a joined party. In contrast, Servicing's role with respect to the PSAs is much broader; but United Guaranty is not a party to the PSAs and United Guaranty does not sue on the PSAs—nor could it.

Servicing is therefore not a required party under Rule 19. Even if it were, this litigation could proceed in equity and good conscience without Servicing.

## B. 09-2732 Removal Case: Diversity and Federal Rule 17.

United Guaranty removed the 09-2732 case on the basis that Servicing's

---

[23]    Insurance law is state law; and the state courts are well accustomed to complex insurance cases. Nevertheless, United Guaranty has a right to a federal forum in which to litigate its claims, which do not require Servicing as a party. Whatever the policy reasons—avoiding perceived local prejudice against out-of-state defendants and keeping local controversies in local courts are often cited—and regardless whether the reasons are good policy, United Guaranty's right to a federal forum remains.

1    citizenship should be disregarded under the diversity statute. 28 U.S.C. §§ 1332
2    (diversity), 1441(a) (removal).

3          The diversity statute requires "complete diversity": that each plaintiff be
4    diverse from each defendant. *In re Digimarc Corp. Deriv. Litig.*, 549 F.3d 1223,
5    1234 (9th Cir. 2008).

6          Servicing and two other Countrywide entities are plaintiffs in this case. They
7    seek remand, contending that Servicing must be considered when testing diversity.
8    28 U.S.C. § 1447(c) (remand). Both Servicing and the defendants are North
9    Carolina Citizens.

10         "A civil case commenced in state court may, as a general matter, be removed
11    by the defendant to federal district court, if the case could have been brought there
12    originally." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 134 (2005).
13    Countrywide's complaint, alleging solely state claims, could have been brought in
14    federal court, if at all, only under the diversity statute.

15        **1. Standards and burdens for evaluating diversity on removal.**

16         Diversity jurisdiction is subject matter jurisdiction, which is fundamental
17    and cannot be waived or ignored. *Wisc. Dept. of Corrections v. Schacht*, 524 U.S.
18    381, 389 (1998); *Billingsley v. Comm'r*, 868 F.2d 1081, 1085 (9th Cir. 1989).

19         The wrong result could lead to lengthy litigation for naught. *See Indiana Gas*
20    *Co., Inc. v. Home Ins. Co.*, 141 F.3d 314 (7th Cir. 1998) (dismissing a case *sua*
21    *sponte* for lack of diversity and observing, "Searching for a comprehensive
22    solution to insurance-coverage questions creates a potential problem when
23    jurisdiction depends on [diversity]."), *cert. denied*, 525 U.S. 931 (1998).

24         The party asserting diversity jurisdiction bears the burden on jurisdictional
25    facts. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994);
26    *Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir. 2006). This
27    party must meet its burden to prove these jurisdictional facts "by a preponderance
28    of evidence." *Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir. 1992). *See also*

*Strotek Corp. v. Air Trans. Assoc. of Am.*, 300 F.3d 1129, 1132 (9th Cir. 2002); *Attorneys Trust v. Videotape Comp. Prods., Inc.*, 93 F.3d 593, 599 (9th Cir. 1996). This is true even at the pleading stage on a motion to remand. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *Burkhart v. United States*, 2008 WL 4067429, at *2, 2008 U.S. Dist. LEXIS 65893, at *5 (N.D. Cal. Aug. 26, 2008); 5B WRIGHT & MILLER § 1350 (at the pleading stage); 14C WRIGHT & MILLER § 3739 p.472 (on motion to remand).

Diversity jurisdiction in general, and removal in particular, are disfavored. When considering diversity, "[d]ue regard for the rightful independence of state governments . . . requires [federal courts to] scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934). As for removal, "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus*, 980 F.2d at 566.[24]

Even so, removal is a right conferred by Congress. And "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress"—including diversity jurisdiction on removal. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

**2. The parties' arguments.**

Countrywide's motion for remand mentions that the 09-2732 removal case involves other kinds of policies (and related securitizations) in addition to the policies also at issue in the 09-1888 federal case. Mot. at 3. However, its arguments concern solely the Master Policy (and related securitizations) at issue in the 09-1888 federal case.

United Guaranty's opposition (1) notes that some of these other policies name insureds besides BNY Trust; (2) briefly discusses each type of policy; (3)

---

[24]     By contrast, Rule 19 law, discussed above, favors allowing cases to proceed. 7 WRIGHT & MILLER 1609 n.9.

observes that the policies were related to securitizations with slightly different structures than those implicated in the 09-1888 federal case; (4) and attaches exhibits to demonstrate these facts. Opp. at 2-7, 16; Gaines Decl. However, United Guaranty observes that Countrywide's motion does not elaborate the differences among the securitization agreements, so neither will United Guaranty. Opp. at 8 n.9. Nevertheless, United Guaranty brought the relevant (and undisputed) jurisdictional facts to the Court's attention and discussed each of the policies at issue. United Guaranty has met its burden. Countrywide's reply did not mention any distinctions from the 09-1888 federal case regarding the policies or securitization agreements. *But see* Reply at 2 n.1 (asserting that "Servicing LP has not relinquished any arguments related to its substantial interests in the [non-Master Policy] mortgage insurance policies" and that Countrywide neglected to discuss the other policies, or their related securitizations, because of an allegation in United Guaranty's 09-1888 federal complaint).

The parties' reluctance to carefully address the volumes of documents in issue, and federal courts' duty to police the bounds of their limited jurisdiction, *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 593 (2004), impelled the Court twice to require more information regarding the policies and agreements. *See supra* n.9 (discussing the procedures used in this case). As a result of its own review of the relevant documents, the Court identified several provisions, not mentioned by either side, that may be important to the diversity analysis and that differ from the provisions discussed above in the 09-1888 federal case.

