1  QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP
2     Richard A. Schirtzer (Bar No. 150165)
      richardschirtzer@quinnemanuel.com
3     Eric J. Emanuel (Bar No. 102187)
      ericemanuel@quinnemanuel.com
4     Randa A.F. Osman (Bar No. 150798)
      randaosman@quinnemanuel.com
5     Molly Stephens (Bar No. 232211)
      mollystephens@quinnemanuel.com
6  865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
7  Telephone:   (213) 443 3000
   Facsimile:    (213) 443 3100
8
   QUINN EMANUEL URQUHART
9  OLIVER & HEDGES, LLP
      Philippe Z. Selendy
10     philippeselendy@quinnemanuel.com
   51 Madison Avenue
11 New York, New York 10010
   Telephone:   (212)-849-7000
12 Facsimile:    (212)-849-7100

13 Attorneys for United Guaranty Mortgage
   Indemnity Company

14

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18

19 UNITED GUARANTY MORTGAGE          | CASE NO. CV 09-01888 MRP (JWJx)
   INDEMNITY COMPANY,                |
20                                   | **AMENDED COMPLAINT FOR
              Plaintiff,             | BREACH OF CONTRACT,
21                                   | BREACH OF IMPLIED
         vs.                         | COVENANT OF GOOD FAITH
22                                   | AND FAIR DEALING, FRAUD,
   COUNTRYWIDE FINANCIAL             | NEGLIGENT
23 CORP., COUNTRYWIDE HOME           | MISREPRESENTATION,
   LOANS, INC., and THE BANK OF      | NEGLIGENCE, RESCISSION, AND
24 NEW YORK TRUST COMPANY,           | UNFAIR COMPETITION**
   N.A., solely in its trustee (rather than |
25 individual) capacity,            | Complaint Filed:  3/19/09
                                     | Trial Date:   None Set
26            Defendant.             | DEMAND FOR JURY TRIAL

27

28

1    This is a diversity action pursuant to 28 U.S.C. §1332(a), in which

2    plaintiff United Guaranty Mortgage Indemnity Company ("United Guaranty"), by

3    and through its attorneys, Quinn Emanuel Urquhart Oliver & Hedges LLP, for its

4    Complaint herein against Countrywide Financial Corporation ("Countrywide

5    Financial"), Countrywide Home Loans, Inc. ("Countrywide Home") (collectively,

6    "Countrywide"), and The Bank of New York Trust Company, N.A., solely in its

7    trustee (rather than individual) capacity ("Bank of New York Trust" or "Co-

8    Trustee"), alleges as follows:

9                                **NATURE OF ACTION**

10       1.      This action arises out of the fraudulent acts and misrepresentations of

11   Countrywide, through which it induced United Guaranty to insure over one billion

12   dollars of mortgage loans generated by Countrywide and its network of brokers.

13   This action further arises out of the negligence and contractual breaches of Bank of

14   New York Trust.

15       2.      In 2006 and 2007, Countrywide, the largest residential mortgage

16   originator and servicer in the country, orchestrated the issuance of billions of dollars

17   of residential mortgage-backed securities that it dubbed Countrywide Asset-Backed

18   Securities ("CWABS").  In order to form these securities, Countrywide originated

19   and sold (or otherwise conveyed) tens of thousands of subprime mortgage loans (the

20   "Mortgage Loans") to trusts, for which The Bank of New York served as the

21   Trustee and Bank of New York Trust served as Co-Trustee.  These trusts in turn

22   issued certificates for sale on the secondary market that entitled their owners to a

23   portion of the cash flow generated from the repayment of the Mortgage Loans.  As

24   part of its contracts with Bank of New York Trust conveying the Mortgage Loans

25   and structuring the CWABS, Countrywide agreed to purchase insurance from

26   United Guaranty to cover the Mortgage Loans.

27       3.      United Guaranty is a provider of mortgage insurance, which covers

28   mortgage lenders in the case a borrower defaults on a loan.  Mortgage insurance

shifts some of the risk of default from the lender to the insurer. Accordingly, with mortgage insurance in place, lenders have generally been willing to accept lower down payments on homes. Mortgage insurance has historically been a vehicle to allow responsible borrowers easier access to the housing market.

4.      Since 1963, United Guaranty has sold mortgage insurance to a wide variety of clients, traditionally insuring mostly fixed-rate residential mortgages with 30-year and 15-year terms. United Guaranty has sold mortgage insurance to Countrywide for over forty years.

5.      In 2006, Countrywide sought eleven insurance policies from United Guaranty to cover the Mortgage Loans underlying each of the eleven CWABS (the "Insurance Policies" or "Policies"). However, unlike the traditional use of mortgage insurance -- to facilitate home purchases by responsible borrowers -- Countrywide wanted coverage in order to increase the credit rating of the CWABS, and thus make them more marketable to investors. United Guaranty had limited experience in the subprime market, and, as detailed below, Countrywide made multiple representations and traded on its long-standing relationship with United Guaranty to induce United Guaranty to issue the Insurance Policies.

6.      In order to procure coverage, Countrywide falsely represented to United Guaranty that it had originated the underlying Mortgage Loans in strict compliance with its underwriting standards and guidelines, which were developed over time to screen the creditworthiness of borrowers and the likelihood that mortgage loans would be repaid. As Countrywide well knew, United Guaranty relied on these underwriting guidelines to evaluate the risk it would incur by issuing the Insurance Policies. Countrywide also falsely represented the quality of the loans themselves by sending United Guaranty loan tapes that contained false information on individual loans, including misrepresentations regarding characteristics of the loans and the creditworthiness of the borrowers. Countrywide knew that United

1  Guaranty would rely on this data in determining which loans to insure and what

2  premiums to set.

3        7.     Based on representations concerning the quality of the underlying

4  Mortgage Loans and Countrywide's adherence to both its own underwriting

5  standards and industry standards of reasonable and prudent underwriting, United

6  Guaranty priced and issued the Insurance Policies to Bank of New York Trust.

7  Because the Mortgage Loans were subprime, strict adherence to underwriting

8  standards was essential to control the risk inherent in subprime lending.

9        8.     In reality, Countrywide had abandoned any reasonable and prudent

10  underwriting standard in order to secure as large a piece of the mortgage boom as

11  possible.  Under the direction of former Chief Executive Officer Angelo Mozilo and

12  former President and Chief Operating Officer David Sambol, Countrywide

13  systematically disregarded its own underwriting guidelines in order to generate an

14  unprecedented volume of loans.  Countrywide intentionally extended billions of

15  dollars in loans to borrowers who could not afford to repay loans, who committed

16  fraud in loan applications (often with the assistance and encouragement of

17  Countrywide employees and brokers), or who otherwise did not satisfy the basic risk

18  criteria for prudent and responsible lending that Countrywide claimed to use.

19        9.     Countrywide's failure to abide by any standard of care in its loan

20  origination practice dramatically changed the risk profile of the Insurance Policies,

21  and, as a direct result, thousands of insured loans are in default or foreclosure.  Due

22  to the high number of defaults, United Guaranty undertook a review of the

23  underlying Mortgage Loans, obtaining from Countrywide the original loan files for

24  a sample of the loans.  To date, United Guaranty's review has found that the

25  majority of the Mortgage Loans were either underwritten in violation of

26  Countrywide's guidelines, or contain some other material defect, such as missing

27  documentation, misrepresented credit scores, or false social security numbers.  In

28  many cases, Countrywide's files note that the sole justification for granting an

-3-

1    underwriting exception was to increase its market share by matching a competitor's

2    offer.

3        10.    Despite the fact that the vast majority of Mortgage Loans were

4    materially misrepresented and underwritten without regard to any prudent

5    underwriting standards, Bank of New York Trust represented in both the Insurance

6    Policies, and as a condition precedent for United Guaranty to issue the Insurance

7    Policies, that each Mortgage Loan was accurately described and underwritten in

8    accordance with Countrywide's underwriting guidelines and prudent underwriting

9    judgment.  As the Insured, Bank of New York Trust had a duty to exercise

10   reasonable care in making these representations of fact to United Guaranty and was

11   negligent in making these representations.

12       11.    As a result of the unprecedented number of defaults in the Mortgage

13   Loans, United Guaranty has already paid out insurance claims totaling nearly $40

14   million and is exposed to additional claims of several hundred million dollars more.

15   If Countrywide had truthfully represented the characteristics of the Mortgage Loans,

16   and disclosed its conscious failure to adhere to its represented underwriting

17   guidelines, United Guaranty would not have issued the Insurance Policies.