The jurisdictional facts are clear and undisputed. The legal relevance of those facts required reviewing numerous insurance policies and securitization agreements. The jurisdictional facts and the relevant entities' roles under the agreements may be stated as simple propositions that fit well into the legal framework.

### 3. The transactions and parties involved.

The eleven policies also in the 09-1888 federal case. The 09-2732 removal case involves all eleven policies from the 09-1888 case. Many observations from the Rule 19 discussion, above, about those policies and related PSAs are equally relevant here.

Four more Master Policy-based policies. In addition to those eleven policies, the 09-2732 removal case includes four additional policies that use the same standardized Master Policy and amendatory endorsement. Joint Stip. at 5. The discussion above applies to these four policies, with a single exception: one policy's declaration page names Bank of New York, not BNY Trust, under "INSURED." Tab 1(A). The insured's address stated on this declaration page also differs from the address listed for BNY Trust. *Compare id. with* Tabs 2-15(A). However, the commitment letter for that policy names BNY Trust and was signed by BNY Trust. Tab 1(C). The PSAs connected to this policy make BNY Trust name as "Co-Trustee" (with Bank of New York as "Trustee") and have the same relevant provisions conferring the same mortgage insurance-related rights and responsibilities as the PSAs in the 09-1888 federal case.

The "Pool Policy." In addition, the 09-2732 removal case involves what the parties call the "Pool Policy." Joint Stip. Exh. A at 5. This policy's standardized terms and conditions form and amendatory endorsement do not materially differ from those already discussed, though the particular language varies slightly. *Id.* For example, the "Insured" is still "(a) the Person designated on the face of th[e] Policy," but this can change if "(b) th[e] policy has been assigned" and United Guaranty approves the assignment. Tab 16(A) § 1.31. The "Servicer" is still the agent of the "Insured." *Id.* § 1.53. The Pool Policy is still expressly a first-party contract between the "Insured" and United Guaranty. *Id.* §§ 1.27, 6.8. The conditions of assigning coverage are limited and require United Guaranty's approval. *Id.* § 2.16. And the amendatory endorsement has no relevant provisions.

Tab 16(A).

The "Person on the face"—the declaration page—of the policy is "BNY Western Trust Company . . . solely as co-trustee" in a particular securitization. Tab 16(A). The declaration page does not mention a servicer. *Id.* The parties do not dispute that BNY Western Trust is a BNY Trust affiliate and does not pose a potential diversity issue.[25]

The commitment letter for this policy was signed by BNY Western Trust ("as co-trustee") and Countrywide Home Loans, Inc., in addition to being "[a]ccepted by" United Guaranty. Tab 16(C). It lists BNY Western Trust as "Insured" ("as co-trustee"). *Id.* ¶ 1.

The Pool Policy-related PSA is among CWABS, CHL, Servicing, Bank of New York ("Trustee"), and Bank of New York Western Trust ("Co-Trustee"). It contains the same relevant provisions, located in the same sections, as the Master Policy-related PSAs. Tab 16(B) §§ 3.01 (requiring the Master Servicer to undertake the Co-Trustee's "obligations under the Mortgage Insurance Policy, other than payment of the Mortgage Insurance Premium and obtaining the approval of the Mortgage Insurer with respect to the appointment of a successor servicer"); 8.12 (the same, this time phrased as a "direct[ion]" from Co-Trustee to the Master Servicer). Here also, the Trustee holds legal title to the mortgages. *Id.* §§ 2.01 (conveying mortgages to the Trustee), 10.04 (reiterating that mortgages were fully transferred to the trustee). And Servicing has an express role in mortgage foreclosure litigation, but no corresponding role in mortgage insurance litigation. *Id.* § 3.13 (providing that Servicing may prepare court pleadings and present them to the Trustee for the Trustee's signature).

Sixteen "Bulk Policies." The 09-2732 case also includes policies for a

---

[25]    Joint Submission of Countrywide and BNY Trust Exh. A, at 1 (June 18, 2009) [hereinafter "Joint Sub."]; United Guaranty's Statement re Citizenship, at 1 (June 18, 2009) [hereinafter "UG Statement"].

1   slightly different type of securitization transaction. All securitizations thus far

2   discussed have involved first-lien mortgages. The Bulk Policies cover only second-

3   lien mortgages, including some revolving home equity loans.

4          The Bulk Policies use a standardized terms and conditions form that does

5   not materially differ, in its relevant provisions, from the Pool Policy. The

6   standardized terms and conditions form has the same conditional definition of

7   "Insured" as the Pool Policy's form. Tabs 17-28(A) § 1.18. It also defines

8   "Servicer" as "the agent for the Insured." *Id.* § 1.41 (emphasis added). It limits

9   coverage assignments and requires United Guaranty's approval of coverage

10  assignments. *Id.* § 2.16. And it is expressly a first party contract between the

11  Insured and United Guaranty. *Id.* § 6.7.

12         The declaration page for most Bulk Policies mentions Servicing's corporate

13  name—though only "as Master Servicer" in connection with a particular

14  securitization. Tabs 17-24, 27(A). This is a distinction from all other declaration

15  pages involved in either case; the other declaration pages are entirely silent about a

16  servicer. *Compare* Tabs 1-16(A), 25-26(A), 28-38(A) *with* Tabs 17-24, 27(A). The

17  amendatory endorsements contain no relevant provisions. Tabs 17-28(A).

18         For some Bulk Policy-related second-lien mortgage securitizations, CWABS

19  conveyed the mortgages to the trustee under PSAs, as discussed in the 09-1888

20  federal case. These PSAs have the same structure as the Pool Policy-related PSA.