18       12.    The Securities and Exchange Commission ("SEC") has undertaken an

19   investigation of Countrywide and has discovered widespread evidence of

20   underwriting fraud at the company.  The evidence shows that Countrywide

21   consciously departed from its underwriting guidelines to expand its market share,

22   dedicating its credit risk management department almost exclusively to processing

23   undisclosed requests for expansion of its underwriting guidelines.  The evidence

24   also shows that Countrywide was well aware that the mortgage loans it was

25   underwriting and selling to investors in securitizations were not properly

26   underwritten and at high risk of default.  On April 13, 2006, Angelo Mozilo, the

27   former CEO of Countrywide, wrote that he had "personally observed a serious lack

28   of compliance within our origination system as it relates to documentation and

generally a deterioration in the quality of loans originated versus the pricing of those loan [sic]."   Further, a 2006 audit by Countrywide showed that 50 percent of the stated income loans originated by Countrywide were based on borrowers lying about their income.  And an internal review undertaken by Countrywide in the first quarter of 2007 rated nearly 12 percent of the loans reviewed as "severely unsatisfactory" or "high risk," based on findings that such loans had debt-to-income, loan-to-value, or FICO scores outside of Countrywide's already wide underwriting guidelines.

13.     The Attorney General for the State of California has also discovered evidence of underwriting fraud at Countrywide.  As the Attorney General has alleged:

Countrywide's deceptive scheme had one primary goal -- to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums.  Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a wide variety of deceptive practices, undertaken with the direction, authorization, and ratification of Sambol and Mozilo, in order to maximize its profits from the sale of those loans to the secondary market.

14.     Former Countrywide insiders have admitted to Countrywide's reckless and abusive course of conduct.  A former senior level vice president at Countrywide has said, according to a securities class action filed against Countrywide, that "so long as we could sell it, we'd do it."  Brian Koss, a former senior regional vice president, told Business Week:

[Countrywide] approached making loans like making widgets, focusing on cost to produce and not risk or compliance.  Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse. The fiduciary responsibility of making sure whether the loan should truly be done was not as important as getting the deal done.

15.     In short, Countrywide abandoned its own underwriting guidelines to boost its market share and then misrepresented the quality of its loans so that United Guaranty would issue the Insurance Policies.

16.     Moreover, even though Bank of New York Trust expressly represented in the Insurance Policies, and in the Commitment Letters as a condition precedent to the issuance of the Insurance Policies, that each Mortgage Loan complied with applicable guidelines and was accurate and complete in all material respects, Bank of New York Trust has failed to take any steps to uncover Countrywide's fraud or the inaccuracy of its own representations.  Bank of New York Trust has yet to notify United Guaranty of the inaccuracy of its representations, and, in fact, continues to submit claims on loans it knows or should know are fraudulent or fail to comply with underwriting guidelines.

17.     United Guaranty would not have issued the Insurance Policies had it known Countrywide's and Bank of New York Trust's representations were false. United Guaranty is therefore entitled to the damages described below and to rescission of these Policies.

## **PARTIES**

18.     Plaintiff United Guaranty Mortgage Indemnity Company is a North Carolina corporation with its principal place of business in Greensboro, North Carolina.  United Guaranty is one of the nation's largest providers of mortgage guaranty insurance.

19.     Defendant Countrywide Financial Corporation is a Delaware corporation with its principal executive offices in Calabasas, California. Countrywide Financial, itself or through its subsidiaries, is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, securities dealing, and insurance underwriting.  On July 1, 2008, Countrywide Financial was acquired by Bank of America.

-6-

20.     Defendant Countrywide Home Loans, Inc., a wholly-owned subsidiary of Countrywide Financial Corporation, is a New York corporation with its principal executive offices in Calabasas, California.  Countrywide Home Loans originates and services residential home mortgage loans.

21.     On information and belief, Countrywide employees involved in the CWABS transactions held positions at both Countrywide Home and Countrywide Financial and made representations to United Guaranty on behalf of both companies.  For example, Steven Radu of Countrywide was involved in the CWABS transactions and often acted as United Guaranty's main contact at Countrywide for these transactions.  Mr. Radu had titles at both Countrywide Home and Countrywide Financial.  In addition, his email correspondence did not distinguish whether he was writing on behalf of Countrywide Home or Countrywide Financial.

22.     Defendant The Bank of New York Trust Company, N.A. is a national banking association incorporated under the laws of the United States and located in Los Angeles, California.  Bank of New York Trust served as the co-trustee for the transactions at issue.

## JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     This Court has personal jurisdiction over the defendants by virtue of their business activities within California.

25.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as substantial events giving rise to this complaint took place in California.

CASE NO. CV 09-01888 MRP (JWJx)
AMENDED COMPLAINT

# FACTUAL ALLEGATIONS

I.   PRIOR TO 2004, UNITED GUARANTY HAD A LONG HISTORY WITH COUNTRYWIDE INSURING CONSERVATIVE MORTGAGES

26.     United Guaranty has provided mortgage insurance to mortgage lenders since 1963.  Traditionally, the role of a mortgage insurer is to enable borrowers to obtain a mortgage with only a small down payment.  Lenders normally require a down payment of at least 20 percent of a home's value, which can be a significant obstacle for first-time or low-income homebuyers.  By law, the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac") can purchase subprime mortgage loans that have a certain level of mortgage insurance.  With mortgage insurance, the lender is therefore able to make loans with a smaller down payment and still sell the loans to Fannie Mae or Freddie Mac.

27.     Mortgage insurance is payable to the lender when a borrower defaults and the lender is not able to recover its costs after foreclosure and sale of the mortgaged property.  When the borrower's property fails to adequately secure the loan, a mortgage insurer, such as United Guaranty, can be required to pay out an insurance claim.  The mortgage insurer is therefore directly exposed to the underlying property, which serves as collateral for the loan.  Because the mortgage insurer covers the risk of borrower default, it shares many of the same risks as homeowners, e.g., fluctuations in the economy and property values that make it difficult for homeowners to pay their mortgages.

28.     Countrywide is a mortgage lender that was established in 1969 and soon became a customer of United Guaranty.  For almost forty years, Countrywide has purchased mortgage insurance from United Guaranty.

29.     Since 1990, Countrywide and United Guaranty have used a "delegated model" for underwriting mortgage insurance.  Underwriting is the process whereby an insurer determines the risk associated with a loan and decides whether to offer

insurance.  Under the delegated model, United Guaranty did not underwrite each loan itself.  Instead, it relied on Countrywide to represent information on the loans to be insured.  For example, Countrywide represented that the loans met with certain underwriting guidelines, such as minimum credit scores or maximum loan-to-value ratios.  Based on Countrywide's representations, United Guaranty then decided whether to offer insurance.  The delegated underwriting model is widely used in the mortgage insurance industry because it is efficient, cost-effective, and preferred by many lenders.

30.     Throughout its relationship with United Guaranty, Countrywide extolled its prudent underwriting standards and disciplined adherence to those standards, as well as the multiple safeguards it used to ensure the creditworthiness of borrowers and prevent fraud.  For example, Countrywide risk management personnel presented their Structured Loan Desk group as an effective control to assure discipline in the granting of any exceptions to underwriting standards.  Countrywide has also broadly promoted its proprietary automated underwriting system, CLUES, as a state-of-the-art risk assessment and underwriting control system.  United Guaranty gained confidence in Countrywide's underwriting throughout the decades it insured traditional, first-lien mortgage loans underwritten by Countrywide.

II.     BEGINNING IN 2004, COUNTRYWIDE SHIFTED ITS BUSINESS TO THE ORIGINATION OF NON-CONFORMING LOANS FOR SECURITIZATION

31.     Prior to 2004, United Guaranty's business with Countrywide was limited to insuring traditional, first-lien mortgage loans to prime borrowers meeting the guidelines for sale to Fannie Mae or Freddie Mac.  By law, Fannie Mae and Freddie Mac can only purchase mortgage loans that conform to certain regulatory guidelines.  These loans are known in the industry as "conforming loans."  Conforming loans, if properly underwritten and serviced, are historically the most

conservative loans and have the lowest rates of delinquency and default.  Mortgage loans that fail to meet the regulatory guidelines are known in the industry as "non-conforming loans."

32.    In the early 2000s, the demand for securities backed by mortgage loans increased dramatically.  Mortgage loans are securitized when a pool of loans is sold to a trust that in turn sells certificates, or securities, to private investors representing interests in the mortgage loans.  Certificate owners are entitled to distributions of loan payments.

33.    Countrywide sought to capitalize upon the increased demand for mortgage-backed securities by embarking on a campaign to increase the volume of loans it originated -- loans that would then be securitized and sold on the secondary market.  In a January 2004 call with analysts, former Chief Executive Officer Angelo Mozilo announced that Countrywide, already the industry leader with nearly a 15% loan origination market share, planned to double its market share within four years:  "Our goal is market dominance, and we are talking 30% origination market share by 2008."

34.    Thereafter, Countrywide expanded its loan origination business for non-conforming loans, including subprime mortgages, stated income loans, interest-only loans, Pay Option ARMs (an adjustable rate mortgage loan that allows a borrower to make initial minimum monthly payments less than monthly accrued interest), closed-end second liens, and home equity lines of credit.  It then sold pools of these loans to trusts for securitization.