21  Tabs 17-19(B). The insurance-related provisions of these PSAs are substantially

22  the same in the relevant respects as well: the Trustee takes title to the mortgages

23  and the Co-Trustee assumes responsibility for mortgage insurance, with Servicing

24  acting "on behalf of" the Co-Trustee in this respect. *Id.* §§ 2.01 (conveying

25  mortgages to the Trustee), 3.01 (stating duties of Servicing), 8.12 (Servicing

26  handles insurance claims "on behalf of" Co-Trustee and debt instrument holders),

27  10.04 (reiterating that mortgages were conveyed to the trustee).

28         However, there are two relevant distinctions between these PSAs and the

-40-

PSAs discussed above. First, under these PSAs, the Master Servicer instead of the Co-Trustee pays the aggregate mortgage premiums. *Id.* §§ 3.01, 8.12. Second, rather than the Co-Trustee's "directing" the Master Servicer to act on the Co-Trustee's behalf, the PSA binds the Co-Trustee to "receive and hold" the mortgage insurance policy and receive claim proceeds. *Id.* § 8.12. The PSA then obligates Servicing to submit claims "on behalf of the Co-Trustee." *Id.* This is a purely formal distinction from the PSAs already discussed: rather than reciting that the Co-Trustee directs the Master Servicer to act as its agent, this PSA requires the Master Servicer to take action on behalf the Co-Trustee and debt instrument holders. *Compare id. with* Tabs 1-16(B) § 8.12.

A Wells Fargo-related entity is named ("as co-trustee" in connection with a particular securitization) under "INSURED" on the declaration page and commitment letters for the policies related to these PSAs. Tabs 17-19(A), (C). Wells Fargo-related entities are Co-Trustees on the securitizations related to those policies. Tabs 17-19(B). The parties agree that these Wells Fargo affiliates pose no diversity issue.[26] "Bank of New York" also served as Trustee on these securitizations. *Id.*

Some Bulk Policies covered revolving home equity loans that were securitized. In the revolving home equity loan securitizations, "CWHEQ"— presumably "Countrywide Home EQuity"— rather than "CWABS"—which presumably stands for "Countrywide Asset-Backed Securities"—held the mortgages immediately before conveyance. Tabs 20-28(B).[27]

---

[26]     The parties may disagree about whether the Wells Fargo affiliates have one or two citizenships, but they agree that the Wells Fargo affiliates are not North Carolina citizens. Joint Sub. Exh A., at 1, 1 n.1; UG Statement at 1.

[27]     The declaration page and commitment letter for one of these policies refers to a securitization agreement date that is inconsistent with the dates on the relevant securitization agreements. Tab 21. The Court contacted the parties, who "conferred" and "agree that the appropriate documents were submitted." Email

1    The last of these CWHEQ transactions was pursuant to a PSA that uses the

2    same structure as the securitizations already discussed. Tab 28(B). For the Bulk

3    Policy related to this securitization, "BNY Delaware" is the "insured" on both the

4    declaration page and commitment letter. Tab 28(A), (C). BNY Delaware is

5    likewise the "Co-Trustee" for the related securitization. Tab 28(B). The parties do

6    not dispute that BNY Delaware poses no diversity issue.[28] And, again, Bank of

7    New York is the "Trustee." *Id.*

8    However, earlier CWHEQ transactions were pursuant to "sale and servicing

9    agreements" ("SSAs"), not PSAs. The SSAs create a different securitization

10   structure than the PSAs. Their differences warrant some extended discussion. The

11   SSAs, like the PSAs, choose New York law. Tabs 20-27(B) § 8.02.

12   Servicing played no part in the SSAs. Instead, CHL, a party that poses no

13   diversity concern, acts as Master Servicer. Tabs 20-27(B) (stating that CHL is the

14   Master Servicer and nowhere mentioning Servicing); 09-2732 Compl. ¶ 3 (alleging

15   that CHL had a "role as . . . master servicer" under some agreements). However,

16   Servicing is named ("as Master Servicer") on some originally filed declaration

17   pages and some "updated" declaration pages to which two nonparty Bank of New

18   York affiliates object. Schirtzer Decl. Exhs. A-G (May 26, 2009).

19   Even if Servicing rather than CHL were involved, the legal result is the

20   same; which party was the "Master Servicer" under the SSAs at the time of filing

21   and removal is irrelevant, given the SSAs' legal structure.

22

23

---

24   from counsel for Countrywide to Courtroom Deputy with counsel for United
     Guaranty and BNY Trust courtesy copied (June 10, 2009). Counsel for
25   Countrywide represented that the dates "may be drafting errors." *Id.*

26   One of the "updated" declaration pages that BNY Trust objects to involves
     this policy, but contains the same discrepancy. Shirtzer Decl. Exh. A; Objection of
27   Nonparties BNY Mellon Trust and BNY Mellon Trust of Del. (June 18, 2009) *See
     also supra* n.9 (discussing the objection).
28   [28]   Joint Sub. Exh A. at 1; UG Statement at 2.

The parties to the SSAs are: (1) CWHEQ; (2) a statutory trust (a different one for each securitization); (3) Countrywide Home Loans, Inc.; and (4) an Indenture Trustee. *Id.*

The SSAs, like the PSAs, divide responsibility for the insurance policies between a "Master Servicer" and a Co-Trustee, though with different language and in a slightly different securitization structure. *See* Tabs 20-27(B). The SSAs refer to the Co-Trustee; all but two disclose the Co-Trustee's identity. Tabs 22-27(B) § 1.01. However, the Co-Trustee was not a party to the SSAs, but to an "Indenture" referenced by the SSAs and entered into concurrently with the SSAs. *Id.* The identities of the remaining two Co-Trustees are disclosed in these Indentures.[29] The Indenture Trustee, statutory trust, and Co-Trustee are parties to these SSA-related Indentures. The Indentures incorporate the SSAs by reference.