III.    <u>COUNTRYWIDE INDUCED UNITED GUARANTY TO INSURE MORTGAGE LOANS UNDERLYING ELEVEN SECURITIZATIONS</u>

35.    In 2006 and 2007,  Countrywide orchestrated the creation of eleven securitizations encompassing over $13 billion of Mortgage Loans:  CWABS 2006-20, CWABS 2006-21, CWABS 2006-22, CWABS 2006-23, CWABS 2006-26, CWABS 2007-01, CWABS 2007-02, CWABS 2007-03, CWABS 2007-05,

1  CWABS 2007-06, and CWABS 2007-07 (collectively, the "Securitizations").  The

2  Securitizations closed between November 2006 and May 2007.

3          36.      Countrywide Securities arranged each Securitization, structuring and

4  marketing the transaction, as well as making SEC filings.  Each Securitization was

5  composed of a pool of residential mortgage loans originated or acquired by

6  Countrywide Home.  Countrywide Home then sold (or otherwise conveyed) the

7  mortgage loans to trusts.  Bank of New York acted as Trustee of the trusts, and Bank

8  of New York Trust acted as Co-Trustee.  The trusts then issued certificates to

9  private investors that represented interests in the mortgage loans and entitled

10  certificate owners to distributions of loan payments.

11          37.      To increase the credit rating of the CWABS, and thus make them more

12  marketable to investors, Countrywide induced United Guaranty to issue the

13  Insurance Policies for each Securitization by representing to United Guaranty that it

14  was insuring non-fraudulent loans that complied with its underwriting guidelines

15  and conservative risk management practices.  Because Countrywide transferred its

16  interest in the mortgage loans and the risk of default to investors, it was not

17  concerned about the actual risk of default by borrowers under the mortgage loans

18  except as it affected marketability of the securities.

19          38.      In 2006, Countrywide initiated discussions with United Guaranty about

20  providing mortgage insurance for the Securitizations.  Because Countrywide was

21  selling the mortgage loans to trusts, it would not be the insured under the Policies.

22  The insured would be the Co-Trustee for the trusts -- Bank of New York Trust.

23          39.      The underlying Mortgage Loans covered by the United Guaranty

24  Policies had already been underwritten by Countrywide.  Countrywide represented

25  to United Guaranty that the underlying Mortgage Loans had been underwritten in

26  accordance with its conservative underwriting practices and published underwriting

27  guidelines.  Based on Countrywide's representations, including in the loan tapes,

28  Technical Manuals, and Commitment Letters, United Guaranty reasonably believed

1  it was insuring loans that were underwritten in strict accordance with Countrywide's

2  underwriting guidelines and originated within an effectively managed underwriting

3  organization.

4  IV.    COUNTRYWIDE MADE MULTIPLE REPRESENTATIONS TO INDUCE

5         UNITED GUARANTY TO INSURE ITS MORTGAGE LOANS

6         40.    United Guaranty relied on multiple representations by Countrywide --

7  both contractual and non-contractual -- when it insured the loans underlying the

8  CWABS Securitizations.

9         A.    Non-Contractual Representations

10        41.    In order to induce United Guaranty to issue the Insurance Policy for

11 each individual Securitization, Countrywide emailed United Guaranty loan tapes

12 that purportedly contained the characteristics of loans that would be included in the

13 Securitization.  These loans were called the "initial loan" population, and

14 Countrywide requested a bid from United Guaranty based on the loan characteristics

15 of the initial loan population.  Each loan tape listed information for each of the

16 hundreds of individual loans to be securitized, including, *inter alia*, the size of the

17 loan, the value of the property, the loan-to-value ratio ("LTV"), and the delinquency

18 status of each loan.  Based upon this information, Untied Guaranty determined

19 whether to issue insurance, which loans the insurance would cover, and the

20 appropriate premium to charge for coverage.

21        42.    For some Securitizations, United Guaranty and Countrywide agreed

22 that Countrywide could upsize, post-closing, the final population of Mortgage Loans

23 to be insured.  Pursuant to this agreement, Countrywide submitted additional loans

24 to United Guaranty post-closing.  These loans were called the "prefunding"

25 population.  As with the initial loan population, Countrywide emailed a loan tape

26 containing the characteristics of the prefunding population to United Guaranty.

27 United Guaranty then issued new Certificates under the relevant Insurance Policy to

28 cover these loans.

43.     Loan tapes were submitted by Countrywide to United Guaranty for the eleven Securitizations as follows:

          a.     <u>CWABS 2006-20</u>

               i.     On October 9, 2006, Alex Panin, an employee of Countrywide, emailed Christian Thielman, an employee of United Guaranty, a loan tape containing information on the loans to be included in the CWABS 2006-20 securitization for United Guaranty's bid.

               ii.     On October 18, 2006, Alex Panin emailed Christian Thielman and Christopher Walendin, an employee of United Guaranty, a loan tape containing information on additional loans to be included in the CWABS 2006-20 securitization.

               iii.     On November 21, 2006, Alex Panin emailed Christian Thielman and Christopher Walendin a loan tape containing information on the prefunding population for the CWABS 2006-20 securitization.

          b.     <u>CWABS 2006-21 and CWABS 2006-22</u>

               i.     On October 23, 2006, Alex Panin emailed Christian Thielman a loan tape containing information on the loans to be included in the CWABS 2006-21 securitization for United Guaranty's bid.

               ii.     On October 31, 2006, Alex Panin emailed Christian Thielman a loan tape containing information on the loans to be included in the CWABS 2006-22 securitization for United Guaranty's bid.

               iii.     On November 3, 2006, Alex Panin emailed Christopher Walendin and informed him that Countrywide has decided to split the deal into two transactions: CWABS 2006-21 and 2006-22.

               iv.     On November 27, 2006, Alex Panin emailed Christopher Walendin a loan tape listing loans to be included in the closing population of the CWABS 2006-21 and 2006-22 deals.

1           v.      On December 27, 2006, Alex Panin emailed Christian

2    Thielman and Christopher Walendin a loan tape containing information on the

3    prefunding population for the CWABS 2006-21 and 2006-22 securitizations.

4           vi.     On January 10, 2007, Alex Panin emailed Christian

5    Thielman and Christopher Walendin a loan tape containing information on the

6    prefunding population for the CWABS 2006-21 securitizations.

7        c.    <u>CWABS 2006-23</u>

8           i.      On October 31, 2006, Alex Panin emailed Christian

9    Thielman a loan tape containing information on the loans to be included in the

10   CWABS 2006-23 securitization for United Guaranty's bid.

11          ii.     On November 16, 2006, Alex Panin emailed Christian

12   Thielman a loan tape containing information on the loans to be included in the

13   CWABS 2006-23 securitization for United Guaranty's bid.

14          iii.    On December 1, 2006, Alex Panin emailed Christian

15   Thielman and Christopher Walendin a loan tape listing loans to be included in the

16   closing population of the CWABS 2006-23 securitization.

17          iv.    On January 10, 2007, Alex Panin emailed Christian

18   Thielman and Christopher Walendin a loan tape containing information on the

19   prefunding population for the CWABS 2006-23 securitization.

20       d.    <u>CWABS 2006-26</u>

21          i.      On December 6, 2006, Alex Panin emailed Christian

22   Thielman and others at United Guaranty a loan tape containing information on the

23   loans to be included in the CWABS 2006-26 securitization for United Guaranty's

24   bid.

25          ii.     On December 27, 2006, Alex Panin emailed Christian

26   Thielman and Christopher Walendin a loan tape listing loans to be included in the

27   closing population of the CWABS 2006-23 securitization.

28

1              iii.      On January 19, 2007, Alex Panin emailed Christian

2    Thielman and Christopher Walendin a loan tape containing information on the

3    prefunding population for the CWABS 2006-26 securitization.

4         e.     <u>CWABS 2007-01</u>

5              i.      On January 23, 2007, Alex Panin emailed Christian

6    Thielman and Christopher Walendin a loan tape containing information on the loans

7    to be included in the CWABS 2007-01 securitization for United Guaranty's pricing.

8              ii.      On March 16, 2007, Alex Panin emailed Christian

9    Thielman, Christopher Walendin and Daniel Walker Jr. a loan tape containing

10   information on the prefunding population for the CWABS 2007-01 securitization.

11        f.     <u>CWABS 2007-02</u>

12             i.      On February 1, 2007, Alex Panin emailed Christian

13   Thielman and Christopher Walendin a loan tape containing information on the loans

14   to be included in the CWABS 2007-02 securitization for United Guaranty's pricing.

15             ii.      On March 26, 2007, Alex Panin emailed Christian

16   Thielman and Christopher Walendin a loan tape containing information on the

17   prefunding population for the CWABS 2007-02 securitization.

18        g.     <u>CWABS 2007-03</u>

19             i.      On February 23, 2007, Alex Panin emailed Christopher

20   Walendin a loan tape containing information on the loans to be included in the

21   CWABS 2007-03 securitization for United Guaranty's pricing.

22        h.     <u>CWABS 2007-05</u>

23             i.      On March 16, 2007, Alex Panin emailed Christopher

24   Walendin a loan tape containing information on the loans to be included in the

25   CWABS 2007-05 securitization for United Guaranty's pricing.

26             ii.      On March 19, 2007, Alex Panin emailed Christopher

27   Walendin a loan tape containing information on a corrected population of loans to

28   be included in the CWABS 2007-05 securitization for United Guaranty's pricing.