Under the SSAs, Countrywide conveyed the loans to a statutory trust, which took all rights and legal title to the mortgages. Tabs 20-27(B). Then, in the Indentures, the statutory trust assigned all its interest in the underlying mortgages to the Indenture Trustee. The Indentures, like the Bulk Policy-related PSAs, provide that the Co-Trustee holds the policy and receives mortgage insurance proceeds. Indentures § 6.15.

In the Bulk Policy-related PSAs, the Master Servicer pays the mortgage premiums. Tabs 17-19(B) §§ 3.01, 8.12. But in these Bulk Policy-related SSAs, the Co-Trustee pay the premiums, though it makes these payments "as directed by" the

---

[29] The Indentures, together with the other securitization-related agreements, were publicly filed with the SEC. The Indentures are therefore matters of public record which may be judicially noticed. *Wilbur v. Washington*, 423 F.3d 1101, 1112 (9th Cir. 2005). Further, the parties offered to supply them. Joint Stip. ¶ 3.

Each statutory trust registered with the SEC; the securitization documents were attached to a Form 8-K filing by each registrant statutory trust after securitization. "Indenture" citations refer to these SEC filings.

-43-

Master Servicer. Indentures § 6.5. This is the only relevant difference between the SSAs and Bulk Policy-related PSAs.

However, though different in form, this is the same substance as the Bulk Policy-related PSAs: the SSAs obligate the Co-Trustee to be the named insured and require the Master Servicer to perform the Co-Trustee's obligations under the insurance policy. The Master Servicer's role under the PSAs is still ministerial with regard to the insurance policy; it still acts as an agent.

A Chase affiliate was the original "Indenture Trustee" on these transactions." Tabs 20-27(B). Another Chase affiliate was the original Co-Trustee. Tabs 22-27(B); Indentures. These parties are the "insured . . . as co-trustee" under the relevant securitization agreements. Tabs 22-27(B); Indentures.

Bank of New York acquired the Chase affiliates named as Indenture Trustee and Co-Trustee on these transactions. As a result of the acquisition, these Chase affiliates became Bank of New York affiliates. The parties do not dispute that the Bank of New York affiliates create no diversity issue.[30]

In addition, some mortgages insured under the Bulk Policy appear to have been held in Countrywide's portfolio. There is no securitization associated with these loans. "Treasury Bank" or "Countrywide Bank" is named under "INSURED" on both the declaration pages and commitment letters. Tabs 29-32(A), (C). Treasury Bank merged into Countrywide Bank before the complaint was filed. The parties do not dispute this, nor do they dispute that Countrywide Bank poses no potential diversity issue.[31]

---

[30]      Joint Sub. Exh A., at 1; UG Statement at 1-2. *See also* Objection of Nonparties BNY Mellon Trust and BNY Mellon Trust of Del., at 1-2 (June 18, 2009).

[31]      Joint Sub. Exh A., at 1-2; UG Statement at 2-3. *See also* Off. Thrift Supervision Order No. 2007-08 (Mar. 5, 2007) (approving new ownership structure and federal charter changes); Off. Comp. Curr. Cond'l Approv. No. 900 (April 23, 2009) (approving merger into Bank of America, N.A.).

1          Six "Accumulation Policies." Finally, there are six "Accumulation Policies."

2     The Accumulation Policies are between Treasury Bank and United Guaranty.

3     Again, Treasury Bank merged into Countrywide Bank before the complaint was

4     filed.

5          The accumulation policies cover second-lien mortgages. No other parties

6     appear to have been involved and these mortgages do not appear to have been

7     securitized. Tabs 33-38(A), (C).

8          Summary of the transactions and policies. The conclusions from the 09-1888

9     federal case about the parties' roles apply equally to all policies in the 09-2732

10    removal case: Servicing again acts as an agent with regard to the mortgage

11    insurance policies. Servicing did not sign any insurance documents. It is not a

12    named insured. Nine declaration pages acknowledge it by its corporate name, but

13    even then only in its capacity "as Master Servicer" (though the related

14    securitization agreements indicate that CHL, not Servicing, was the Master

15    Servicer). Tabs 17-24(A), 27(A). Finally, under some agreements, CHL, not

16    Servicing, is the Master Servicer.

17         Further, in the 09-2732 case, Servicing is an agent for several different

18    principals. At the times of complaint and removal, Servicing might have acted as

19    agent for various principals under the securitization agreements. It is undisputed

20    that none of these principals have North Carolina citizenship. The diversity issue

21    therefore is whether Servicing, in its role as an agent with regard to mortgage

22    insurance, is a real and substantial party to the mortgage insurance-related

23    controversy.

24    **4. Legal standard.**

25         Diversity and removal. When removal is based on diversity, complete

26    diversity must exist at two points: (1) when the complaint is originally filed and (2)

27    at removal. *Strotek Corp. v. Air Trans. Assoc. of Am.*, 300 F.3d 1129, 1131-32 (9th

28    Cir. 2002). "Once jurisdiction attaches, a party cannot thereafter, by its own

change of citizenship, destroy diversity." *Id.* at 1132.[32]

Parties counted for diversity. When a representative party sues on behalf of another, the Supreme Court holds that the diversity statute accounts only for "real and substantial parties to the controversy." *Navarro Savings Assoc. v. Lee*, 446 U.S. 458, 461 (1980). "Thus, a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Id.* at 461.

The Supreme Court in *Navarro* faced a dispute involving an asset held in a business trust's name. The *Navarro* Court looked to the dispute's subject matter—there, a trust asset—to determine the real and substantial parties to the controversy. The *Navarro* Court concluded that the relevant parties on one side of this dispute were the eight "<u>active</u> trustees whose <u>control</u> over the assets <u>held in their own names</u> is <u>real and substantial</u>": the trustees, not the trust's shareholders. *Id*. at 465 (emphasis added). The Court distinguished such trustees from "'naked trustees' who act as 'mere conduits' for a remedy flowing to others." *Id.* (internal citation omitted).