-15-

iii.     On May 7, 2007, John Lee, and employee of Countrywide, emailed Christian Thielman and Christopher Walendin, a loan tape containing information on the prefunding population for the CWABS 2007-05 securitization.

i.     <u>CWABS 2007-06</u>

i.     On March 19, 2007, Alex Panin emailed Christopher Walendin a loan tape containing information on the loans to be included in the CWABS 2007-06 securitization for United Guaranty's pricing.

ii.     On May 7, 2007, John Lee, an employee of Countrywide, emailed Christian Thielman and Christopher Walendin, a loan tape containing information on the prefunding population for the CWABS 2007-06 securitization.

j.     <u>CWABS 2007-07</u>

i.     On April 4, 2007, Alex Panin emailed Christopher Walendin a loan tape containing information on the loans to be included in the CWABS 2007-07 securitization for United Guaranty's pricing.

ii.     On April 10, 2007, Alex Panin emailed Christopher Walendin an updated loan tape containing information on the loans to be included in the deal.

iii.     On June 12, 2007, Alex Panin emailed Christian Thielman, Christopher Walendin and others at United Guaranty a loan tape containing information on the prefunding population for the CWABS 2007-07 securitization.

44.     In addition to providing United Guaranty with the loan tapes representing specific facts about the loans to be insured, Countrywide also made specific oral representations to United Guaranty regarding its underwriting guidelines and its strict adherence to those guidelines.  For example, in early 2006, John McMurray, the chief credit officer for Countrywide, orally represented to Kurt Smith of United Guaranty that Countrywide had developed stringent underwriting procedures to manage risk and guard against fraud.  He represented that

-16-

1   Countrywide strictly followed those procedures and never mentioned that
2   Countrywide routinely employed exceptions to the procedures.

3       45.     As another example, in or about March 2007, Steve Radu, the
4   Executive Vice President of Credit Risk Management at Countrywide, represented
5   in an email to Bryon Jones, a Vice President at United Guaranty, that Countrywide
6   underwrote and re-underwrote subprime loans to mitigate risk and guard against
7   fraud.

8       46.     In addition to oral representations about its conservative underwriting
9   practices and strict adherence to underwriting guidelines, Countrywide also made
10  representations regarding its underwriting practices and adherence to underwriting
11  guidelines in Technical Manuals provided to United Guaranty in October 2006 and
12  regularly updated thereafter.  In the Technical Manuals, Countrywide represented
13  that:

14          It is Countrywide's policy to originate and purchase investment quality
15          loans.  An investment quality loan is one that is made to a borrower
16          from whom timely payment of the debt can be expected, is adequately
17          secured by property, and is originated in accordance with
18          Countrywide's Technical Manual and Loan Program Guides.

19      47.     Countrywide also represented in its Technical Manuals that it rarely
20  underwrote loans that were exceptions to its underwriting guidelines, and, when it
21  did, it required significant documentation to justify the exception.  In particular,
22  Countrywide's Technical Manuals provides that "[w]hen underwriting exception
23  loans, the underwriter [Countrywide] must … [e]nsure that the mortgage file
24  contains documentation that supports the final underwriting decision and the
25  Uniform Underwriting and Transmittal Summary fully documents compensating
26  factors in determining the investment quality of the loan."

27

28

-17-                    CASE NO. CV 09-01888 MRP (JWJx)
                                         AMENDED COMPLAINT

B.    Contractual Representations

48.    In addition to non-contractual representations that Countrywide made about the Mortgage Loans and the underwriting standards used to underwrite the Mortgage Loans, Countrywide also made contractual representations.  For each Securitization, Countrywide executed a Commitment Letter, signed by Countrywide, Bank of New York Trust, and United Guaranty, pursuant to which United Guaranty agreed to issue an insurance policy to Bank of New York Trust to cover certain loans that underlie the Securitization.  In each Commitment Letter, Countrywide made specific representations concerning the quality of the loans and standards used to underwrite each loan.  Countrywide specifically represented in each letter that:  (i) the loans were underwritten in accordance with Countrywide's subprime underwriting guidelines; (ii) the electronic data files prepared by Countrywide and delivered to United Guaranty were true and correct; (iii) none of the Mortgage Loans was in default as of the date of execution; (iv) none of the Mortgage Loans negatively amortize; (v) none of the Mortgage Loans has been more than thirty days delinquent; and (vi) none of the Mortgage Loans has been thirty days delinquent more than once in the last twelve months.

49.    The Commitment Letters were executed and the mortgage insurance policies were issued for each of the eleven Securitizations as follows:

a.    On November 8, 2006, the Commitment Letter for the CWABS 2006-20 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Darren Bigby for Countrywide, Ernest Ulate Jr. for Bank of New York Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

b.    On November 30, 2006, the Commitment Letters for the CWABS 2006-21 and 2006-22 Securitizations were executed and the Policies were issued.  The Commitment Letters were signed by Darren Bigby for Countrywide, Ernest Ulate Jr. for Bank of New York Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

CASE NO. CV 09-01888 MRP (JWJx)
AMENDED COMPLAINT

c.       On December 8, 2006, the Commitment Letter for the CWABS 2006-23 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Darren Bigby for Countrywide, Ernest Ulate Jr. for Bank of New York Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

d.       On December 29, 2006, the Commitment Letter for the CWABS 2006-26 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Dan Walker for United Guaranty.  Although it contains spaces for Countrywide and Bank of New York Trust to sign, United Guaranty does not have a copy containing their signatures.

e.       On February 9, 2007, the Commitment Letter for the CWABS 2007-01 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Darren Bigby for Countrywide, Maria Allison for Bank of New York Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

f.       On February 28, 2007, the Commitment Letter for the CWABS 2007-02 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Elizabeth Chen for Countrywide, Bill Marshall for Bank of New York Trust Company, N.A., and Will Hamilton for United Guaranty.

g.       On March 29, 2007, the Commitment Letter for the CWABS 2007-03 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Elizabeth Chen for Countrywide, Bill Marshall for Bank of New York Trust Company, N.A., and Will Hamilton for United Guaranty.

h.       On March 30, 2007, the Commitment Letter for the CWABS 2007-05 Securitization was executed and the Policy was issued.  The Commitment Letter was signed by Elizabeth Chen for Countrywide, Bill Marshall for Bank of New York Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

i.       On March 30, 2007, the Commitment Letter for the CWABS 2007-06 Securitization was executed and the Policy was issued.  The Commitment

CASE NO. CV 09-01888 MRP (JWJx)
AMENDED COMPLAINT

1   Letter was signed by Elizabeth Chen for Countrywide, Bill Marshall for Bank of
2   New York Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

3                   j.      On May 4, 2007, the Commitment Letter for the CWABS 2007-
4   07 Securitization was executed and the Policy was issued.  The Commitment Letter
5   was signed by Elizabeth Chen for Countrywide, Lila Garlin for Bank of New York
6   Trust Company, N.A., and Daniel Walker Jr. for United Guaranty.

7   V.     BANK OF NEW YORK TRUST MADE CONTRACTUAL
8          REPRESENTATIONS TO OBTAIN MORTGAGE INSURANCE FROM
9          UNITED GUARANTY

10          50.     As alleged above, Bank of New York Trust also executed each
11  Commitment Letter pursuant to which United Guaranty agreed to issue an insurance
12  policy to cover certain loans that underlie each Securitization.  As a condition
13  precedent to the execution of each of the Commitment Letters by United Guaranty,
14  Bank of New York Trust made certain representations that it was later required to
15  make as part of each Policy, including that the mortgage loans to be insured
16  complied with certain underwriting guidelines.

17          51.     In each Policy, Bank of New York Trust expressly represented and
18  warranted that each Mortgage Loan was accurately and completely described in all
19  material respects.

20          52.     Additionally, in each Policy, Bank of New York Trust "covenant[ed]
21  and agree[d] that all Loans shall be reported by it in accordance with the terms and
22  conditions of the Reporting Acceptance Program Manual and underwritten in
23  accordance with prudent underwriting judgment."  Because the Commitment Letter
24  for each Securitization expressly substituted Countrywide's subprime underwriting
25  guidelines for those in the Reporting Acceptance Program Manual, Bank of New
26  York Trust covenanted in each Policy that all Mortgage Loans were underwritten in
27  accordance with Countrywide's subprime guidelines and with prudent underwriting
28  judgment.

CASE NO. CV 09-01888 MRP (JWJx)
AMENDED COMPLAINT

53.     Finally, Bank of New York Trust expressly accepted the risk of any material misrepresentation regarding a Mortgage Loan made to United Guaranty on its behalf, including any material misrepresentation by Countrywide.