Transactions involving multiple corporate parties may put pressure on the traditional rules. The corporate form must be respected, absent limited exceptions. But corporations—and corporate relationships—do not distract courts from looking to a controversy's substance when assessing diversity. The Ninth Circuit has no case on point. But, in a related context—where legal claims are assigned, thereby destroying diversity—the Circuit approves "modern authority [that] focuses on the reality of the transaction" to determine who is the "real party in

---

[32]     It is undisputed that, for those mortgages that were not securitized, "Countrywide Bank" held the mortgages at the time of filing and removal. At the time of both filing and removal, Countrywide Bank was a citizen of Colorado. Seven days <u>after</u> removal, Countrywide Bank merged into Bank of America, N.A., a North Carolina citizen. *Supra* n.31. This post-removal event does not destroy jurisdiction.

interest." *Attorneys Trust v. Videotape Comp. Prods., Inc.*, 93 F.3d 593, 597, 599 (9th Cir. 1996).[33]

    *Attorneys Trust* evaluated a partial assignment of interest that may have been made to avoid diversity jurisdiction. *Attorneys Trust* looked to out-of-circuit cases that addressed diversity-destroying partial assignments. It approved cases that looked to the "reality of the transaction" to determine whether an assignment made the nondiverse party the relevant party under the diversity statute. *Attorneys Trust*, 93 F.3d at 597-98 (discussing these cases and observing that they "were also cases where the assignee was not truly a real party in interest"). This approach was adopted in order to avoid having a "party [be] deprived of a forum to which he would otherwise be entitled" and having "the jurisdiction which Congress conferred upon the federal courts [be] manipulated." *Id.*[34]

---

[33]    There is another doctrine, fraudulent joinder, which traditionally addresses fraudulently joined defendants but may apply to plaintiffs as well. Some courts entertain such a doctrine as to plaintiffs. The Ninth Circuit has not endorsed it as to plaintiffs. The doctrine, if validly applied to plaintiffs in this jurisdiction, would require that United Guaranty meet the demanding standard that there be "no possibility [the relevant plaintiff] could succeed on [its] claims." *Lighting Sci. Group Corp. v. LED Holdings, LLC*, --- F. Supp. 2d ----, 87 U.S.P.Q.2d 1359, 1364-65 (E.D. Cal. 2008).

[34]    *Attorneys Trust* did note that these cases were federally filed, not removal, cases. It acknowledged a line of 19th-century Supreme Court cases which held that a "colorable" claim assignment prevented removal. 93 F.3d at 598-99. *See Go Computer, Inc. v. Microsoft Corp.*, 2005 WL 3113068, at *2-3, 2005 U.S. Dist. LEXIS 31404, at *8 (N.D. Cal. Nov. 21, 2005) (remanding "because the Court cannot find that the assignment in question was a partial assignment, because [of these Supreme Court precedents and *Attorneys Trust*'s discussion of them,] and because the Court must resolve any doubts against removal, the Court concludes that Microsoft has not met its burden to establish that removal jurisdiction exists on the basis of diversity.")

But the question in the 09-2732 removal case is which potential representative parties qualify under *Navarro*, not whether a colorable assignment may be questioned on removal. There is no assignment here at issue. *See Minogue*

1    The *Attorneys Trust* issue is not the same as the *Navarro* issue. *Attorneys*

2  *Trust* asks whether an assignment of interest destroys diversity; *Navarro* asks

3  whether a particular representative party counts for diversity. However, the Court

4  is persuaded that the Ninth Circuit would take an *Attorneys Trust*-like approach to

5  the *Navarro* issue. Indeed, the Supreme Court has recognized that *Navarro*

6  demonstrates that "business reality is taken into account for purposes of

7  determining whether a trustee is the real party to the controversy." *Carden v.*

8  *Arkoma Assocs.*, 494 U.S. 185, 192 (1990).

9    In similar fashion, when discerning the real and substantial parties to the

10  controversy under *Navarro*, the Second Circuit looks to a corporate entity's true

11  interests in the controversy. That Circuit has had several opportunities to evaluate

12  the real and substantial parties to controversies involving corporate-relationship

13  diversity. It recently reviewed and summarized its jurisprudence at some length in

14  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003).

15    The Second Circuit has disregarded for diversity a corporation that "did not

16  suffer any corporate damage or pecuniary loss itself [and that did not] lay claim to

17  any portion of the pecuniary recovery." *Id.* at 194 (quoting and discussing *Airlines*

18  *Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857 (2d Cir. 1995)). Instead, using

19  the "mere conduit" language from *Navarro*, the Second Circuit concluded that this

20  corporation was "a mere conduit for a remedy owing to others, advancing no

21  specific interests of its own." *Id.*

22    The Second Circuit summarized the law thus: "a crucial distinction must be

23  made between a plaintiff who sues solely in his capacity as an agent, on the one

24  hand, but also as an individual who has his own stake in the litigation." *Oscar*

25

26  *v. Modell*, 2006 WL 1704932, at *16 n.20, 2006 U.S. Dist. LEXIS 40026, at *54

27  n.20 (N.D. Ohio June 16, 2006) (surveying the case law at length and noting that

28  the inquiry into whether a particular representative counts for diversity under the
   *Navarro* inquiry is different in kind from assignments).

1    *Gruss*, 337 F.3d at 194. And, "where a plaintiff brings a suit solely in his

2    representative capacity, the citizenship of the represented party, and not that of the

3    representative, controls." *Id.* (citing 4 James William Moore, et al., MOORE'S

4    FEDERAL PRACTICE § 17.13[2][b] (3d ed. 1999)).

5          Sometimes a party plays a role greater than a "mere conduit." *Id.* This does

6    not deter the inquiry into the transaction's reality. For example, several parties may

7    have real and substantial interests in the controversy. If only one of those parties

8    has the right to manage and control the dispute, that party—"the master of the

9    litigation"—counts for diversity. *Id.* at 194-95 (discussing three other cases from

10   the Second Circuit). This may arise from the "active trustee" phrase in *Navarro*.