VI.     UNITED GUARANTY RELIED ON THE REPRESENTATIONS TO ISSUE AND PRICE THE INSURANCE POLICIES

54.     Each of the eleven Securitizations closed in an abbreviated time frame. As alleged above, the CWABS 2006-20 Securitization closed in 30 days after the identification of the loans to be insured in the transaction; the CWABS 2006-21 and 2006-22 Securitizations closed in 38 days; the CWABS 2006-23 Securitization closed in 38 days; the CWABS 2006-26 Securitization closed in 23 days; the CWABS 2007-01 Securitization closed in 17 days; the CWABS 2007-02 Securitization closed in 27 days; the CWABS 2007-03 Securitization closed in 34 days; the CWABS 2007-05 Securitization closed in 14 days; the CWABS 2007-06 Securitization closed in 11 days; and the CWABS 2007-07 Securitization closed in 30 days.

55.     In addition, multiple transactions often closed simultaneously.  For example, in the same week that the CWABS 2007-06 Securitization closed, Countrywide, United Guaranty, and Bank of New York Trust also executed Commitment Letters for two other CWABS Securitizations.

56.     Countrywide set up the CWABS Securitizations in this manner so that United Guaranty was unable to exercise any right of access to loan files or conduct a loan-level review of the mortgage loans that would be covered by the Policies.  In fact, Countrywide did not make the loan files available to United Guaranty for review prior to the close of each Securitization.

57.     In deciding to issue the Insurance Policies for each Securitization, United Guaranty relied on Countrywide's representations -- both oral and in the Commitment Letters -- that the mortgage loans to be insured were non-fraudulent loans underwritten in strict accordance with Countrywide's underwriting guidelines.

CASE NO. CV 09-01888 MRP (JWJx)
AMENDED COMPLAINT

58.     Further, United Guaranty relied on the truthfulness of the information provided by Countrywide in the loan tapes both to exclude loans from the insurable pool and to determine the premiums to charge for every Securitization at issue. United Guaranty used the information provided on the loan tapes to determine which loans were eligible and ineligible for insurance based on their LTV, the borrower's credit scores, and other information pertaining to individual loans. Loans that were of insufficient credit quality or had a specific characteristic, such an very large loan amount, were cut from the insurable pool by United Guaranty. Based on Countrywide's misrepresentations in the loan tapes, United Guaranty included in the insurable pool loans that it would not have included had it received truthful information.

59.     To calculate premium rates, United Guaranty performed a complicated series of internal calculations on information from the loan tapes that took into account both the individual characteristics of each loan and aggregate information about the pool as a whole.  Specifically, United Guaranty used the loan characteristics for each loan to calculate the expected default rate for each loan based on United Guaranty's internal models.  These rates, along with other loan characteristics, were fed into a subprime discounted cash-flow model that took into account United Guaranty's coverage obligations, severities of loss, and characteristics of the loan pool from or derived from the loan tape.  The final product was a *single premium rate* to be applied to all loans in the group of loans input into the model.  This single premium rate determined from the pool of loans was later applied to individual loans as a multiplier to calculate the premium payment attributable to that loan.  Generally, United Guaranty generated single premium rates from the characteristics of all loans in a Securitization that fell within a certain LTV band, and applied that single rate to all loans within that band.  The premium for every loan in a Securitization was therefore dependant not just on the

characteristics of the individual loan, but on the characteristics of other loans within the pool.[1]

60.     Consequently, removing individual loans from the insurance pool for fraud does not address the effect that misrepresentations regarding individual loans had on the premium rates for other loans in the pool.  Additionally, every loan that is removed from the loan pool exposes United Guaranty to a greater risk of variance in the default rates of the remaining loans.  United Guaranty's pricing model is premised on expected results over a large pool of mortgage loans.  When a large number of loans is removed from the pool, the overall performance of the pool becomes less stable, and United Guaranty's model becomes less accurate.

61.     Based on the long history of business dealings between the two companies, conversations involving Alex Panin, Elizabeth Chen, and John S. Lee of Countrywide and Chris Thielman of United Guaranty, and industry practice, Countrywide was aware that United Guaranty would rely on its representations in the loan tapes to exclude loans from the insurable pool and to calculate premiums. Countrywide provided the loan tapes to United Guaranty with the express purpose that they be relied upon in such a manner.

VII.   BEGINNING IN 2007, THE COUNTRYWIDE MORTGAGE LOANS
         SHOWED AN ABNORMALLY HIGH RATE OF DEFAULT

62.     Starting in the summer of 2007, after United Guaranty issued insurance for the last of the eleven Securitizations, the underlying Mortgage Loans began to show a high number of delinquencies.  Many of these delinquent loans resulted in defaults, despite the availability of foreclosure alternatives and other remedies.

---

[1]   For the later CWABS, United Guaranty would sometimes provide a chart to Countrywide, prior to getting the loan tape, that set out provisional rates based on historical data.  Upon receiving the loan tape for the deal, United Guaranty would run the data from the tape through its pricing model, and update the chart according to the new data.

These defaults caused Bank of New York Trust, as the insured, to submit claims on the Insurance Policies.

63.     Consistent with its normal operating procedure, United Guaranty investigated each claim submitted before making a payment on that claim.  United Guaranty's investigation of claims revealed an unusually high rate of fraud in connection with the Mortgage Loans for which claims were submitted.  Specific representations that United Guaranty determined to be misrepresentations, while processing the claims submitted by Bank of New York Trust, as the Insured, are identified in Appendix A.

64.     When United Guaranty discovered fraud in connection with a Mortgage Loan for which a claim was submitted, it denied the claim and rescinded insurance coverage for that loan.  For all other claims, United Guaranty complied with its obligation under the Insurance Policies to pay the claims while reserving its rights.  As of March 2009, United Guaranty had paid nearly $40 million on the Insurance Policies covering Countrywide's Securitizations.  Moreover, United Guaranty believes it has paid claims on fraudulent loans where the fraud was undiscovered.

VIII.   UNITED GUARANTY DISCOVERED ORIGINATOR FRAUD BY COUNTRYWIDE

65.     United Guaranty initially assumed that the fraud it discovered in the claims submitted under the Insurance Policies was restricted to isolated incidents.

66.     However, based on the unusually high default rates for claims in the Securitizations (United Guaranty's denial rate for claims submitted under the Insurance Policies insuring the Securitizations was almost 50 percent, while its denial rate for claims submitted under policies insuring other first-lien loans was about 13 percent), United Guaranty commenced an investigation to determine whether it was the victim of systemic originator fraud by undertaking an audit of the loans underlying two CWABS Securitizations.  As part of this audit, United Guaranty requested and obtained the loan files from Countrywide for certain

-24-

Mortgage Loans, which represented a sample of the Mortgage Loans in the two CWABS Securitizations.  United Guaranty then compared the loan files, which Countrywide had not previously transmitted, with the information on the loan data tapes that Countrywide had transmitted to United Guaranty in the course of each Securitization to induce United Guaranty to execute the Commitment Letters and issue the Policies.

67.    United Guaranty's audit of these loan files, to date, has revealed widespread originator fraud by Countrywide.  Contrary to Countrywide's express representations to United Guaranty, many of the Mortgage Loans failed to comply with Countrywide's underwriting guidelines.  Additionally, representations in the loan tapes for many of the loans examined have turned out to be false.  Specific fraudulent representations or violations of underwriting guidelines identified during United Guaranty's internal audit are set forth in Appendix B.

68.    To date, United Guaranty's internal review has revealed that about 40% of the Mortgage Loans audited fail to comply with Countrywide's own underwriting guidelines.  In addition, over 40% of these loans contained other material defects, such as false credit scores or fraudulent appraisals.  Accounting for loans with both deficiencies, over 55% of the Mortgage Loans either failed to comply with Countrywide's underwriting guidelines or contained some material defect.

69.    Countrywide's misrepresentations about its underwriting and the true characteristics of the Mortgage Loans were material to United Guaranty.  If United Guaranty had been aware of Countrywide's misrepresentations, it would not have issued the Insurance Policies.

IX.    BANK OF NEW YORK TRUST, AS THE INSURED, HAS FAILED TO TAKE ANY ACTION TO VERIFY ITS OWN REPRESENTATIONS OR TO DETECT AND REMEDY COUNTRYWIDE'S FRAUD

70.    Countrywide sent United Guaranty fraudulent information, including fraudulent loan tapes, and intentionally misrepresented its adherence to its

underwriting guidelines to induce United Guaranty to issue the Insurance Policies. In both the Insurance Policies and as a condition precedent to the issuance of the Policies, Bank of New York Trust affirmatively represented that the information Countrywide provided was accurate and complete in all material respects and that the Mortgage Loans complied with Countrywide's underwriting guidelines.  Bank of New York Trust failed to take any steps to confirm the truth or falsity of its affirmative representations or the representations made by Countrywide in the course of seeking insurance on behalf of Bank of New York Trust.

71.    Even after obtaining evidence that Countrywide engaged in fraud in originating the Mortgage Loans and obtaining the Insurance Policies, Bank of New York Trust still has not taken any steps to verify the representations it and Countrywide made to United Guaranty or to investigate Countrywide's fraud.

72.    Indeed, Bank of New York Trust continues to allow claims to be submitted under the Insurance Policies and to allow multiple, meritless appeals of United Guaranty's decision to deny claims based on fraud.