11   446 U.S. at 465.

12         <u>The proper analysis.</u> From these cases, the Court derives three useful

13   inquiries for determining whether an entity involved in a complex transaction

14   counts for diversity. *Compare Attorneys Trust* 93 F.3d at 596-97 (distilling from

15   out-of-circuit cases a series of questions to guide the determination whether an

16   assignment destroyed diversity).

17         First, what is the party's interest in the dispute's subject matter? The more

18   substantial the interest in the dispute, the more likely the party will count for

19   diversity. *See Navarro*, 446 U.S. at 461 (stating the long-established rule that

20   diversity counts "real and substantial parties to the controversy"); *Oscar Gruss*,

21   337 F.3d 194-95.

22         Second, is that interest in the party's own name? The party is more likely a

23   mere agent if the interest is held in another's name. *See Navarro*, 446 U.S. at 464-

24   65 (twice noting that the real and substantial interest was held in the parties'

25   names).

26         And third, to what extent does the party manage or control the dispute or its

27   subject matter? The more management or control a party has, the more likely it is a

28   real and substantial party to the controversy. *See Oscar Gruss*, 337 F.3d 194-95

1  (discussing the "master of the litigation" cases); *Navarro*, 446 U.S. at 465

2  (emphasizing that the relevant parties were "active trustees" with "control" that

3  was "real and substantial").

4      <u>Relationship to the Federal Rules.</u> The "real and substantial party" standard

5  under the diversity statute may share "rough contours" with one or more standards

6  under the Federal Rules, but it is a separate and independent standard. *Navarro* 446

7  U.S. at 463 n.9. For instance, Rule 17(a) provides, "An action must be prosecuted

8  in the name of the real party in interest." And it specifically states that "a trustee of

9  an express trust" is a real party in interest. Fed. R. Civ. Proc. 17(a)(1). Though

10 there exists "rough symmetry" between Rule 17(a) and the jurisdictional rule, "the

11 two rules serve different purposes and need not produce identical outcomes in all

12 cases." *Navarro*, 446 U.S. at 463 n.9.[35] *See also* Fed. R. Civ. Proc. 82 ("These

13 rules do not extend or limit the jurisdiction of the district courts . . . .").

14     Further, the diversity question often arises when a court asks whether

15 Federal Rule 17's "real party in interest" requirement mandates the action be

16 prosecuted in an absent party's name, thus potentially defeating diversity

17 jurisdiction. It is therefore natural that courts sometimes elide the distinction. *See*

18 *Allstate Ins. Co. v. Hughes*, 358 F.3d 1089 (9th Cir. 2004), *as amended* (Feb. 17,

19 2004), (discussing Rule 17 in a diversity inquiry without citing *Navarro* and

20 relying on *Glacier General Assurance Co. v. G. Gordon Symons Co., Ltd.*, 631

21 F.2d 131 (9th Cir. 1980), a case argued and submitted before *Navarro*—though

22 filed shortly after *Navarro*—that does not cite *Navarro*).

23     **5. Diversity analysis.**

24     As with Rule 19 in the 09-1888 federal case, the issue again turns on

25 Servicing's role. The question is more intricate, however, because Countrywide

26 sues on thirty-eight policies written over the course of approximately five years.

27  

28 [35]    For example, a union can sue in its own name but its citizenship is based on
that of its members. *Id.*

-50-

As stated above, three relevant inquiries for determining whether Servicing is a relevant party to this mortgage insurance controversy are: First, what is the party's interest in the dispute's subject matter? Second, is that interest in the party's own name? And third, to what extent does the party manage or control the dispute or its subject matter?

As explained above, Servicing signed no policy document. It is not an insured under any policy. It signed no commitment letter. It made no representations in a commitment letter. It has no legal title to the insured assets. Rather, a Trustee (under the PSAs) or Indenture Trustee (under the SSAs) holds the insured assets. A Co-Trustee (under the PSAs and SSAs) holds the insurance policy in its own corporate name. The PSAs and SSAs expressly delegate some, but not all, mortgage insurance-related duties to a Master Servicer.

The dispute's subject matter. This dispute involves not trust assets directly but agreements related to the trust assets—not the mortgages themselves but policies insuring them. It is most immediately between an insurance company and the parties involved in obtaining insurance. The dispute's outcome will ultimately affect the insured assets' owners.

CHL and a Co-Trustee signed the commitment letters to obtain the insurance. Representations about the insured mortgages were in these letters. Servicing did not sign any letter; no representations involved in obtaining insurance could be charged to Servicing.

United Guaranty was unquestionably aware that it was insuring mortgages that would be subject to securitization. It is likewise beyond doubt that United Guaranty was aware of Servicing's involvement in most securitization transactions. Moreover, the policies require that United Guaranty approve a change in servicing entities. Thus, United Guaranty's own documents acknowledge a servicer, the identity of which could materially affect the insured assets.

However, though United Guaranty acknowledged a servicer's role, that role

-51-

is, with respect to mortgage insurance, exclusively as an agent for other parties. Indeed, the provisions requiring United Guaranty's approval for a change in servicer are the only policy provisions that refer directly to the servicer, as "the Servicer"; all others refer to "the Beneficiary" or "the Insured," for whom the Servicer may be an agent. Therefore, United Guaranty's interest in approving new servicers appears limited to ensuring that the owner of the insured mortgage has a competent agent handling the insured mortgage.