X.    <u>UNITED GUARANTY HAS SUFFERED SUBSTANTIAL DAMAGE AS A RESULT OF COUNTRYWIDE'S AND BANK OF NEW YORK TRUST'S CONDUCT</u>

73.    Countrywide originated and sold to the Securitizations an extremely large number of Mortgage Loans that were made to borrowers unable to repay. These Mortgage Loans were fraudulent or materially failed to comply with Countrywide's underwriting guidelines or reasonable and prudent lending standards. As a result, the number of defaults in the Mortgage Loans underlying the Securitizations has been extremely high.  United Guaranty has suffered damages arising directly from the Insurance Policies it issued to cover the underlying Mortgage Loans.

74.    First, as alleged above, had United Guaranty known the true characteristics of the Mortgage Loans, it would not have issued the Insurance

1  Policies.  Accordingly, United Guaranty has been damaged in the total amount of

2  the claims it has paid and is obligated to pay under the Insurance Policies.  To date,

3  United Guaranty has paid nearly $40 million in claims on the Mortgage Loans

4  underlying the Securitizations and is exposed to over $300 million in risk.

5          75.     Second, assuming that United Guaranty would have issued the

6  Insurance Policies, it would have done so at a substantially different premium.  As

7  alleged above, the premiums United Guaranty charged for the existing Insurance

8  Policies were based on a significantly lower level of risk than the actual risk

9  associated with insuring the underlying Mortgage Loans.  United Guaranty has

10  therefore suffered damages in an amount to be determined at trial by charging

11  significantly lower premiums than it would have charged for the level of risk it

12  unwittingly insured.

13          76.     Moreover, United Guaranty believes it has paid claims on fraudulent

14  loans and on loans that do not meet underwriting guidelines because the fraud or

15  failure to comply with underwriting guidelines was undiscovered in United

16  Guaranty's claims review process.  United Guaranty has therefore suffered damages

17  in an amount to be determined at trial by paying improperly submitted claims.

18          77.     In addition to the foregoing damages, Countrywide's and Bank of New

19  York Trust's misconduct and contractual breaches have also damaged United

20  Guaranty in several other ways.

21          78.     First, Countrywide's and Bank of New York Trust's misconduct has

22  hampered United Guaranty's ability to pursue other business opportunities.  Every

23  time a Mortgage Loan goes into delinquency, United Guaranty must establish a

24  reserve to pay a potential claim.  The current delinquency rate for the Mortgage

25  Loans underlying the CWABS Securitizations is nearly 60 percent, which has forced

26  United Guaranty to place more than $120 million in reserve.  United Guaranty is

27  suffering damages from its inability to employ that capital in its other business

28  pursuits.

79.     Further, the number of claims made under the Policies, and the massive fraud investigation that United Guaranty has been forced to undertake, has also caused significant damages to United Guaranty.  Because of the number of claims made under the Policies, United Guaranty has had to increase the staff of its claims department and hire additional personnel both to handle claims and to conduct investigations.  Prior to the issuance of the Insurance Policies, United Guaranty needed only five claims adjusters to handle all Countrywide claims.  Today, eight people are required to handle Countrywide claims.

80.     Moreover, when a claim is made on a loan that has certain indicia of fraud in the loan file, such as a property appearing overpriced or a reported income that does not match the occupational status of a borrower, United Guaranty hires a third party to investigate the loan.  This investigation can include, *inter alia*, an interview with the borrower, verification of the borrower's employment, and confirmation of the property appraisal.  An investigation into a particular loan can cost several thousand dollars.  An enormous number of the loan files for the CWABS Mortgage Loans submitted for claims contain indicia of fraud and have been investigated.  United Guaranty's damages include the costs of these third-party investigations.

81.     Bank of New York Trust's improper use of the appeals process has also driven up United Guaranty's costs associated with the Insurance Policies.  When United Guaranty denies coverage of a claim, the Insured is permitted to appeal that denial, and ask United Guaranty to reexamine the loan in question.  Bank of New York Trust, through its agent, has contested the denial of almost every claim to the furthest extent possible, regardless of the merits of the appeal.  This has forced United Guaranty to commit time, staff, and resources to reexamine loans for which coverage is clearly unwarranted under the terms of the Policies.

82.     United Guaranty has also incurred costs to remove Countrywide's fraudulent data from United Guaranty's pricing database.  United Guaranty's pricing

-28-

1  and risk assessment models are based on historical performance data of mortgage
2  loans, including the CWABS loans.  United Guaranty must now incur the cost to
3  review and scrub its databases of Countrywide's false information to protect its
4  ability to assess and price risk -- the foundation of its business.

5        83.    Based on all of the foregoing, United Guaranty now seeks to rescind
6  the Insurance Policies and recover damages on the basis of Countrywide's and Bank
7  of New York Trust's misconduct and contractual breaches.

8

9                            **CAUSES OF ACTION**
10                        **FIRST CAUSE OF ACTION**
11                        **(BREACH OF CONTRACT)**

12       84.    United Guaranty incorporates by reference all the foregoing allegations
13  as though fully set forth herein.

14       85.    This is a claim for breach of contract against Countrywide Home and
15  Bank of New York Trust.

16       86.    The Commitment Letters and Insurance Policies for the eleven
17  CWABS are valid and enforceable contracts that give rise to certain obligations on
18  the part of Countrywide Home and Bank of New York Trust with respect to the
19  Mortgage Loans.

20       87.    United Guaranty has performed and continues to perform all
21  conditions, covenants, and promises required on its part to be performed in
22  accordance with the terms and conditions of the Commitment Letters and Policies.

23       88.    As set forth above, Countrywide Home's and Bank of New York
24  Trust's express representations and warranties in the Commitment Letters were
25  untrue and inaccurate in material ways as of the date of each Commitment Letter.
26  Therefore, Countrywide and Bank of New York Trust are in breach of each
27  Commitment Letter.

28

89.     Additionally, as set forth above, Bank of New York Trust's express representations and warranties in the Insurance Policies, including the representations and warranties that all Mortgage Loans complied with Countrywide's subprime underwriting guidelines and "prudent underwriting judgment," were untrue and inaccurate in material ways as of the date of each of the Insurance Policies.  Therefore, Bank of New York Trust is in breach of each Insurance Policy.

90.     As set forth above in Section X, United Guaranty has suffered damages due to Countrywide Home's and Bank of New York's breaches of the Commitment Letters and Insurance Policies.  These damages include receiving significantly lower premiums relative to the risk associated with insuring the underlying Mortgage Loans, the cost of having to establish significant capital reserves to cover the high rate of claims, the cost of investigating an inordinate number of claims and processing multiple, meritless appeals, and payments of improper claims where the impropriety was undetected in United Guaranty's claims review process.

## SECOND CAUSE OF ACTION
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

91.     United Guaranty incorporates by reference all the foregoing allegations as though fully set forth herein.

92.     This is a claim for breach of the implied covenant of good faith and fair dealing against Countrywide Home.

93.     Countrywide Home has breached the implied covenant of good faith and fair dealing implicit in the Commitment Letters for each CWABS Securitization.

94.     Countrywide Home has interfered in bad faith with United Guaranty's rights to receive the benefits entitled to it under the Commitment Letters.  In

choosing which loans to securitize and insure, Countrywide Home selected loans from its origination portfolio with the intent of shifting the risk on the riskiest loans from Countrywide to United Guaranty and to investors.  Countrywide Home then hid the fact that it originated Mortgage Loans in blatant disregard of its underwriting standards to shift the risk of default under those loans to United Guaranty and the CWABS investors.

95.    Moreover, despite knowing that it obtained the Commitment Letters and the associated Insurance Policies through fraud, Countrywide Home has allowed numerous claims on fraudulent loans to be made under the Policies in an attempt to get United Guaranty to pay claims on fraudulent Mortgage Loans.

96.    United Guaranty has performed and continues to perform all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Commitment Letters.

97.    As set forth above in Section X, Countrywide Home's breach of the implied covenant of good faith and fair dealing has caused substantial harm and damages to United Guaranty.  These damages include receiving significantly lower premiums relative to the risk associated with insuring the underlying Mortgage Loans, the cost of having to establish significant capital reserves to cover the high rate of claims, the cost of investigating an inordinate number of claims and processing multiple, meritless appeals, and payments of improper claims where the impropriety was undetected in United Guaranty's claims review process.

## **THIRD CAUSE OF ACTION**
## **(FRAUDULENT INDUCEMENT)**

98.    United Guaranty incorporates by reference all the foregoing allegations as though fully set forth herein.

99.     This is a claim for fraudulent inducement to contract against Countrywide Home and Countrywide Financial in violation of Cal. Civ. Code §§ 1709, 1710, subd. 1 and 3, and 1572, subd. 1 and 3, and the common law.

100.    Countrywide had a legal duty not to engage in fraud.

101.    Further, Countrywide had a legal duty to disclose to United Guaranty all facts within its knowledge material to the contract for insurance coverage and not to conceal what it knew or ought to know under California Insurance Code §§ 330, 331, and 332.

102.    Countrywide also had a legal duty under California Insurance Code §§ 358 and 359 not to make materially false statements in procuring coverage from United Guaranty.