Servicing's role under the securitization agreements and even its fee structure reinforce that Servicing is the "naked trustee" and "mere conduit" the *Navarro* Court stated would lack the relevant interest. 446 U.S. at 464. The policies define "Servicer" using the phrase "agent of the Insured"; the PSAs and SSAs repeatedly state that the Master Servicer acts "on behalf of" other securitization parties. Servicing earns fees for its collection efforts, whether the money comes from mortgage payments or mortgage insurance. But such fees do not give Servicing a "claim to any portion of the pecuniary recovery"; they are recompense for collection. *Oscar Gruss*, 337 F.3d at 194. Indeed, Servicing passes the money it collects on to a trust, for which a trustee bears responsibility. *Compare Navarro*, 446 U.S. at 465 (finding that the "active trustees . . . whose control over the assets held in their own names is real and substantial" were the parties that count for diversity). In sum, Servicing "advanc[es] no specific interests of its own" and will suffer no "corporate damage or pecuniary loss itself" as a result of this mortgage insurance dispute. *Oscar Gruss*, 337 F.3d at 194.

Servicing's relationship to the policies, and the insured assets, sounds only in agency. Agents are quite unlikely to be real and substantial parties to a controversy. *Navarro*, 446 U.S. at 465.

The name in which the interest is held. Nothing in the policies even mentions Servicing's own corporate name, with the sole exception that eight (of thirty-eight) declaration pages acknowledge a role "as Master Servicer" (though,

1  for those with related SSAs, the related securitization agreements identify CHL,

2  not Servicing, and therefore the record is inconsistent). Tabs 17-24, 27. Servicing

3  might be an "Insured" under some policy terms where the context requires. *See*

4  *supra* n.19. This interest is not in Servicing's own corporate name, but in the name

5  of a "Servicer" that may be replaced. And, to the extent the dispute ultimately

6  affects the owner of the insured assets, Servicing does not hold the insured assets

7  in its own name.

8       Servicing therefore has no interest in the dispute's subject matter in

9  Servicing's own name. This further suggests a mere agency relationship,

10  disfavoring a finding that Servicing is a real and substantial party to the

11  controversy. *See Navarro*, 446 U.S. at 465.

12       <u>Extent of management and control over dispute and its subject matter.</u> CHL

13  made representations in the commitment letters and signed the commitment letters.

14  A "Co-Trustee" signed the commitment letters "as Co-Trustee"; and certain

15  representations in the commitment letters may (or may not) be chargeable to the

16  Co-Trustee.

17       The PSAs and SSAs limit the duties of the Co-Trustee and Trustee (or

18  Indenture Trustee). Indeed, some agreements contain language stating that the Co-

19  Trustee shall "hold" the mortgage insurance policy (though most state that the

20  "Co-Trustee shall act as the Insured" before the Co-Trustee delegates some duties

21  to the servicer). *Compare* Tabs 1-16(B) § 8.12 ("act") *with* Tabs 17-19, 28 § 8.12

22  ("hold"). Thus, the "active trustee" factor from *Navarro* could somewhat disfavor

23  finding a Co-Trustee a relevant party.

24       However, the question addressed is not which parties count for diversity, but

25  whether Servicing counts. Because Servicing did not sign a commitment letter—

26  and no representations regarding the insured mortgages could be charged to

27  Servicing—Servicing is not an "active" trustee with regard to obtaining mortgage

28  insurance.

Servicing's obligations with regard to mortgage insurance after the insurance is obtained are somewhat more "active." However, those obligations arise from the securitizations, not any agreement between Servicing and United Guaranty; and they arise after CHL and the Co-Trustee have obtained the mortgage insurance. Those obligations are to act as the Co-Trustee's agent—expressly "on behalf of" the Co-Trustee—with regard to some mortgage insurance duties. Notably, those obligations are the processing of claims and may including handling premium payments and some collection duties. Those obligations do not, by their express terms, extend to mortgage insurance-related litigation.[36]

The Court has no information to evaluate who might control this subject matter or the dispute—that is, who might be "master of the litigation," *Oscar Gruss*, 337 F.3d 194-95 —but those in control would much more likely be the parties (or the corporate parents of the parties) that signed the commitment letters or are the Insured under the insurance policies than Servicing.

Nothing suggests that Servicing manages or controls the subject matter or the dispute. Some party or parties must bear responsibility; whichever the party or parties may be, it is not the servicer. This disfavors a finding that Servicing is a real and substantial party to the controversy. *See Oscar Gruss*, 337 F.3d 194-95.

The *LaSalle* case. A similar fact pattern arose in a case decided under Rule 17. *LaSalle Bank Nat'l Assoc. v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465 (S.D.N.Y. 2001), *subseq. proc'g at* 424 F.3d 195 (2d Cir. 2005). *LaSalle* addressed a mortgage servicer's interest in litigation involving mortgage-backed securities. *LaSalle* was filed in federal court by a mortgage securitization trustee against two diverse defendants; *LaSalle* was not a removal case.

---

[36]     This contrasts with the express role the agreements give the Master Servicer in mortgage foreclosure litigation. Tabs 1-20(B) § 3.13, Tabs 21-27(B) § 3.07, Tab 28(B) § 3.12 (providing that Servicing may prepare court pleadings and present them to the Trustee for the Trustee's signature).

1    The *LaSalle* defendants were (1) the originator and (2) a securitizer of a

2   mortgage. That mortgage allegedly did not meet the two defendants' warranties

3   and representations about it. *Id.* at 466, 468-69. After the mortgage defaulted, the

4   servicer investigated the mortgage's underwriting as part of its obligation to

5   "maximize" trust assets. *Id.* at 467. When the servicer allegedly discovered the

6   mortgage was deficient, the servicer gave the securitizer "notice . . . and

7   demanded" that the securitizer repurchase the mortgage. *Id.* at 468. The securitizer

8   refused. The securitization trustee sued. *Id.*

9    The *LaSalle* defendants asserted that the servicer, which was not diverse

10  from the defendants, was a "real party in interest" in whose name the case must

11  have been prosecuted under Rule 17. *Id.* at 469-71.