103.    Based on its expertise and specialized knowledge, and in light of its false and misleading representations, Countrywide owed a duty to United Guaranty to disclose material facts about the Securitizations that were not known by United Guaranty and that were not reasonably discoverable.

104.    Because Countrywide decided of its own volition to provide material information to United Guaranty regarding the Securitizations, it owed United Guaranty a duty of candor and full disclosure, and owed United Guaranty a duty to correct any factual inaccuracies contained in its communications and to disclose the whole truth.

105.    As set forth above in Sections IV, VII, and VIII and in Appendix A and Appendix B, Countrywide made both false representations of material fact and concealed and suppressed material facts necessary in order to make its statements not misleading in light of the circumstances under which they were made in violation of legal duties.  Countrywide made the representations with knowledge of their falsity, without any belief in the truth of the statements, and/or with reckless disregard as to their falsity.

106.   Countrywide made the false representations of fact and suppressed material facts both in documents outside the parties' contracts, including the loan tapes, and in oral discussions, as alleged in Paragraphs 41 to 47, above.

107.   Countrywide made the above representations and concealed material facts with the intent to defraud United Guaranty and to induce United Guaranty to rely on the statements in agreeing to issue the Policies.  Countrywide sought to securitize the Mortgage Loans and transfer the risk of such loans to United Guaranty and the CWABS investors.  Countrywide knew that obtaining mortgage insurance from United Guaranty would result in a higher credit rating for the securities issued by the CWABS trusts, making the securities more attractive to investors and allowing them to be sold at a higher price and/or lower cost to Countrywide.  Thus, Countrywide made these false statements and omissions to induce United Guaranty to issue the Insurance Policies with the intent that United Guaranty rely on the statements and omissions.

108.   As set forth above in Section VI, United Guaranty reasonably relied on Countrywide's false representations.  Countrywide was responsible for underwriting each Mortgage Loan, and Countrywide structured the timing of each CWABS Securitization to compel United Guaranty to rely on its representations.  Further, United Guaranty, as the insurer, had the right to rely on the representations of Countrywide, the applicant for insurance.

109.   United Guaranty was not aware of the falsity of Countrywide's statements when it entered into the Insurance Policies.  Had United Guaranty been aware of the falsity of the statements, including the representations that Countrywide had underwritten the Mortgage Loans according to its subprime underwriting guidelines, it would have refused to do business with Countrywide, and would not have entered into any of the Insurance Policies in question.  United Guaranty was also unaware of the material facts concealed and suppressed by Countywide, including the number and severity of exceptions allowed as part of its

-33-

1  underwriting guidelines, and had no reasonable means of discovering such

2  information.  If United Guaranty had been made aware of the concealed material

3  facts it would not have entered into the Insurance Policies.

4      110.   Countrywide knew that United Guaranty was relying on Countrywide's

5  expertise, and Countrywide encouraged such reliance.  Countrywide knew that its

6  representations described above would be relied upon by United Guaranty in

7  connection with its decision to issue each insurance policy.  Countrywide also knew

8  that if United Guaranty was made aware of the concealed material facts set forth

9  above that United Guaranty would not have entered into the Insurance Policies.

10     111.   Countrywide's fraudulent inducement to contract has caused United

11  Guaranty to suffer damages as set forth in more detail in Section X.  For example,

12  United Guaranty has received substantially lower premiums relative to the risk of

13  insuring the underlying Mortgage Loans.  United Guaranty has placed greater

14  amounts of capital in reserve to pay potential claims, preventing it from employing

15  that capital to other business pursuits.  Further, United Guaranty has paid claims for

16  loans it would have refused to cover had it been aware of the falsity of

17  Countrywide's representations or the concealed material facts.  United Guaranty has

18  also incurred substantial burden and expense investigating a deluge of claims arising

19  under these fraudulent loans.  And United Guaranty must bear the cost of removing

20  the fraudulent Countrywide data from its pricing databases to protect its ability to

21  assess and price risk.

22     112.   Because Countrywide committed these acts and omissions maliciously,

23  wantonly and oppressively, and because the consequences of Countrywide's acts

24  knowingly affected the general public, including but not limited to all persons with

25  interests in the Securitizations, United Guaranty is entitled to recover punitive

26  damages.

27     113.   Countrywide's false representations and material omissions were in

28  violation of its legal duties and obligations under California Insurance Code §§ 330,

-34-

331, 332, 350, 351, 358, and 359.  Countrywide's false representations were made in violation of Cal. Civ. Code §§ 1709, 1710, subd. 1, and 1572, subd. 1, and Countrywide's concealment of materials facts is in violation of Cal. Civ. Code §§ 1709, 1710, subd. 3, and 1572, subd. 3.

## FOURTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

114.   United Guaranty incorporates by reference all the foregoing allegations as if fully set forth herein.

115.   This is a claim for negligent misrepresentation against Countrywide Home and Countrywide Financial in violation of Cal. Civ. Code §§ 1709, 1710, subd. 2, and 1572, subd. 2, and the common law.

116.   Countrywide had a legal duty to make truthful and accurate representations to United Guaranty of all facts within its knowledge material to the contract for insurance coverage under California Insurance Code §§ 330, 331, and 332.

117.   Countrywide also had a legal duty under California Insurance Code §§ 358 and 359 not to make materially false statements in procuring coverage from United Guaranty.

118.   Based on its expertise and specialized knowledge, and in light of its false and misleading representations, Countrywide owed a duty to United Guaranty to disclose material facts about the Securitizations that were not known by United Guaranty and that were not reasonably discoverable.

119.   Because Countrywide decided of its own volition to provide material information to United Guaranty regarding the Securitizations, it owed United Guaranty a duty of candor and full disclosure.  Countrywide also owed United Guaranty a duty to correct any factual inaccuracies contained in its communications and to disclose the whole truth.

120.   As set forth above in Sections IV, VII, and VIII and in <u>Appendix A</u> and <u>Appendix B</u>, Countrywide made false representations of material facts to United Guaranty, including affirmative representations about the characteristics of the Mortgage Loans and affirmative representations that the Mortgage Loans underlying each CWABS Securitization were underwritten according to Countrywide's subprime underwriting guidelines.

121.   Countrywide made the above representations without any reasonable ground for believing the information to be true.  Among other things, Countrywide knew that it was not adhering to its underwriting guidelines in order to expand its market share of the subprime loan origination and securitization business.

122.   Countrywide made the above representations in order to induce United Guaranty to rely on the statements and issue the Insurance Policies.

123.   Countrywide made the false representations of fact both in documents outside the parties' contracts, including the loan tapes, and in oral discussions, as alleged in Paragraphs 41 to 47, above.

124.   As set forth above in Section VI, United Guaranty reasonably relied on Countrywide's false representations.  Countrywide was responsible for underwriting each Mortgage Loan, and Countrywide structured the timing of each CWABS Securitization to compel United Guaranty to rely on its representations.  Further, United Guaranty, as the insurer, had the right to rely on the representations of Countrywide, the applicant for insurance.

125.   United Guaranty was unaware of the falsity of Countrywide's statements when they were made.  Had United Guaranty been aware of the falsity of the statements, including the representations that Countrywide had underwritten the Mortgage Loans according to its subprime underwriting guidelines, it would have refused to do business with Countrywide, and would not have issued any of the Insurance Policies in question.

126.   Countrywide's negligent misrepresentations have caused United Guaranty to suffer damages as set forth in more detail in Section X.  For example, United Guaranty has received substantially lower premiums relative to the risk of insuring the Mortgage Loans.  United Guaranty has placed greater amounts of capital in reserve to pay potential claims, preventing it from employing that capital to other business pursuits.  Further, United Guaranty has paid claims for loans it would have refused to cover had it been aware of the falsity of Countrywide's representations or the concealed material facts.  United Guaranty has also incurred substantial burden and expense investigating a deluge of claims arising under these fraudulent loans.  And United Guaranty must bear the cost of removing the fraudulent Countrywide data from its pricing databases to protect its ability to assess and price risk.

127.   Countrywide's false representations were in made violation of its legal duties and obligations under California Insurance Code §§ 330, 331, 332, 350, 351, 358, and 359 and Cal. Civ. Code §§ 1709, 1710, subd. 2, and 1572, subd. 2.

## FIFTH CAUSE OF ACTION
### (NEGLIGENCE)

128.   United Guaranty incorporates by reference all the foregoing allegations as if fully set forth herein.

129.   This is a claim for negligence against Countrywide Home and Bank of New York Trust.

130.   Countrywide Home applied for insurance coverage for the Mortgage Loans underlying the CWABS and acted as Bank of New York Trust's agent in obtaining the Insurance Policies.  Countrywide Home therefore had a legal duty to exercise reasonable care in obtaining insurance coverage under California Insurance Code §§ 330, 331, 332, 350, 351, 358, and 359, which required Countrywide to disclose material information for the purpose of obtaining insurance coverage in an

honest, truthful, and accurate manner and fully divulge in good faith all facts within its knowledge material to insurance coverage.