12   The *LaSalle* approach fully accords with the Court's approach in this case.

13  First, because the *LaSalle* dispute involved an underlying mortgage (rather than

14  mortgage insurance), *LaSalle* noted that the securitization trustee was the "relevant

15  [party for] the diversity inquiry" under the Supreme Court's *Navarro* case. *Id.* at

16  470. *LaSalle* reached this conclusion because the plaintiff securitization trustee

17  held all the "customary powers" of a trustee that the *Navarro* Court found

18  dispositive. *Id.*

19   Next, *LaSalle* noted that unless Rule 17 required that the suit be prosecuted

20  in the servicer's name as "the real party in interest," there could be no potential

21  diversity issue. *Id.*

22   *LaSalle* then looked carefully at the servicer's role under the PSA. That PSA

23  bore two important similarities to the PSAs here: (1) the securitization trustee was

24  the representative owner with legal title and the legal powers flowing from title,

25  *id.*; and (2) the trustee contractually delegated some duties with regard to the

26  underlying mortgages to the servicer, but those duties were "strictly limited." *Id.* at

27

28

470-71.[37]

The *LaSalle* PSAs even gave the servicer a role in litigation over the *LaSalle* dispute's subject matter. The *LaSalle* servicer could "prepare" court pleadings, though the trustee had to "execute" any pleadings. *Id.* The servicer may even have signed the complaint. *Id.* at 469. But the "prepare"-"execute" distinction was of a piece with the *LaSalle* PSAs' other terms, the thrust of which established the trustee as "a traditional trustee who simply contractually delegated some of its duties to [the servicer]." *Id.* at 470-71.[38]

Thus, *LaSalle* concluded, the servicer could not be a Rule 17 "real party in interest <u>to an action alleging breach of contractual terms relating to</u>" a securitized mortgage's underwriting. *Id.* at 470 (emphasis added).[39]

*LaSalle*, like this Court, properly focused its inquiry on the nature of the dispute; *LaSalle* involved a dispute regarding a mortgage, not a dispute among securitization parties. The servicer was not a Rule 17 real party to the *LaSalle* mortgage dispute, though a servicing entity was unquestionably an integral part of the overall securitization.

---

[37]    *LaSalle* also noted that the servicer could be replaced "with or without cause" by the trust's beneficiaries. *Id.* at 471. The PSAs and SSAs in the 09-2732 removal case allow the servicer to be replaced under somewhat restrictive conditions, but the PSAs and SSAs still have provisions that demonstrate the servicer is fungible and provide for its replacement.

[38]    As noted above, the PSAs and SSAs implicated in the present case have similar provisions for litigation involving the underlying mortgages. No analogous provision exists for litigation involving mortgage insurance. *Supra* n.36.

[39]    In contrast to the securitization structures here in issue, the *LaSalle* securitization used a servicer that was apparently unaffiliated with the originator and securitizer. *LaSalle* proceeded regardless and did not note any potential Rule 19 required party concerns. *Accord supra* Section II.A (explaining why Servicing is not a required party in the related 09-1888 federal case and noting that Servicing's economic alignment with the other Countrywide parties should help ensure that its interests will be protected).

1    Notably, the servicer in *LaSalle* (1) gave notice and made a demand on one

2 of the defendants before the suit was filed; (2) might have "prepared" pleadings;

3 and (3) may have signed the complaint. This is roughly analogous to the situation

4 here: in the course of Servicing's duties to recover money for the trust, Servicing

5 might have submitted claims and had other dealings with United Guaranty, but that

6 does not change the diversity analysis.

7    Conclusion. The 09-2732 removal case involves a dispute regarding

8 mortgage insurance. It is not a dispute among securitization parties. The servicer

9 interacts with the homeowner and property and performs ministerial tasks with

10 regard to the mortgage insurance (e.g., filing claims, remitting proceeds, and

11 helping search for a new mortgage insurance provider if the policy terminates

12 under some circumstances).

13    CHL, Co-Trustees, Trustees, and Indenture Trustees are the entities that

14 potentially count for diversity. Because none poses a diversity issue, the Court

15 expresses no opinion as to which of these entities may count for diversity.

16    Servicing is not a real and substantial party in interest to this mortgage

17 insurance controversy.

18    **6. Rule 17**

19    Rule 17(a) requires that an action "be prosecuted in the name of the real

20 party in interest." Fed. R. Civ. Proc. 19(a)(1). This rule of procedure "allows a

21 federal court to entertain a suit at the instance of any party to whom the relevant

22 substantive law grants a cause of action." *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793

23 F.2d 1034, 1038 (9th Cir. 1986). *See also* 6A WRIGHT & MILLER § 1541 ("Rule

24 17(a) states clearly that the action should be brought in the name of the party who

25 possesses the substantive right being asserted under the applicable law, whether

26 that be state or federal.").

27    United Guaranty's pending motion to dismiss directly raises the issue

28 whether CHL and Servicing have the substantive right under California law to sue

on the policies that name other entities, which are not party to this case, as the insured. The matter will therefore be discussed in connection with the motion to dismiss.

/ / /

### III.

### CONCLUSION

For the foregoing reasons,

- Countrywide's motion to dismiss the 09-1888 federal case (docket no. 17) is DENIED <u>only</u> insofar as it moves to dismiss under Rule 19;

- Countrywide's motion to remand the 09-2732 removal case (docket no. 12) is DENIED; and

- in light of the foregoing, Countrywide's motion in the 09-1888 federal case for a stay under the *Colorado River* doctrine pending the state court's decision (docket no. 25) is DENIED AS MOOT.

IT IS SO ORDERED.

DATED: July 1, 2009

_____

Hon. Mariana R. Pfaelzer
United States District Judge