131.   As set forth above in Sections IV, VII, and VIII and in <u>Appendix A</u> and <u>Appendix B</u>, Countrywide Home breached its duty in obtaining insurance by providing materially false information to United Guaranty and by failing to disclose truthful material facts.

132.   Countrywide Home provided materially false information to United Guaranty to obtain insurance for Bank of New York Trust.  Under general agency principles, Bank of New York Trust is liable for Countrywide Home's breach of duty in obtaining insurance on its behalf.

133.   Independently, as a party to an insurance contract, Bank of New York Trust had a legal duty to exercise reasonable care in obtaining insurance coverage under California Insurance Code §§ 330, 331, 332, 350, 351, 358, and 359, which required Bank of New York Trust to disclose material information for the purpose of obtaining insurance coverage in an honest, truthful, and accurate manner and fully divulge in good faith all facts within its knowledge material to insurance coverage.

134.   As set forth above in Sections V, VII, and VIII and in <u>Appendix A</u> and <u>Appendix B</u>, Bank of New York Trust breached its duty in obtaining insurance by affirmatively representing, without any investigation into whether its representations were correct, that the Mortgage Loans were accurately and completely described in all material respects and that they were underwritten in accordance with Countrywide's underwriting guidelines and prudent underwriting judgment.

135.   Further, Bank of New York Trust continues to breach its duties of care. It continues to ignore information that the Mortgage Loans were fraudulent and not underwritten in accordance with Countrywide's guidelines or prudent underwriting standards.  Indeed, Bank of New York Trust continues to allow claims to be submitted under the Insurance Policies, and continues to allow appeals to be filed

when claims are denied for fraud, despite evidence that Countrywide has engaged in fraudulent practices in originating the Mortgage Loans and obtaining the Policies.

136.   As a result of Countrywide Home's and Bank of New York Trust's negligent breaches of duty, United Guaranty has suffered and continues to suffer damages as set forth in more detail in Section X.  For example, United Guaranty has received substantially lower premiums relative to the risk of insuring the Mortgage Loans.  United Guaranty has placed greater amounts of capital in reserve to pay potential claims, preventing it from employing that capital to other business pursuits.  Further, United Guaranty has paid claims for loans it would have refused to cover had it been aware of the falsity of Countrywide's representations or the concealed material facts.  United Guaranty has also incurred substantial burden and expense investigating a deluge of claims arising under these fraudulent loans.  And United Guaranty must bear the cost of removing the fraudulent Countrywide data from its pricing databases to protect its ability to assess and price risk.

## SIXTH CAUSE OF ACTION
### (RESCISSION)

137.   United Guaranty repeats and incorporates by reference all the foregoing allegations as if fully stated herein.

138.   This is a claim against Countrywide Home and Bank of New York Trust for global rescission of the Insurance Policies under California Insurance Code §§ 330, 331, 332, 334, 338, 359, 360, 441, and 447, and Cal. Civ. Code § 1689(b)(1).

139.   Section 331 of the California Insurance Code permits global rescission of an insurance policy based on concealment, "whether intentional or unintentional." Section 330 of the California Insurance Code defines concealment as "[n]eglect to communicate that which a party knows, and ought to communicate."

140.   In addition, Section 338 of the California Insurance Code permits global rescission of an insurance policy based on "[a]n intentional and fraudulent omission, on the part of one insured, to communicate information of matters proving or tending to prove the falsity of a warranty."

141.   As set forth above in Sections IV, VII, and VIII and in <u>Appendix A</u> and <u>Appendix B</u>, Countrywide Home concealed and suppressed material facts regarding the Mortgage Loans and its intentional deviation from its underwriting guidelines, including information tending to prove the falsity of express warranties made in the Commitment Letters and Insurance Policies.

142.   Likewise, although Bank of New York Trust made express warranties in both the Commitment Letters and Insurance Policies, it made no attempt to determine whether its express warranties were true or false and continues to take no action, as the Insured, to determine the falsity of its express warranties, despite evidence of Countrywide's fraudulent practices.

143.   The failure to disclose material facts influenced United Guaranty's estimation of the risks in issuing the Insurance Policies and its decision to issue the Insurance Policies.  Had United Guaranty been aware of the true material facts, it would never have issued the Insurance Policies.

144.   Further, Section 359 of the California Insurance Code permits global rescission of an insurance policy based on a material misrepresentation, providing that "[i]f a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false."  Sections 334 and 360 of the California Insurance Code provide that "[m]ateriality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

145.   As set forth above in Sections IV, V, VII, and VIII and in <u>Appendix A</u> and <u>Appendix B</u>, Countrywide Home and Bank of New York Trust made material and false representations regarding the Mortgage Loans and Countrywide's adherence to its underwriting guidelines.  The false representations influenced United Guaranty's decision to issue the Insurance Policies and estimation of the risks in issuing the Insurance Policies.  Had United Guaranty been aware of Countrywide Home's and Bank of New York Trust's misrepresentations, it would never have issued the Insurance Policies.

146.   Independently, Section 447 of the California Insurance Code permits global rescission of an insurance policy based on "violation of a material warranty or other material provision of a policy," with materiality measured under the standard set forth in Section 334 of the California Insurance Code (see Paragraph 144, above).

147.   As set forth above in Sections IV, V, VII, and VIII and in <u>Appendix A</u> and <u>Appendix B</u>, Countrywide and Bank of New York Trust violated express warranties in the Commitment Letters and Insurance Policies.  The express warranties influenced United Guaranty's decision to issue the Insurance Policies and estimation of the risks in issuing the Insurance Policies.  Had United Guaranty been aware that Countrywide and Bank of New York Trust could not fulfill the express warranties, it would never have issued the Insurance Policies.

148.   Finally, California Civil Code 1689(b)(1) permits rescission when a party's consent to the contract was obtained by fraud.  United Guaranty entered into the Insurance Policies in reliance on Countrywide's fraudulent misrepresentations about the characteristics of the Mortgage Loans and its adherence to its stated underwriting guidelines.  United Guaranty's decision to enter into the Insurance Policies was based on the false representations made by Countrywide both prior to and at the time of entering the contract.  Had United Guaranty been aware of the

falsity of these statements, and the concealed material information, it would never have entered into the Insurance Policies.

149.   Based on the foregoing, United Guaranty is entitled to global rescission of the Insurance Policies.

## SEVENTH CAUSE OF ACTION
## (UNFAIR COMPETITION AND BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200)

150.   United Guaranty repeats and incorporates by reference all the foregoing allegations as if fully stated herein.

151.   This is a claim against Countrywide Home and Countrywide Financial for Unfair Competition and Business Practices in violation of California Business and Professions Code Section 17200.

152.   As set forth above, Countrywide Home's and Countrywide Financial's conduct in providing United Guaranty with fraudulent information about the Mortgage Loans and concealing their intentional deviation from underwriting standards induced United Guaranty to issue the Insurance Policies for the Securitizations in violation of Section 332 of the California Insurance Code, which required Countrywide Home and Countrywide Financial to communicate to United Guaranty in good faith all facts within their knowledge that were material to the Insurance Policies.

153.   Countrywide Home's and Countrywide Financial's violation of Section 332 of the California Insurance Code constitutes an unlawful business act or practice in violation of Section 17200 of the California Business and Professions Code.

154.   As set forth above in Section X, United Guaranty has suffered injury in fact and lost money or property as a result of Countrywide Home's and Countrywide Financial's violation of Section 17200 of the California Business and Professions Code.  Based on the information Countrywide Home and Countrywide

Financial provided, United Guaranty agreed to issue the Insurance Policies and has paid claims for loans it would not have otherwise paid but for Countywide Home's and Countrywide Financial's violation of Section 17200 of the California Business and Professions Code.

155.   As a consequence of Countrywide Home's and Countrywide Financial's violation of Section 17200 of the California Business and Professions Code, United Guaranty is entitled to restitution and disgorgement of its lost money and property.

## **PRAYER FOR RELIEF**

WHEREFORE United Guaranty prays for relief as follows:

a.      Rescission of the Insurance Policies;

b.      Reimbursement of United Guaranty's payments on fraudulent claims or on claims on loans that fail to meet underwriting guidelines under the Policies, including draw downs on guarantees;

c.      United Guaranty's losses, including reserve costs, lost profits, and lost opportunities;

d.      Indemnification for United Guaranty's attorneys' fees and costs associated with enforcing its legal rights under the Commitment Letters and Insurance Policies;

e.      Restitution of United Guaranty's lost money and property;

f.      Punitive damages;

g.      Prejudgment interest at the maximum legal rate; and

h.      Such other and further relief as the Court may deem just and proper.

CASE NO. CV 09-01888 MRP (JWJx)
AMENDED COMPLAINT

1    DATED: July 15, 2009                    QUINN EMANUEL URQUHART OLIVER &
2                                            HEDGES, LLP

3
                                            By   /s/
4                                               Richard A. Schirtzer
5                                               Attorneys for United Guaranty Mortgage
                                               Indemnity Company
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. CV 09-01888 MRP (JWJx)
                                                       AMENDED COMPLAINT