1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 **United Guaranty Mortgage Indemnity Co.,** | **Case No.** **CV-09-1888-MRP (JWJx)** |
| 12 | |
| 13 Plaintiff, v. | |
| 14 **Countrywide Financial Corp.**, *et al.*, | **ORDER Granting Motions to Dismiss the Amended Complaint** |
| 15 Defendants. | |

16

17    In this mortgage insurance case, an insurer ("United Guaranty")[1] sues two

18  affiliated mortgage companies (collectively, "Countrywide"; separately,

19  "Countrywide Financial" and "Countrywide Home")[2] and a mortgage

20  securitization trustee ("BNY Trust").[3]

21    The original complaint asserted contract, tort, and statutory claims.

22

---

23  [1]    United Guaranty Mortgage Indemnity Company.
   [2]    Countrywide Financial Corporation and Countrywide Home Loans, Inc.
24  Countrywide Financial is the parent company. Amended Compl. ¶¶ 19-20.
   Countrywide Home is a wholly owned subsidiary that "originates and services
25  residential home mortgage loans." *Id.* ¶ 20.
26  [3]    The Bank of New York Trust Company, N.A. BNY Trust is now "Bank of
   New York Mellon Trust Company, N.A." This order nevertheless uses the name
27  that appears on the complaint. BNY Trust is sued "solely in its trustee (rather than
28  individual) capacity."

Countrywide and BNY Trust moved to dismiss the original complaint. The claims for breach of contract and breach of implied covenant survived. The other claims were dismissed with leave to amend, primarily for failure to overcome the economic loss rule, which generally bars tort claims for contractual breaches.

United Guaranty then filed the Amended Complaint ("AC"). Now before the Court are motions to dismiss the tort and statutory claims reasserted in the AC. The motions are granted in their entirety.

# I.

# BACKGROUND

**A. Procedural posture.**

This insurance dispute has generated three court cases and several arbitrations. Two of the cases are pending before this Court.

United Guaranty filed the present case in this Court. The other case was filed by Countrywide in California state court; United Guaranty subsequently removed that case to this Court. United Guaranty filed the third case in North Carolina federal court, citing forum selection clauses. Each side also initiated arbitration proceedings against the other. A prior order, the "Omnibus Order Resolving Three Jurisdiction-Related Motions," details the parties' procedural maneuvers. Docket no. 84 (July 1, 2009).

Of the two cases before this Court, the present case is narrower in factual scope and broader in legal theories. In it, United Guaranty sues on eleven "Master Policies" that insure first-lien mortgages that Countrywide securitized.[4] United Guaranty asserts claims in contract, in tort, and under California statutory law.

**B. The securitizations.**

In the securitizations, Countrywide affiliates conveyed a pool of mortgages

---

[4]    Countrywide's removal case implicates more types of loans, policies, and securitizations. *See* Omnibus Order at 9-10, 38-45. Its claims are much narrower in legal scope, however.

-2-

1    to a first trustee. In exchange for the mortgages, this first trustee issued debt
2    instruments that represent a right to proceeds from trust assets (such as incoming
3    mortgage payments by homeowners or, perhaps, mortgage insurance proceeds).

4    Countrywide and a second trustee, BNY Trust, obtained mortgage insurance
5    on a subset of the securitized loans from United Guaranty. BNY Trust (in its role
6    as a trustee) is the sole named "insured" on the policies. The first trustee is not
7    party to the mortgage insurance transaction; it is likewise not a party to this case.[5]

8    Altogether, the securitizations in issue "encompass[] over $13 billion" of
9    mortgage loans. AC ¶ 35.

10   **C. The complaints.**

11   United Guaranty's original complaint asserted seven claims. Countrywide
12   and BNY Trust each filed a motion to dismiss. Two contract claims survived the
13   motions. They are: (claim 1) breach of contract against Countrywide Home and
14   BNY Trust; and (claim 2) breach of the implied duty of good faith and fair dealing
15   against Countrywide Home. In granting the remainder of the motions, the Court
16   provided United Guaranty brief statements of its reasoning. The Court further
17   granted United Guaranty leave to amend.[6]

18   United Guaranty amended by filing the AC. The AC substantially reasserts
19   the dismissed claims, though it adds allegations, attaches two appendices, and
20   rearranges some defendants. Countrywide and BNY Trust each filed a motion to
21   dismiss the AC. These motions are now before the Court.

22   / / /

---

[5]    *See* Omnibus Order at 2-7 (providing more detail on the transactions).
[6]    Order Granting in Part Motions to Dismiss at 2, docket no. 85 (July 1, 2009).

1     The AC claims addressed in the motions[7] are: (claim 3) fraudulent

2 inducement against Countrywide Home and Countrywide Financial; (claim 4)

3 negligent misrepresentation against Countrywide Home and Countrywide

4 Financial; (claim 5) negligence against Countrywide Home and BNY Trust; (claim

5 6) rescission against Countrywide Home and BNY Trust; and (claim 7)

6 California's statutory Unfair Competition Law against Countrywide Home and

7 Countrywide Financial.

8     For the reasons that follow, claims 3-7 are DISMISSED WITH PREJUDICE

9 as to all defendants.

## II.

## LEGAL STANDARD

12     A motion to dismiss tests whether properly pled allegations, if true, amount

13 to an actionable claim. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). In

14 evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept

15 as true all properly pled allegations of material fact in the complaint and read the

16 complaint in the light most favorable to the nonmoving party. *Sprewell v. Golden*

17 *State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001); *Parks Sch. of Bus., Inc. v.*

18 *Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995). However, a court will not accept as

19 true unreasonable inferences; nor will it accept legal conclusions cast in the form

---

[7]     Not addressed in the present motions are amendments to the original
complaint's surviving claims: (claim 1) breach of contract and (claim 2) breach of
the implied covenant of good faith and fair dealing. United Guaranty added some
damages allegations to claim 1. *Compare* Orig. Compl. ¶ 93 *with* AC ¶ 90. As for
claim 2, it appears that United Guaranty added damages allegations and inserted
language that may suggest it seeks to propound the tort of bad faith breach of the
implied covenant. *Compare* Orig. Compl. Cl. 2 (alleging only a "breach" but not
"bad faith" or noncontract damages, ¶¶ 96, 100) *with* AC Cl. 2 (adding allegations
of "bad faith" and enlarging the damages allegation, ¶¶ 94, 97). The Court
sustained claims 1 and 2 as originally pled; it has not ruled on the legal effect or
adequacy of these changes.

of factual allegations. *Iqbal*, 129 S. Ct. at 1949.

A complaint may be read together with documents incorporated by reference and facts appropriate for judicial notice. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998); *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir. 2001).[8]

Pleading generally requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). Showing entitlement to relief requires "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . ." *Iqbal*, 129 S. Ct. at 1949 (citing and quoting *Twombly*, 550 U.S. at 556 (internal quotations omitted)).

Plausibility is "context-specific" and takes into account "judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. But plausibility analysis does not license judicial whim; nor does it allow a court to blur the line between dismissal and summary judgment. *See Twombly*, 550 at U.S. 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (internal quotations omitted)).

In addition, "the circumstances constituting fraud or mistake"—as opposed to "conditions of mind"—must be alleged "with particularity." Fed. R. Civ. Proc. 9(b). Rule 9(b) ensures that defendants have adequate notice of the fraud's "who, what, when, where, and how." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124

---

[8]    In deciding jurisdiction-related motions in this and the related case, the Court considered a fuller record and ruled on jurisdictional facts. See Omnibus Order. The standards for the present motions are more limiting. Accordingly, care has been taken not to look beyond the AC (and matters appropriate for judicial notice, as explained below). Citations to the Omnibus Order, above, are for background only.

(9th Cir. 2009). Even if fraud is not "an essential element" of a claim, Rule 9(b) still applies to claims that "are grounded in fraud" (also known as claims that "sound in fraud") and to "averments of fraud." *Kearns*, 567 F.3d at 1124-25. Allegations that do not meet Rule 9(b) are "disregarded" or "stripped from" the complaint. *Id.* at 1124.

A complaint that fails to meet these standards will be dismissed. Leave to amend should be given "freely . . . when justice so requires." Fed. R. Civ. Proc. 15(a)(2). However, dismissal with prejudice is appropriate if amendment would be "futile." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

### III.

### ALLEGATIONS

The following allegations come from the AC, are assumed true, and are stated in the light most favorable to United Guaranty. No allegations have yet been "stripped" for failure to comply with Rule 9(b).

**A. United Guaranty and its business with Countrywide.**

United Guaranty provides mortgage insurance, which "shifts some of the risk of default from the lender to the insurer." ¶ 2. Mortgage insurance covers the difference between the lender's loss "after foreclosure and sale" of a mortgaged property. ¶ 27.

United Guaranty has extensive experience in mortgage insurance, having sold it "to a wide variety of clients" since 1963. *Id.* United Guaranty and Countrywide have done business "for over forty years." *Id.*

During its business relationship with United Guaranty, Countrywide "made specific oral representations" to United Guaranty, such as that "Countrywide had developed stringent underwriting procedures [and that] Countrywide strictly followed those procedures . . . ." ¶ 44-45. Countrywide also provided "Technical Manuals" that represented that Countrywide "rarely underwrote loans that were exceptions to its underwriting guidelines, and, when it did, it required significant

documentation to justify the exception." ¶ 46.

Since 1990, United Guaranty has used a "delegated model" for underwriting Countrywide loans. ¶ 29. This means it chose to "rel[y] on Countrywide to represent information on the loans to be insured." *Id.* Such information includes borrowers' minimum credit scores and the mortgages' loan-to-value ratio (i.e., the amount loaned versus the property value). *Id.*; ¶ 44. United Guaranty used this information to decide whether to offer insurance on those loans. ¶ 29.

**B. The eleven policies in suit.**

Countrywide obtained the eleven policies at issue between October 2006 and June 2007. ¶¶ 4, 35, 38, 43. The policies covered loans for securitization, with BNY Trust as the securitization trustee holding mortgage insurance. ¶ 2. The loans were "subprime," a class of loans that are inherently riskier than "traditional" loans. ¶¶ 5, 7.

Despite United Guaranty's experience with mortgage insurance in general, and Countrywide in particular, "United Guaranty had limited experience in the subprime market." ¶ 5. To reassure United Guaranty, "Countrywide made multiple representations and traded on its long-standing relationship with United Guaranty to induce United Guaranty to issue the [eleven policies]." ¶ 5.

More specifically, "Countrywide falsely represented to United Guaranty that it had originated the underlying Mortgage Loans in strict compliance with its underwriting standards and guidelines, which were developed over time" to reduce default risk. ¶ 6. Countrywide sent United Guaranty data containing "false information on the individual loans, including misrepresentations regarding characteristics of the loans and the creditworthiness of the borrowers." *Id.* "Countrywide knew that United Guaranty would rely on this data in determining which loans to insure and what premiums to set." *Id.*

BNY Trust signed the letters containing Countrywide's representations, assuring United Guaranty "that each Mortgage Loan was accurately described and

underwritten in accordance with Countrywide's underwriting guidelines and prudent underwriting judgment." ¶¶ 10, 50-53.

Based on the foregoing, "United Guaranty priced and issued" the policies to BNY Trust. ¶ 7.

It bears emphasis that the insurance policies were issued in what the parties refer to as "bulk" or "pool" transactions: altogether, the eleven transactions involve thousands of loans and "encompass[] over $13 billion" in residential mortgages. AC ¶¶ 35-38.

**C. The events leading to suit.**

"In reality, Countrywide had abandoned any reasonable and prudent underwriting standard[s]." ¶ 8. And BNY Trust "failed to take any steps to uncover Countrywide's fraud or the inaccuracy of its own representations." ¶ 16.

As a result, "in the summer of 2007," the insured loans "began to show a high number of delinquencies." ¶ 62. As claims were submitted, United Guaranty's claims investigations "revealed an unusually high rate of fraud in connection with the Mortgage Loans for which the claims were submitted." *Id.*[9] United Guaranty's denial rate for claims under the policies was 50% (compared with a 13% denial rate for other first-lien loans). ¶ 66.

United Guaranty then "commenced an investigation to determine whether it was the victim of "systemic originator fraud"—that is, fraud by Countrywide as opposed to the mortgage borrowers. ¶ 66. To investigate, United Guaranty audited the loans underlying two of the securitizations. ¶ 66. The audit revealed that "over 55% of the Mortgage Loans either failed to comply with Countrywide's underwriting guidelines or contained some material defect." ¶ 68.[10]

---

[9]    The AC includes an appendix listing denied claims and the reasons for the denial. Appx. A.

[10]    The AC includes an appendix summarizing some audit results. Appx. B.

**D. United Guaranty's losses.**

The AC groups United Guaranty's losses into two categories: (a) losses it characterizes as "arising directly" from the policies, ¶ 73; and (b) losses it characterizes as arising "in several other ways." ¶ 77.

**1. Losses characterized as "arising directly" from the policies.**

"As of March 2009," when United Guaranty filed this suit, it "had paid nearly $40 million" in claims under the eleven policies. ¶ 63.

United Guaranty never would have issued the policies if it had known about Countrywide's practices. ¶ 74. Even if United Guaranty would have issued the policies, it would have charged higher premiums for the increased risk caused by Countrywide's practices. ¶ 75. United Guaranty further "believes it has paid claims" on loans for which it has no liability under the policies because United Guaranty failed, in its claims processing, to discover some "fraudulent loans and on loans that do not meet underwriting guidelines." ¶ 76.

**2. Losses characterized as arising "in several other ways."**

United Guaranty has been "forced . . . to place more than $120 million in reserve" to pay potential claims under the policies. ¶ 78. This displaced capital has "hampered United Guaranty's ability to pursue other business opportunities." *Id.*

The large number of claims under the policies and United Guaranty's presuit audit has caused United Guaranty to hire three additional claims adjusters. ¶ 79. Relatedly, the large number of claims has increased the number of third-party claims investigators United Guaranty has hired. ¶ 80.

Finally, because United Guaranty relies on historical data to price risk, it "must now incur the cost to review and scrub its databases of Countrywide's false information." ¶ 82.

**3. BNY Trust's role in causing losses.**

BNY Trust "still has not taken any steps to verify the representations it and Countrywide made to United Guaranty or to investigate Countrywide's fraud."

¶ 71. And BNY Trust "continues to allow claims to be submitted . . . and to allow multiple, meritless appeals of United Guaranty's" claims denials. ¶¶ 72, 81.

## IV.

## THE POLICIES

The insurance policies define and limit the parties' rights and obligations. In addition, several provisions are in considerable tension with some allegations in the AC.

**A. Judicial notice of the policies.**

United Guaranty does not attach any policy contracts to the AC. However, the contracts are readily identifiable because the AC states the unique identification number of specific securitizations; those securitizations, in turn, are associated with particular policy contracts. ¶¶ 35, 42-43, 49.

The Court takes judicial notice of the contracts' provisions. Notice is limited to what the contracts say; notice is not appropriate for the substantive truth of any representations made in the contracts. *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir. 2001).

Judicial notice is proper because the contracts are integral to the complaint and no party disputes the contracts' identity and accuracy.[11] During prior

---

[11]    *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) ("[D]ocuments crucial to the plaintiff's claims, but not explicitly incorporated in his complaint" may be considered to prevent plaintiffs from "surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based"), *superseded by statute on other grounds*, *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) ("Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." (internal quotations omitted)).

BNY Trust disputes some policy documents in the related case that Countrywide originally filed in state court. Omnibus Order at 11-12 n.9. But BNY Trust has no quarrel with the identity or accuracy of the documents underlying the policies in the present case.

1  proceedings in this same case, the parties made a stipulated filing containing their

2  contracts. Omnibus Order at 11 n.9 (explaining the procedure); docket nos. 49, 52-

3  57 (containing the relevant contracts).[12]

4  **B. Policy components.**

5        Each policy comprises the same three standardized forms and a

6  "commitment letter."

7        **1. Standardized forms.**

8        All eleven policies incorporate the same standardized forms: (1) the base

9  "terms and conditions" form—for these policies, called the "Master Policy"; (2) an

10  "amendatory endorsement," another form which modifies some paragraphs in the

11  Master Policy; and (3) a "declaration page," which contains some fields for

12  information customized to each transaction. *See generally Haynes v. Farmers Ins.*

13  *Exch.*, 32 Cal. 4th 1198, 1207-08 (2004) (discussing form insurance agreements

14  and amendatory endorsements).

15        Of the standardized forms, only the Master Policy is relevant to the current

16  interpretive issues.

17        **2. Commitment letters.**

18        Before each policy became effective, United Guaranty wrote a "commitment

19  letter" to explain its understanding of the putative policy and the mortgages to be

20  insured. Countrywide Home and BNY Trust then signed the commitment letters.

21  After that, United Guaranty signed an "Accepted by" line. No other party signed

22  the commitment letters.

23        The commitment letters for the eleven transactions at issue contain the same

24  provisions in the same locations. Likewise, factual representations regarding the

25  insured mortgages are made in an "Exhibit B"—also known as a "loan tape"

26

27  [12]        Further, most policy documents were filed with the SEC. *See, e.g.*, CWABS,
28  Inc., Form 8-K, Ex-99.5 (Nov. 8, 2006) (attaching most policy documents related
   to the earliest securitization in suit, known as "CWABS 2006-20").

because it lists the mortgages and some data about them—to each commitment letter. Commitment letter citations ("CL") therefore refer equally to any commitment letter.

By the Master Policy's terms, the commitment letters became part of the policy. Master Policy § 1.31. The commitment letters are, by far, the most detailed and customized component of the policies.

**C. Interpretive rules.**

Both the Master Policies and commitment letters contain California choice of law provisions. Master Policy § 6.8; CL ¶ 11.

**1. General interpretive principles.**

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 396 (2005) (internal quotations omitted). Contract interpretation is a matter of law and "solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence." *Super. Dispatch, Inc. v. Ins. Corp. of New York*, 176 Cal. App. 4th. 12, 31 (2009). *See also Powerine*, 37 Cal. 4th at 389-90.

A policy will be interpreted, "if possible, solely from the written provisions of the contract." *Powerine*, 37 Cal. 4th at 390. The entire contract must be considered: "[A]n insurance policy must be interpreted as a whole and in context." *Mirpad, LLC v. Cal. Ins. Guarantee Assoc.*, 132 Cal. App. 4th 1058, 1070 (2005). During interpretation, terms generally receive their "ordinary and popular sense unless used by the parties in a technical sense." *Id.* at 1069 (internal quotations and modifications omitted).

**2. Resolving ambiguity.**

Where an ambiguity arises in contracts that involve both standardized form and customized components, the customized components generally control. Cal. Civ. Code § 1651.

The commitment letters—drafted for each transaction and containing a schedule with representations about the insured loans—are the most customized component for present purposes.[13]

If, after reading a policy this way, "an asserted ambiguity is not eliminated . . . courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." *Powerine*, 37 Cal. 4th at 391. Ambiguity in insurance contracts is resolved against the insurer even if the insured is legally sophisticated and possesses significant negotiating leverage. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 823 (1990).[14]

**D. Transactional structure and key policy provisions.**

The following provisions provide background on the transactions' structure and the policies' provisions.

These contractual provisions are important background to the legal discussion; United Guaranty's legal arguments can only be understood in the

---

[13]    California courts emphasize the importance of the declaration page, which is often the most specific and customized document for many transactions. *See Haynes*, 32 Cal. 4th at 1206-07, 1210. However, the declaration pages contain no information relevant to the present issues.

[14]    An exception arises if policy language was <u>both</u> "actually negotiated" <u>and</u> "jointly drafted." *AIU*, 51 Cal. 3d at 823; *Agricultural Ins. Co. v. Superior Court*, 70 Cal. App. 4th 385, 398-99 (1999) (discussing *AIU*). Indeed, not even "line-by-line" negotiation by the parties changes the rule if the negotiated lines are "adopted verbatim from standard form policies" used by the insurer. *AIU*, 51 Cal. 3d at 824 n.9; *Coca-Cola Bottling Co. of San Diego v. Columbia Cas. Ins. Co.*, 11 Cal. App. 4th 1176, 1186 (1992) ("As we interpret *AIU*, an insured's bargaining position is important and will alter the usual rules of policy interpretation, <u>but only</u> if it can be demonstrated that the insured's bargaining power was brought to bear <u>in creating the particular language in dispute</u>." (emphases added)). In this case, only the Subprime Guideline Summary was allegedly drafted by a party other than United Guaranty; the standardized forms are United Guaranty's own; and United Guaranty wrote the Commitment Letters. *See* CL ¶ 2.

context of the provisions' necessary implications. The legal discussion cites additional provisions, where relevant.

### 1. Delegated underwriting.

The Master Policy discusses United Guaranty's standard delegated underwriting program. *See, e.g.*, Master Policy §§ 1.34-38, 1A. Such a delegated model makes sense when engaging in bulk mortgage insurance transactions: the applicant represents material information about the mortgage, then the insurer prices and issues the policy based on that information. *See* AC ¶ 29.

The commitment letters replace United Guaranty's standard program with Countrywide's "Subprime Guideline Summary." CL ¶ 2. Specifically, the commitment letters recognize that, because the ordinary delegated underwriting guidelines "do not apply," even very high loan-to-value ratios—including 100% loans—are covered. *Id.*

The commitment letters refer only to the Subprime Guideline Summary in defining the loans that are eligible for submission to United Guaranty. *Id.* The "Technical Manuals" and other Countrywide representations regarding Countrywide's general origination practices are not part of the delegated underwriting guidelines. *See, e.g.*, AC ¶¶ 46 (discussing the "Technical Manuals"); 52, Exh. B (recognizing that the Subprime Guideline Summary, not the Technical Manuals, was substituted for United Guaranty's ordinary guidelines). And the

/ / /

commitment letters contain an integration clause. ¶ 22.[15]

**2. United Guaranty's audit rights.**

United Guaranty did not entirely abdicate underwriting to Countrywide. The parties chose to give United Guaranty audit rights—both before and after the policy transactions closed. CL ¶ 8.1; Master Policy 1A.3(b). United Guaranty controlled the form in which the information was reported and reserved the right to request any additional information "which may be reasonably requested by United Guaranty." CL ¶¶ 8.1, 8.3.

The commitment letters further state that "United Guaranty <u>shall</u> request the right to perform due diligence on loans to be covered under the Policy." CL ¶ 8.1

---

[15]    In California, integration clauses do not bar fraudulent inducement theories as a matter of law. *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 301 (2005). But neither are integration clauses "in every case irrelevant." *Id.* For example, an integration clause may be relevant to reasonable reliance, *id.* at 301-03, which federal courts assess on motions to dismiss under the plausibility standard. However, some California cases contain stronger language against using integration clauses. *Ron Greenspan Volkswagen v. Ford Motor Land Dev. Corp.*, 32 Cal. App. 4th 985, 994 n.6 (1995) (stating in dicta, without significant analysis and after distinguishing prior cases, that an integration clause might be disregarded, even if assented to by sophisticated parties in a business agreement). *See generally* GLENN D. WEST & W. BENTON LEWIS, JR., CONTRACTING TO AVOID EXTRA-CONTRACTUAL LIABILITY—CAN YOUR CONTRACTUAL DEAL EVER REALLY BE THE "ENTIRE" DEAL?, 64 BUS. LAW. 999 (2009) (discussing integration clauses and related certainty-enhancing provisions in sophisticated business agreements; observing that states, and courts within them, are coming to various conclusions about such clauses' effect).

Given this state of the law, and because the result does not change whether the integration clause is considered, the Court draws no particular inference from the clause. Its presence is merely noted as background to the nature of these sophisticated parties' agreement.

(emphasis added).[16]

United Guaranty's commitment letter memorializes that the parties assented to these provisions "[i]n order to <u>verify the accuracy of certain information</u> . . . <u>and to expedite</u> the issuance of the Policy." CL ¶ 8.1 (emphases added). *But see* AC ¶¶ 55-56 (alleging that "Countrywide set up the [securitizations to close in periods ranging from as short as 11 days to as long as 38 days] so that United Guaranty was unable to exercise any right of access to loan files or conduct a loan-level review of the mortgage loans . . . .").

### 3. Separate coverage options and certificates.

Though United Guaranty insured loans that were pooled for securitization, the Exhibit B "loan tapes" presented each loan as a separate "coverage option" to United Guaranty. After United Guaranty agreed to cover a particular loan, coverage for each loan became evidenced by a separate "certificate" for each loan.

The Master Policy explains that United Guaranty chose to extend a "coverage option to a specified Loan." §§ 1.10; 2.1. United Guaranty extended that option under the conditions precedent stated in a commitment letter. *Id. See also* CL ¶ 5 (defining the conditions precedent and specifying that "[f]ailure to comply with" certain terms of the Master Policy "may result in cancellation of coverage").

After those conditions were satisfied, the commitment became the "Certificate" that extends and evidences coverage for each "specified Loan." *Id.* Master Policy §§ 1.07; 2.1. However, the certificate <u>only</u> incorporates representations with respect to the <u>particular loan</u> to which the representations relate. *Id.* § 1.31 (providing that all application materials and the commitment letter

---

[16]    The original complaint alleged that United Guaranty "properly performs its due diligence for loans underwritten using the delegated model." Orig. Compl. ¶ 26. The original complaint also alleged United Guaranty's policy-granted right of access to the underlying files. Orig. Compl. ¶ 53. The AC strikes these allegations. The Court draws no inference from the original complaint's allegations.

are "made a part [of the policy] with respect to the Loans to which they relate"). The commitment letters confirm that the attached "Schedule of Loans will serve as the Certificate for each loan insured by the Policy." CL ¶ 4.

But even if United Guaranty or BNY Trust exercise their cancellation rights,[17] the cancellation goes only to the certificate—not the entire policy. Master Policy §§ 2.6 (cancellation by insured), 2.7 (cancellation by insurer). *Accord* CL ¶ 7 (providing for "automatic resc[ission]" as to individual loans under some circumstances); Master Policy § 2.8 (providing that coverage can "automatically terminate" under some conditions, but that the termination is only "with respect to any Loan" and that termination will result in "the return of all related premium for the time period after the occurrence of the event giving rise to the termination").

Indeed, the Master Policy confirms that "cancellation of a certificate will not cancel Policy." § 2.6.

Further, if a loan is assigned, the certificate generally follows the loan. § 2.14. And the commitment letter clarifies that "the intent of the parties [is] that the Policy cover only loans which are part of" a particular securitization. CL ¶ 4. Thus, if the terms of the securitization require Countrywide to remove a loan from the securitization, then "the loan will be removed from coverage under the Policy and United Guaranty will have no liability under the Policy with respect to that loan." *Id.*

Two provisions contemplate that coverage could cease as to more than one loan at a time. The first provides that if the premium for a group of loans is not paid, then coverage may be canceled for the entire group of loans to which the

---

[17]    "Cancellation" is a term of art in the insurance industry. "Cancellation" refers to coverage's ceasing prospectively; rescission is retrospective. *Imperial Casualty & Indemnity Co. v. Sogomonian*, 198 Cal. App. 3 169, 182 (1988). The parties' contractual usage is consistent with this usage. *See, e.g.*, Master Policy §§ 2.6, 2.7, 2.9 (establishing or using a "cancellation" to describe the right to cease coverage prospectively).

premium relates. Master Policy § 2.5. The second, entitled "Discontinuance of the Issuance of Certificates by the Company; Cancellation of Policy," requires United Guaranty to follow certain notice procedures. Master Policy § 2.9. Most important, it contains a proviso "that <u>Certificates issued prior to the cancellation of this Policy shall continue in force</u> so long as all premiums are paid pursuant to, and subject to all other terms and conditions of, this Policy." *Id.* (emphasis added).

### 4. Provisions governing misrepresentation and fraud.

Nothing in the policy documents contemplates cancellation, rescission, or termination of coverage for an entire loan pool insured under a Master Policy (what the parties call "poolwide rescission")—not even for fraud. Instead, the policies expressly address fraud and allocate the risks of misrepresentation.

Indeed, the policies specifically provide for borrower and originator fraud as to particular loans. Under the Master Policy,

> the Insured [i.e., BNY Trust] accepts the risk of any misrepresentations whether innocent or otherwise . . . by the Borrower <u>or any other Person</u> in the loan application and in the appraisal, the plans and specifications, and other exhibits and documents submitted therewith or any other term thereafter <u>and the subsequent misrepresentation of that same information to the Company</u> [i.e., United Guaranty] in the [delegated underwriting] Form submitted [i.e., the Commitment Letter Exhibit B "loan tapes"] <u>in connection with the respective Loan</u>."
> § 2.2(b) (emphases added).

Thus, the insured accepts the risk of a material misrepresentation by anyone involved in loan origination—including Countrywide, because it meets the definition of "any other Person," Master Policy § 1.29—if the insured repeats that misrepresentation when applying for insurance. But the provision expressly provides only loan-by-loan remedies—"in connection with the respective loan"— and does not allow fraudulent representations by anyone involved with the

-18-

origination of one loan to affect coverage for other loans. *Id.*

This makes sense when insuring pools of mortgages that were originated by different loan officers, in different offices—and perhaps even by mortgage companies other than Countrywide. In such a transaction, the insured repeats the information provided by these myriad people; in a large enough pool, misrepresentations of some sort become nearly inevitable.

But the Master Policy goes further, expressly providing for claims handling fraud by the insured. It lays out how the parties will handle "any Claim involving or arising out of any dishonest, fraudulent, criminal, or knowingly wrongful act (including error or omission) by any Insured or . . . involving or arising out of negligence of any Insured, or any of their agents or employees . . . ." § 3.5. It also governs what happens if a claim is excluded for failing to conform to the delegated underwriting guidelines. § 3.8. Of course, both these provisions provide remedies only with respect to an individual loan; neither allows claims fraud with regard to one loan to affect coverage of other loans. *Id.* §§ 3.5(b), 3.8.

# V.

## DISCUSSION

The AC's tort claims (claims 3-5) fail for the same—or closely related—reasons. Accordingly, they are treated in the first section. The statutory rescission and Unfair Competition Law claims (claims 6 and 7) raise different issues and are addressed in separate sections.

**A. Tort claims.**

The three tort claims are negligence, negligent misrepresentation, and fraudulent inducement. United Guaranty asserts all three tort claims against Countrywide; it asserts only negligence against BNY Trust.

Two issues—the pleading standard and the economic loss rule—pervade the tort claims' analysis. The following discussion proceeds by explaining the pleading standard and economic loss rule, then evaluating the tort claims.

**1. Pleading fraud.**

All three tort claims against Countrywide in this case are subject to Rule 9(b)'s heightened standard. "Under California law, negligent misrepresentation is a species of actual fraud" and is therefore subject to Rule 9(b). *Lorenz v. Sauer*, 807 F.2d 1509, 1511-12 (9th Cir. 1987) (citing *Gold v. Los Angeles Democratic League*, 49 Cal. App. 3d 365, 373-74 (1975)). As for the negligence claim, the AC's negligence allegations against Countrywide are indistinguishable from the allegations underlying the fraudulent inducement claim. *See* Countrywide Mot. at 6-7 (comparing the allegations in tabular form). The negligence claim is therefore "grounded in fraud" and Rule 9(b) applies.

Negligence is the only tort asserted against BNY Trust. As against BNY Trust, the negligence claim does not sound in fraud. Rather, the AC distinguishes BNY Trust's allegedly negligent conduct from Countrywide's allegedly fraudulent conduct. *See, e.g.*, ¶¶ 1, 50-53, 70-72, 81. Because only nonfraud claims are asserted against BNY Trust, and because BNY Trust's role in the transactions at issue is carefully distinguished from Countrywide's role, BNY Trust will not receive Rule 9(b) protection. *In re Countrywide Fin. Sec. Litig.*, 588 F. Supp. 2d 1132, 1162-63 (C.D. Cal. 2008) (surveying "sounds in fraud" law in the securities context and concluding that Rule 9(b) does not apply where a complaint (1) distinguishes which defendants act fraudulently and which defendants do not act fraudulently; (2) specifies particularized allegations as to the fraud defendants; and (3) those particularized allegations do not raise an inference of scienter against the nonfraud defendants).

**2. The economic loss rule.**

The economic loss rule generally bars tort claims for contract breaches, thereby limiting contracting parties to contract damages. *Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000) ("A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations.").

1

### a. The rule's application and exceptions.

2
Though the economic loss rule is easy to state, the rule's application and

3
exceptions are more conceptually difficult. Most of the parties' arguments address

4
the rule. Applying the rule to the present circumstances requires considering the

5
rule's exceptions and policy rationales.[18]

6
The rule "prevents the law of contract and the law of tort from dissolving

7
into one another." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979,

8
988 (2004) (internal modification and quotations omitted). By preventing tort

9
claims—and, thus, tort damages—the rule encourages parties to reach a mutually

10
beneficial private bargain. Limiting recovery to contract damages makes it easier

11
for parties to "estimate in advance the financial risks of their enterprise." *Freeman*

12
*& Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 106 (1995) (quoting *Applied*

13
*Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994)); *Foley v.*

14
*Interactive Data Corp.*, 47 Cal. 3d 654, 694 (1988).[19] As a result, the rule is

15

16
[18]    One line of cases can be dispensed forthwith: United Guaranty incorrectly

17
argues that *Biakanja v. Irving*, 49 Cal. 2d 647 (1958), provides a framework for

18
exceptions to the economic loss rule. *Biakanja*'s test, by its own terms, determines
whether a tort duty is owed to third parties "not in privity" of contract. *Id.* at 650.

19
Modern cases confirm *Biakanja*'s limited application. *See, e.g.*, *Stop Loss*

20
*Ins. Brokers, Inc. v. Brown & Toland Med. Group*, 143 Cal. App. 4th 1036, 1042-
43 (2006). Thus, *Biakanja* controls the inquiry whether an insurance broker owes

21
an insurer a tort duty where that broker is not in privity of contract with the

22
insured. *Century Surety Co. v. Crosby Ins., Inc.*, 124 Cal. App. 4th 116 (2004)
(imposing a tort duty on an insurance broker, who was not in privity of contract

23
with insurer, not to transmit to the insurer "actual misstatements" of which the

24
broker "knows"). But *Biakanja* and *Century Surety* are irrelevant when the parties

25
have a contractual relationship.

26
[19]    In some circumstances, the rule also promotes more efficient private
ordering by enabling the "efficient breach[]" that occurs when the breaching

27
party's benefits outweigh the nonbreaching party's harm, usually on the

28
assumption that the nonbreaching party can obtain an alternative contract in the
market. *Freeman*, 11 Cal. 4th at 97 (internal quotations omitted).

particularly strong when a party alleges "commercial activities that negligently or inadvertently [went] awry." *Robinson Helicopter*, 34 Cal. 4th at 991 n.7.

### b. Types of exceptions to the rule.

California's economic loss rule has exceptions that fall into two broad categories. The first category applies to products liability cases, where the California rule first arose. *Robinson Helicopter*, 34 Cal. 4th at 991 n.7.[20] In the products liability context, the rule may be overcome by allegations of "personal injury or damages to other property [besides the defective product]." *Robinson Helicopter*, 34 Cal. at 988 (internal quotations and citations omitted).

California's economic loss rule has a second category of exceptions for breach of a noncontractual duty. These exceptions require the breach of a tort duty apart from the general duty not to act negligently. *Id.* at 988. Indeed, "[i]f every negligent breach of a contract gives rise to tort damages, the [rule] would be meaningless, as would the statutory distinction between tort and contract remedies." *Id.* at 990 (quoting *Erlich v. Menezes*, 21 Cal. 4th 543, at 553-554 (1999)). Thus, the California Supreme Court emphasizes that courts should "focus[] on" intentional conduct when considering whether to allow an exception to the rule. *Id.*[21] That Court has likewise admonished courts to "comprehensively to consider the implications of their holdings" before allowing tort claims to invade contractual relationships. *Foley*, 47 Cal. 3d at 688.

California courts have found exceptions to the economic loss rule in the noncontractual duty category where the conduct also (1) breaches a duty imposed by some types of "special" or "confidential" relationships; (2) breaches a "duty" not to commit certain intentional torts; or (3) was committed "intending or

---

[20]    *See also Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873-877 (9th Cir. 2007) (tracing the rule's common law development).

[21]    The law in most jurisdictions is stricter, requiring an intentional breach of a noncontractual duty. *See Giles*, 494 F.3d at 879.

knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." *Robinson Helicopter*, 34 Cal. 4th at 990 (citing and quoting *Erlich*, 21 Cal. 4th at 553-554).

### c. Special "bad faith" exception for insurers.

But the California Supreme Court recognizes that not all its decisions fit within this taxonomy. It created the taxonomy with the caveat that it applies "outside the insurance context." *Id.* This caveat refers to a tort—the tort of "bad faith breach of the implied covenant of good faith and fair dealing"—that lies against an <u>insurer</u> under some circumstances, such as where the insurer "withholds payment [on a claim] unreasonably and in bad faith." *Benavides v. State Farm Gen. Ins. Co.*, 136 Cal. App. 4th 1241, 1248-53 (2006).

The exception derives in part from the inapplicability of "efficient breach" to the insurance market, see *supra* n.19, because no substitute insurance contract exists for a loss that has already occurred. *Medina v. Safe-Guard Prods.*, 164 Cal. App. 4th 105, 111 (2008) (citing *Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 44 (1999)). In addition, as with the special relationship exceptions to the economic loss rule, this exception may protect the party perceived as more vulnerable—the insured. The California Supreme Court has traced the exception to insurers' "status as purveyors of a vital service labeled quasi-public in nature," and because of the "inherently unbalanced" and "adhesive" nature of the relationship between insurer and insured. *Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1180-81 (1993) (quoting *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819-20 (1979)) (emphasis added)).

Even so, the bad faith tort is a "rare exception[]" to the principle that "a business entity has no duty to prevent financial loss to others with whom it deals directly." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 59 (1998). The California Supreme Court recognizes that "the insurance cases represented 'a

major departure from traditional principles of contract law.'" *Erlich*, 21 Cal. 4th at 553 (quoting *Foley*, 47 Cal. 3d at 690). The tort is thus disfavored and has been cabined by modern courts. Accordingly, even where the insurer might be more "vulnerable" than the insured—such as where the insured is a sophisticated negotiator and is in better economic condition than the insurer—the insurer still cannot sue the insured in tort for bad faith breach of the implied covenant. *Agricultural Ins. Co. v. Superior Court*, 70 Cal. App. 4th 385, 397-99 & n.4 (1999). *See also Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 405-07 (2000) (discussing *Agricultural* with approval and reiterating that a bad faith breach by an <u>insured</u> is still "at base, a breach of contract").

### d. Creating new exceptions to the rule.

Even when allowing exceptions for a noncontractual duty—the type of exception least likely to blur the line between contract and tort—the California Supreme Court carefully reviews "public policy" considerations. Specifically, it has expressed concern for respecting the parties' bargain and allowing parties to voluntarily allocate risks in advance.

*Robinson Helicopter*, the California Supreme Court's most recent case on the economic loss rule, illustrates the rule, its policies, and its exceptions.

Robinson, a helicopter maker, must comply with strict federal requirements for the parts it uses. *Id.* at 986. It contracted with Dana to supply an important safety component. *Id.* at 985 & n.2, 991 n.7. The contract obligated Dana to supply Robinson with components that conformed to precise specifications. *Id.* at 985-86.

During one period under the supply contract, Dana changed the specifications to which the safety component was made. *Id.* at 986. Dana nevertheless provided intentionally false conformance certificates when it supplied those components. *Id.* at 986, 987. These began to fail at an alarming rate. *Id.* at 987. Robinson had to recall the affected helicopters and explain the situation to federal and foreign regulators. *See id.* at 986. Fortunately, no accidents were traced

to the fraudulent components. *Id.*

*Robison Helicopter* explained the two categories of exceptions discussed above. *Id.* at 988-90. It then held that the knowingly false certificates were fraudulent misrepresentations independent of the supply contract. Specifically, providing nonconforming components breached the supply contract; but providing knowingly false certificates was "independent . . . fraudulent conduct" that breached an independent tort duty. *Id.* at 991.[22]

But the *Robinson Helicopter* Court did not rest its exception solely on extraneous fraud in the certificates. Before allowing an exception, the Court noted that the fraudulent safety components "exposed Robinson <u>to liability for personal damages</u> if a helicopter crashed and to disciplinary action by [federal authorities]." 34 Cal. 4th at 991 (emphasis added). And the Court summarized its holding as "narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies <u>and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss.</u>" *Id.* at 993 (emphasis added).

Moreover, the Court recognized that "[c]ourts should be careful to apply tort remedies only when the conduct in question is <u>so clear</u> in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce." *Id.* at 992 (emphasis added). The Court then reiterated that Dana's conduct could in no way be considered "socially useful" and that the breaching conduct made Dana a "malefactor[]" that "put people at risk." *Id.* & n.7.

---

[22]     *Accord Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873-877 (9th Cir. 2007) (explaining that other jurisdictions would articulate this as a duty or tort "extraneous" to the contract); *In re Enron Corp.*, 2005 WL 356985, at *10-11, 2005 U.S. Dist. LEXIS 2134, at *40-44 (S.D.N.Y. Feb. 15, 2005) (discussing New York law's "extraneous" or "collateral" fraud exception).

1    In the same vein, the Court explained that the *Robinson Helicopter* parties

2  had not negotiated or provided in their contract for fraudulent representations as to

3  the component's specifications. *Id.* at 992. Finally, citing a law review article on

4  sales of goods, the Court recognized that "sophisticat[ed]" parties to commercial

5  contracts can "understand and allocate the risks relating to <u>negligent product</u>

6  <u>design</u>" but even sophisticated parties cannot "be expected to anticipate fraud and

7  dishonesty in every transaction" on goods. *Id.* at 993 (emphasis added).

8    *Robinson Helicopter*'s repeated references to the products liability version of

9  the rule, its emphasis on the particular goods at issue, and its expressly "narrow"

10  and "limited" holding, have led at least one other federal court to question whether

11  the *Robison Helicopter* analysis can apply to contracts other than those for goods.

12  *Oracle USA, Inc. v. XL Global Svcs., Inc.*, 2009 WL 2084154, at *6, 2009 U.S.

13  Dist. LEXIS 59999, at *18 (N.D. Cal. July 13, 2009) (Patel, J.).

14    Regardless whether it can apply outside products liability cases, *Robinson*

15  *Helicopter* creates a "narrow" and "limited" exception for extreme circumstances.

16  Most important, it demonstrates California's strong resistance to further eroding

17  / / /

18

19

20

21

22

23

24

25

26

27

28

the economic loss rule.[23]

**2. The negligence and negligent misrepresentation claims against Countrywide.**

The economic loss rule precludes United Guaranty's negligence and negligent misrepresentation claims against Countrywide.

---

[23]    California intermediate appellate courts have read *Robinson Helicopter* in this way, as the case's plain language mandates. *See, e.g.*, *Benavides*, 136 Cal. App. 4th at 1251-53 (recognizing that *Robinson Helicopter* "identified the limited circumstances" where a contractual relationship "can give rise to a tort claim").

But one panel of the California intermediate appellate court inferred from *Robinson Helicopter*'s "structure" that the case stands for a slightly broader proposition. *County of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 328 (2006), *rev. denied* (June 21, 2006) (with two Justices not participating). Regardless whether resort to "structure" can support broadening a holding that is expressly "narrow" and "limited," *Santa Clara*'s result comports with the foregoing interpretation of *Robison Helicopter*.

In *Santa Clara*, plaintiff governmental entities sued lead paint makers. The plaintiffs were exposed to liability for using lead paint, the hazards of which the defendants allegedly concealed with fraudulent intent. *Id.* at 329. The *Santa Clara* panel extrapolated the following rule from *Robinson Helicopter*: "any intentional affirmative fraud action where the plaintiff can establish that the fraud exposed the plaintiff to liability." *Id.* at 328.

First, *Santa Clara* involved a product, just as *Robinson Helicopter*; and therefore *Santa Clara* could not, and does not, provide any principled reason to extend a *Robinson Helicopter*-type exception outside the products liability context. Second, the dangerous product at issue in *Santa Clara* exposed the plaintiffs to "potential liability" far beyond the contract, just as the helicopter safety component in *Robinson Helicopter* exposed Robinson to "personal liability." *Id.* Third, fraudulent conduct with regard to lead paint—as with helicopter safety components—may be the type of extraordinary commercial conduct that *Robinson Helicopter* denounced as "so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce." 34 Cal. 4th at 992 (quoting *Erlich*, 21 Cal.4th at 554). *Cf. Santa Clara*, 137 Cal. App. 4th at 329 (emphasizing "permanent [bodily] damage" to those exposed to lead).

-27-

### a. Any nonfraud tort duty is "coterminous with," and encompassed by, contractual duties.

"[A]ny negligence law duty of care which might devolve upon an insured when that insured enters into an insurance contract would be coterminous with the insured's contractual duties." *Agricultural*, 70 Cal. App. 4th at 389.

For the negligence and negligent misrepresentation claims, Countrywide's allegedly tortious conduct and representations were all made pursuant to a purely contractual duty. The bases for these claims are the representations about its underwriting standards and the specific data about individual loans, made in Exhibit B to the Commitment Letters. AC ¶¶ 48-49. By the Master Policy's terms, these representations as to each loan became part of the policy <u>for that loan only</u>. § 1.31 (providing that all application materials and the Commitment Letter is "made a part [of the policy] with respect to the Loans to which they relate").

Any breach based on these misrepresentations is therefore a breach of the contract that governs them (and in which they were made).

### b. No *Robinson Helicopter*-type exception is available in the present situation.

The present allegations do not even approach a *Robinson Helicopter*-type exception.

First and foremost, the alleged misrepresentations are not conceptually distinct from the contract. The conformance certificates in *Robinson Helicopter* were the separate, intentional conduct that subjected Dana to tort liability. 34 Cal. 4th at 991. Those separate representations were made after the supply contract was formed. Here, all the representations were made prior to, or at the moment of, contract formation. Nor were the representations collateral to the contract. Such representations might give rise to fraudulent inducement, but not negligence or negligent misrepresentations.

Second, there is no threat of personal liability above and beyond the

-28-

contract. The threats are (1) that the extent of liability on the contract is much more than United Guaranty calculated *ex ante* and (2) that United Guaranty will have to use its contracted-for procedure for exercising its cancellation rights. This is not the kind of extracontractual third-party liability that California courts consider when making an exception to the economic loss rule. *Robinson Helicopter*, 34 Cal. 4th at 993 (considering regulators' actions and Robinson's potential personal liability to third parties for helicopter malfunction), and *Santa Clara*, 137 Cal. App. 4th at 328 (considering the "potential liability" of lead paint users to third parties harmed by the lead paint, as discussed in *supra* n.23).[24]

Further, mortgage insurance is relevantly distinguished from *Robinson Helicopter's* safety components or *Santa Clara's* lead paint. Much of *Robinson Helicopter's* reasoning is specifically tethered to sales of goods; not services. And mortgage insurance does not threaten the kind of bodily harm that fraudulent helicopter safety components and the fraudulently concealed risks of lead paint present. California's economic loss rule originated in products liability; in products liability, bodily harm is an exception to the rule. *Robinson Helicopter*, 34 Cal. 4th at 988; *see also Santa Clara*, 137 Cal. App. 4th at 329 (emphasizing "permanent [bodily] damage" to those exposed to lead paint).

Moreover, allowing suit in tort would "discourage commerce." *Robinson Helicopter*, 34 Cal. 4th at 992. Of course, this is a threat with any exception to the economic loss rule. But the threat is particularly great when parties on both sides of the transaction are sophisticated.

Finally, as the next section explains, these parties could—and did—contract about how to handle misrepresentations—even fraud. *Accord Robinson Helicopter*,

---

[24]    Indeed, the Master Policy contains an indemnification provision that might cover such third-party liability. The provision may allow United Guaranty "to seek indemnification under [the Master Policy] and otherwise seek contractual damages . . . ." Master Policy § 6.7 (emphasis added).

34 Cal. 4th at 993 (justifying an exception to the economic loss rule in part because parties to a product supply contract cannot "be expected to anticipate fraud and dishonesty in every transaction" and the parties to that case had not); *Oracle*, 2009 WL 2084154, at *6, 2009 U.S. Dist. LEXIS 59999, at *20 (declining to find a *Robinson Helicopter*-type exception because the parties to that case "could rationally calculate the possibility of breach").

### c. To whatever extent a tort duty could be extraneous to the contracts, the contracts expressly govern the result.

"It is axiomatic that absent a violation of public policy, a statute, or a constitutional provision, the parties to a private agreement may allocate risks in any manner they may choose." *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 814 (1982).

In this case, sophisticated parties reached a bargain that expressly allocates the risk of misrepresentations—including fraudulent misrepresentations. To effect the allocation, the parties contracted as to the misrepresentations' effects. Thus, even if a *Robinson Helicopter*-like tort duty could be implied against Countrywide, the parties contracted around such a result.

The provisions discussed in *supra* Section IV.D.4 (discussing the policy provisions) unambiguously displace any tort duty to United Guaranty with regard to Countrywide's underwriting. There is no reason to disregard the express bargain that these sophisticated business entities made.

### d. The California Insurance Code provides additional default rules that overlay the ordinary contract rules governing insurance contracts.

United Guaranty attempts to circumvent the economic loss rule by arguing that some provisions of the California Insurance Code impose a tort duty "extraneous" to the contract. United Guaranty locates no case that reads an independent tort duty into the Insurance Code provisions it cites. Cal. Ins. Code §§

330-339 (providing for <u>contract</u> rescission for concealment of facts during contract negotiations under some circumstances), 350-61 (providing for <u>contract</u> rescission for misrepresentations under some circumstances).[25]

First, these provisions' plain text speaks only to contractual duties and rights. *See, e.g.*, Ins. Code. § 332 ("Each party <u>to a contract of insurance</u> . . . .") (emphasis added); Ins. Code § 359 (providing that a "party [may be] entitled to <u>rescind the contract</u>" under some circumstances) (emphasis added). Accordingly, these statutes have long been held to provide contract rules that supplement, but do not replace, ordinary contract rules—at least absent an agreement to the contrary. *See Resure, Inc. v. Superior Court*, 42 Cal. App. 4th 156, 162-63 (1996) (collecting cases and explaining that these statutes "are in the nature of special provisions pertaining to insurance contracts, which are superimposed upon [rather than replace] those provisions of law which govern contracts generally." (quoting *DeCampos v. State Comp. Ins. Fund*, 122 Cal. App. 2d 519, 529 (1954)). Indeed, these provisions serve to "safeguard the parties' freedom to contract." *Mitchell v. United Nat'l Ins. Co.*, 127 Cal. App. 4th 457, 469 (2005). These provisions should not to hinder that freedom by threatening tort remedies for ordinary contractual breach.

Second, the California Supreme Court recognizes that even the well established "bad faith" tort against <u>insurers</u> is "a major departure from traditional principles of contract law." *Erlich*, 21 Cal. 4th at 553 (quoting *Foley*, 47 Cal. 3d at 690). It is highly unlikely these contract-related provisions in the Insurance Code were intended to work an even further departure from contract law.

---

[25]     United Guaranty misplaces reliance on *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1499 (2003). *Pastoria* allowed a fraudulent <u>inducement</u> theory to go forward, citing the Insurance Code's concealment provisions as support for disclosure duty that amounts to the uncontroversial "duty" not to commit fraud extrinsic to, and in the inducement of, a contract. Fraudulent inducement is discussed below in Section V.A.5.

Relatedly, inferring from these provisions a tort duty that runs <u>to the insurer</u> would entirely undermine California's repeated refusal to impose tort duties upon insureds. California courts consistently hold that insurance tort duties run from the insurer to the insured—but not vice-versa. *Supra* Section 5.A.2.c (explaining the tort of bad faith breach of implied covenant in the insurance context).[26]

### e. United Guaranty's vague suggestion that its long course of dealings with Countrywide, and Countrywide's alleged expertise in subprime mortgages, cannot create a "special relationship."

In addition, United Guaranty suggests that its long (approximately 40-year) business relationship with Countrywide creates a special duty. First, these allegations are not particularized enough to surpass Rule 9(b). AC ¶¶ 4, 30, 61.

But even if the allegations did meet the pleading standard, they still could not create a special relationship as a matter of law. Again, there are only "rare exceptions" to the principle that a "a business entity has no duty to prevent financial loss to others with whom it deals directly." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 59 (1998). The alleged situation does not come close to generating an exception to the rule: These parties were not mismatched in negotiating power. Nor was Countrywide's expertise in the mortgage business plausibly superior to this mortgage insurer's expertise in writing mortgage insurance.

In sum, it is implausible on its face that two sophisticated business organizations—even if they have had arm's-length contractual relationships throughout the years—could create the kind of special relationship that impels California courts to protect against fiduciaries' misdeeds. *Accord Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 97 (1995) ("Whatever need there may be to provide special remedies to cover special relationships, there is no

---

[26] This is another point of distinction over *Pastoria*, which involved alleged fraud by an insurer against prospective insureds.

1    similar need in routine business cases." (internal citation and quotations omitted)).

2    At most, the allegations suggest that United Guaranty elected not to exercise its

3    audit rights until well after the transactions closed. Even if United Guaranty chose

4    to delay exercising its audit rights because of its history with Countrywide, such

5    allegations say less about a "special relationship" than about risk appetite and a

6    preference for high-volume transactions.

7    **3. The negligence claim against BNY Trust.**

8    United Guaranty alleges that BNY Trust acted negligently by failing to

9    uncover Countrywide's alleged misrepresentations. AC ¶¶ 70-71. United Guaranty

10    also alleges that BNY Trust has negligently failed to police its agent's claims

11    handling. *Id.* ¶ 72.

12    BNY Trust's relationship with United Guaranty is purely contractual. BNY

13    Trust is the sole named insured. BNY Trust (in its capacity as trustee) is just as

14    much a party to the Commitment Letters as Countrywide. As a result, the claims

15    against BNY Trust are subject to the same analysis as above.

16    **4. Potential claims-related fraud claim against BNY Trust.**

17    United Guaranty argues that agency principles allow BNY Trust to be held

18    liable for claims conduct by its Countrywide-affiliated agent (or agents). An

19    insured cannot be sued under the "bad faith" tort for claims-related conduct, but

20    ordinary fraud may still apply to insurance claims. *Agricultural Ins. Co. v.*

21    *Superior Court*, 70 Cal. App. 4th 385, 401-02 (1999).

22    However, amending the AC to plead claims-related fraud (whether by BNY

23    Trust or an agent), would still be futile. As explained above, the Master Policy

24    expressly provides for claims "fraud" and provides remedies for claims fraud.

25    Section IV.D.4 (discussing the policy provisions). Again, California has a strong

26    policy in favor of allowing contracting parties to define and limit their risk

27    exposure. Here, sophisticated business entities agreed to contractually handle

28    claims fraud by the insured. These contract terms therefore subsume any tort

remedy for claims fraud.[27]

## 5. The fraudulent inducement claim against Countrywide.

The economic loss rule poses no barrier to a properly pled fraudulent inducement claim: "[I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for fraud." *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996).

Therefore, the only issue is whether United Guaranty has properly pled fraudulent inducement. It has not because: (1) the inducement allegations fail to meet Rule 9(b); and (2) even if all the inducement allegations are considered, reasonable reliance is implausible on its face.

### a. The alleged inducing conduct and representations are inadequate under Rule 9(b).

Most allegations characterized as inducement allegations are insufficiently particular. For example, Countrywide's representations that its guidelines were "developed over time to screen the creditworthiness of buyers and the likelihood that mortgage loans would be repaid" do nothing more than describe what underwriting guidelines are; such allegations say nothing about the guidelines' content or effectiveness. ¶¶ 6-7. United Guaranty generally alleges that it began transacting with Countrywide approximately forty years ago, ¶ 4, and makes the conclusory assertion that "[t]hroughout its relationship with United Guaranty, Countrywide extolled its prudent underwriting standards and disciplined adherence to those standards." ¶ 30. However, the extolling's particulars go to Countrywide's general operating procedures—not to the class of loans ("subprime") in issue. *Id.* Further, the representations about Countrywide's operations are alleged to be false or misleading as of the time of securitization transactions, not when they were made ("[t]hroughout" the parties' 40-year history). *Id.*

---

[27]    Thus, the Court need not reach BNY Trust's substantial arguments about pleading agency, privilege, and other issues.

-34-

A few inducement allegations are sufficiently particular. For example, United Guaranty alleges a particular oral representation by a Countrywide credit officer. ¶ 44. United Guaranty also alleges a particular email from a Countrywide risk manager about Countrywide's <u>subprime</u> underwriting. ¶ 45. This email is alleged to pertain to the type of loan—subprime loans—that United Guaranty was insuring. *Id.* Two allegations relate to representations made in Countrywide's Technical Manuals. ¶¶ 46-47.

But these sufficiently particular allegations are irrelevant. The oral representation concerns Countrywide's general operations, not its underwriting standards for the loans (or types of loans) to be insured. And the Countrywide risk manager's email occurs <u>after</u> United Guaranty was alleged to have been induced into the transactions at issue. *Compare* ¶ 43 (alleging the transactions at issue to have occurred between October 2006 and June 2007), *with* ¶ 45 (alleging a March 2007 email). Likewise, the Technical Manuals are not the Subprime Guidelines that the insurance contracts—and other AC allegations, ¶ 52, Exh. B—show governed the underwriting for the particular mortgages in issue.

Further, to the extent that "inducement" could go to United Guaranty's decision to engage in "delegated" underwriting, United Guaranty made that decision in 1990. *¶* 29. Any circa-1990 representations about Countrywide's operations and loan quality that induced United Guaranty to engage in delegated underwriting are not alleged to be false. ¶¶ 31-33, 35, 38 (alleging the relevant changes in Countrywide's operations occurred around 2004-06). And the AC alleges noninducement reasons why delegated underwriting "is widely used in the mortgage insurance industry . . . ." ¶ 29.

After applying Rule 9(b), United Guaranty is left with no discernable

inducement allegations.[28]

### b. Even if all the inducement allegations survived Rule 9(b), reasonable reliance is implausible on its face under Rule 8(a).

Fraudulent inducement requires reasonable reliance. *Alliance Mortgage Co v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995). Reasonable reliance can be decided as a matter of law. *Id.* Under California law, reasonable reliance is judged by an objective standard. *Id.* at 1240. Importantly, that standard is calibrated to the plaintiff's "own intelligence and information." *Id.* The standard does not bind a court to assume a plaintiff has the "minimum knowledge of a hypothetical, reasonable man." *Id.*

Assuming that the reliance allegations are particular enough to survive Rule 9(b), the controlling federal pleading standard requires reliance allegations to be facially plausible. But even if no allegations are stripped under Rule 9(b), nothing in the AC makes reasonable reliance on the alleged inducements facially plausible.

No reasonable <u>insurer</u> would rely upon generalized representations about "quality" underwriting—especially oral representations. Nor would a reasonable insurer rely upon "Technical Manuals" when "Subprime Guidelines" are what expressly govern the mortgages to be insured.

In addition, any reasonable mortgage insurer that (1) was conducting multibillion-dollar bulk transactions and (2) had an express right to audit or sample the underlying loan files before the transactions closed, would engage in some

---

[28]    United Guaranty characterizes some early negotiations regarding which loan tapes would be incorporated into Commitment Letter Exhibit B as "noncontractual representations" and suggests these were fraudulent inducements. ¶¶ 40-41. However, the loan tape representations that actually "induced" United Guaranty to commit to the transaction were the final loan tapes in Exhibit B to the commitment letters. Those representations are expressly governed by the parties' own contractual remedies, including remedies for fraud, as explained above in Section IV.D.4 (discussing the policy provisions).

degree of auditing or sampling of the underlying loan files to be insured. United Guaranty had the audit right; indeed, under the Commitment Letters it may have had some due diligence obligation. CL ¶ 8.1. Assuming the truth of United Guaranty's complaint, as must be done at this stage, then "over 55%" of the insured mortgages failed to meet Countrywide's representations. AC ¶ 68. Under that assumption, the only plausible inference is that United Guaranty failed to conduct any audit before closing the transactions. Thus, United Guaranty's own allegations defeat its claims. *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) ("A plaintiff may plead herself out of court" (internal alterations and quotations omitted)).[29]

### c. Amendment would be futile.

United Guaranty's original complaint alleged reliance on public statements by Countrywide that (1) were about Countrywide's general operations, not the particular mortgages United Guaranty was to insure; and (2) that might be reasonably relied upon by investors or the general public, but could not be

---

[29]    California courts sometimes casually state that an insurer has a "right to rely on" answers in an insurance application—at least in simple transactions where actual inquiry would be onerous relative to the policy's value, and, therefore, reasonable inquiry would not include independent investigation. *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*, 156 Cal. App. 4th 1259, 1271 (2007) (quoting *Mitchell v. United Nat'l Ins. Co.*, 127 Cal. App. 4th 457, 467 (2005)). These courts did not envision complex bulk transactions where the parties contemplate (and expressly provide for) a substantial risk of misrepresentations, including fraudulent misrepresentations.

Indeed, taken out of context, such statements threaten to obviate important statutory limitations on the Insurance Code disclosure duty. *See, e.g.*, Cal. Ins. Code § 333 (defining the <u>required inquiry</u>, which includes the "exercise of ordinary care," notwithstanding § 332's disclosure duty); *Newman v. Firemen's Ins. Co.*, 67 Cal. App. 2d 386, 395 (1944) (rejecting an argument under Insurance Code §§ 332-33, 335 and confirming that the Insurance Code does not absolve an insurer from "the exercise of ordinary care).

1    reasonably relied upon by an insurance company.[30]

2        United Guaranty, under instructions from the Court, amended these

3    allegations to state an equally implausible theory, explained above. The Court sees

4    no reason why further amendment would not be futile; United Guaranty was

5    advised of its pleading deficiencies and presumably did the best it could to remedy

6    them.

7    **B. Rescission (claim 6).**

8        United Guaranty asserts a claim for rescission against BNY Trust and

9    Countrywide Home. The claim seeks "global rescission" as to <u>all</u> the insured

10   mortgages—even those that United Guaranty concedes were insured pursuant to

11   correct representations. AC ¶¶ 138, 149.

12       United Guaranty argues for global rescission under Insurance Code

13   provisions that allow rescission in some circumstances.[31] Cal. Ins. Code §§ 330-39

14   (providing for contract rescission for concealment during contract negotiations

15   under some circumstances), 350-61 (providing for contract rescission for false

16   representations during contract negotiations under some circumstances), 440-49

17   (providing for contract rescission for warranty violations under some

18   circumstances).

19       As explained above, these statutes provide default contractual rules. The

20   following discussion assumes that the rights they provide have not been contracted

---

24   [30]    Order Granting in Part Motions to Dismiss at 3 n.1, docket no. 85 (July 1,

25   2009).

26   [31]    United Guaranty also alleges that global rescission is appropriate under

27   California Civil Code § 1689(b)(1). AC ¶ 148. That provision codifies rescission as
     a remedy for contracts "given by mistake or obtained through duress, menace,
     fraud, or undue influence." This allegation is legally insupportable for the reasons

28   explained in the fraudulent inducement discussion, above.

away, waived, or otherwise impaired.[32]

**1. Severability law.**

Even if grounds for rescission are available, California courts first determine if the policy is "severable"—that is, whether "the various provisions of an insurance policy may be treated separately so that fraud with respect to one risk will not affect the enforceability of remaining insurance." *Coca-Cola Bottling Co. of San Diego v. Columbia Cas. Ins. Co.*, 11 Cal. App. 4th 1176, 1188 (1992). This accords with "the modern rule" that "focus[es] on the contract of insurance" in determining whether coverage is "severable." *Watts v. Farmers Ins. Exch.*, 98 Cal. App. 4th 1246, 1254, 1261 (2002) (observing the trend in the context of interpreting a statutory form insurance contract's severability as to coinsureds).

First, parties are free to agree that a contract is severable. California law determines whether any contract is severable based on "its language and subject matter." *Armendariz v. Found. Health Psychare Svcs., Inc.*, 24 Cal. 4th 83, 122 (2000). *Accord TIG Ins. Co. of Mich. v. Homestore, Inc.*, 137 Cal. App. 4th 749, 756-59 (2006) (focusing on the contract language and finding "unambiguous" a section providing that "the entire policy shall be void" under some circumstances). The inquiry is one of ordinary contract interpretation, determined "according to the intention of the parties" as a matter of law. *Armendariz*, 24 Cal. 4th at 122.

Second, there are some special factors used for insurance contract severability. When a single policy covers distinct risks, coverage for those distinct risks is severable if the policy "in reality amount[s] to separate contracts of

---

[32]    The parties have not briefed whether Insurance Code § 650 (governing the circumstances under which Insurance Code rescission may be exercised), as construed in *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*, 156 Cal. App. 1259, 1268 (2007) (distinguishing the situation where an insurer files a separate suit from where an insurer files the state court version of a counterclaim), is a rule of substance or procedure. The issue is moot because United Guaranty cannot use the Insurance Code for the relief it seeks.

insurance." *Coca-Cola*, 11 Cal. App. 4th at 1188. Several factors have been approved, but the inquiry is practical and looks to the "reality" of the transaction. *Id.* at 1188-89 (twice emphasizing that the inquiry looks to the transaction's "reality"). Factors include: (1) whether there are "separate and distinct limits of liability" for the different risks; (2) whether the premiums for the risks were separately rated; and (3) whether allowing rescission of the entire contract would work the absurdity of inviting litigation on numerous irrelevant statements whenever a claim is made under the policy. *Id.*

**2. The policy documents' unambiguously establish multiple, severable insurance contracts in these bulk transactions.**

Here, the insurance documents unambiguously demonstrate the parties' intent that insurance on each mortgage be severable from the other mortgages insured in the same transaction. Under these circumstances, "global rescission" is not available as a matter of law.

**a. The policy documents' plain terms establish severability.**

As explained above in Section Section IV.D.3 (discussing the policy provisions), insurance was written for each mortgage loan individually and evidenced by a conceptually separate insurance "certificate." Each certificate incorporates only the representations that relate to the particular insured loan—not the representations regarding other loans in the bulk transactions. Master Policy §§ 1.10, 1.7 (defining "certificate" and "commitment"), § 2.7 (limiting how United Guaranty can cancel a certificate after issuance and making clear that cancellation goes only to the certificate to which the misrepresentations relate). Further, nothing in the policy documents contemplates cancellation, rescission, or termination of coverage for an entire loan pool—not even for fraud. The policy documents' own terms are an unambiguous model of what *Coca-Cola* refers to as a "reality" of "separate contracts," despite the use of a single set of documents.

**b. *Coca-Cola* factors also establish severability.**

The factors approved in *Coca-Cola* support the result compelled by the parties' express agreement.

(1) Separate and distinct liability limits. The liability limit is determined "per loan" and set at "60% of original Loan-to-Value" for each loan. CL ¶ 3.

(2) Separately rated premiums. The AC and the policy documents demonstrate that the premiums were apportioned according to individual loans. AC ¶ 59 (alleging that United Guaranty applied a multiplier "to individual loans . . . to calculate the premium payment attributable to that loan");[33] CL Exh. B (the same). And many Master Policy provisions require that portions of the premium be attributable to (or "relate to") individual loans. *See, e.g.*, §§ 2.5-2.8.

(3) Global rescission would work the absurdity of inviting litigation on irrelevant statements. *Coca-Cola* recognized the absurdity of a "global rescission" argument in a complex insurance agreement. *Coca-Cola* approved an inference that the parties intended severable coverage if "global rescission" would invite litigation on "the truthfulness of statements" unrelated to the coverage at issue "when any claim is made on the policy" 11 Cal. App. 4th at 1189 (emphasis in original). *Coca-Cola* recognized that such a result could not be intended by the parties to an insurance contract because "this possibility would largely deprive [the insured] of any benefit." *Id.*

United Guaranty cannot articulate any limiting principle for when misrepresentations as to some loans would entitle it to global rescission for all loans. At one point, counsel admitted that "theoretically" even a single

_____

[33]     United Guaranty elected to calculate a single multiplier based on the transaction's overall loan profile. AC ¶ 59. But that multiplier was then applied to the individual loans to calculate the premium attributable to each individual loan. *Id.* This nuance is relevant to the premium factor; but apportionment among the individual loans is more significant and evinces an intent to make coverage severable.

1  misrepresentation as to one loan could allow United Guaranty could rescind
2  coverage for thousands of loans.[34] The parties cannot have intended to give United
3  Guaranty such a windfall. To the contrary, the parties spelled out the procedures
4  and remedies for misrepresentation or fraud—and those procedures apply on a
5  loan-by-loan basis.

6       Therefore, the "global rescission" claim must be dismissed.[35]

7  **C. California statutory unfair competition (claim 7).**

8       United Guaranty asserts its final claim against Countrywide under
9  California's statutory "Unfair Competition Law." Cal. Bus. & Prof. Code §§ 17200
10 *et seq.* The claim rests on an "unlawful business act or practice" theory—one of
11 three broad types of theories under § 17200. *Cel-Tech Comm'ns., Inc. v. Los*
12 *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179-80 (1999).

13      Under an "unlawful business act or practice" theory, § 17200 may "borrow"
14 some statutory "violations" and make them "independently actionable" in a private
15 action. *Id.* at 180 (explaining that an "unlawful" act or practice theory under the
16 statute "borrows violations of other laws"). The statute's wide scope is tempered
17 by its limited remedies. *Id.* at 179-80.

18      United Guaranty asserts only California Insurance Code § 332 as the
19 predicate violation. AC ¶¶ 152-53.[36]

20

21 [34]    Hearing Tr. at 44:9-46:4 (June 15, 2009) (discussing the issue in connection
22 with motions on the original complaint); Hearing Tr. at 45:9-47:2 (Aug. 24, 2009)
23 (the same in connection with motions on the AC).
   [35]    United Guaranty has been adamant in seeking global statutory rescission—
24 not loan-by-loan statutory rescission, which appear generally consistent with the
25 contract's cancellation (and related) provisions. Even assuming the highly unlikely
   scenario that United Guaranty would seek leave to amend to assert loan-by-loan
26 statutory rescission, no "injustice" will be done by denying United Guaranty such
27 leave because it is still free to assert its contract rights. Fed. R. Civ. Proc. 15(a)(2).
   [36]    This contrasts with the "global rescission" claim, which asserts several
28 different statutory bases for contract rescission.

-42-

Section 332 provides:

> Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, <u>and which the other has not the means of ascertaining</u> (emphasis added).

A California intermediate appellate court has suggested (but not clearly held) that the asserted § 332 can serve as a § 17200 predicates under some circumstances. *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1494, 1496-97 (2003). *Pastoria* involved an insurer that allegedly failed to disclose impending changes in coverage to consumer applicants. *Id.* The *Pastoria* panel tentatively accepted that, under a "literal reading" of these statutes, using them for § 17200 predicates was "not without merit." *Id.* at 1496. The panel then emphasized that not "[e]ven the most basic documents, the application for insurance and the insurance policy [had] been admitted into evidence" and concluded, "at this point, we decline to find that the defendants did not have a [disclosure] duty, as a matter of law." *Id.* at 1497.[37]

But a careful reading of the statutes creates some doubt whether they are the type that could be "violat[ed]" so as to give rise to an "unlawful act or practice" within the meaning of § 17200. Section 332 is part a series of statutes concerning insurance contract negotiations. Together, the statutes "entitle" a party to rescind a contract for "concealment." Cal. Ins. Code § 331 (providing the rescission remedy); §§ 330-39 (containing the entire concealment framework). Section 332

---

[37]    *Pastoria* reached this conclusion under the more lenient state procedural rules for dismissing complaints as a matter of law. *Id.* Further, *Pastoria* held the insurer's alleged misconduct independently actionable under other § 17200 theories not applicable here. 112 Cal. App. 4th at 1497-99 (emphasizing that the case was between a "supplier . . . and a consumer").

-43-

1    defines the general disclosure duty[38] for this contractual remedy. Read in isolation,

2    the duty appears quite broad—but it is subject to numerous qualifications. *Id.* § 333

3    (defining the required inquiry, thereby limiting § 332); § 334 (defining

4    materiality); § 335 (imputing some knowledge to each party as a matter of law,

5    thereby limiting § 332); § 336 (stating conditions under which the rescission right

6    of § 331 for concealment may be waived); § 339 (clarifying that "[n]either party to

7    a contract of insurance is bound to communicate, even upon inquiry, information

8    of his own judgment upon the matters in question").

9        The statutes establish a default "right" held by a contracting party—a right

10   the party may waive, contract away, elect not to invoke, or otherwise impair. *See,*

11   *e.g.*, *Barrera v. State Farm Mut. Auto. Ins. Co.*, 71 Cal. 2d 659, 678 (1969); Cal.

12   Ins. Code § 336 (defining "waiver" for purposes of § 331). Indeed, the statutes'

13   plain text establishes that they merely "entitle[]" contractual rescission under some

14   circumstances. Cal. Ins. Code § 331. It is somewhat unusual to say that default

15   contract rules can be "violated" so as to constitute an "unlawful" business act.

16       Regardless whether § 332 could ever provide a § 17200 predicate, it cannot

17   serve as a predicate in this case. California courts recognize that this default rule is

18   "part of a larger statutory framework that imposes heavy burdens on both parties to

19   a contract of insurance . . . ." *Mitchell v. United Nat'l Ins. Co.*, 127 Cal. App. 4th

20   457, 468 (2005). Such burdensome default rules have little place in negotiated and

21   complex transactions such as those here at issue. The parties, recognizing this,

22   created a contractual "mini-universe" with its own rights and remedies. *Robinson*

23   *Helicopter*, 34 Cal. 4th at 992. One of those rights was United Guaranty's audit

24   right. In view of the audit right, § 332 was not plausibly violated: United Guaranty

25   had "the means of ascertaining" the alleged truth. *See also* Cal. Ins. Code §§ 333

26   (limiting § 332 by requiring the exercise of ordinary care), 335 (imputing some

27   _____

28   [38]    Section V.A.2.c, above, explains why the "duty" imposed in Insurance Code
     § 332 is a contractual, not tort, duty.

-44-

1    knowledge to the contracting parties).

2    　　　　This is not to say that the parties entirely contracted away any rescission

3    remedy under other Insurance Code provisions, see *supra* n.35; only that

4    *Pastoria*'s somewhat wooden reading of § 332 does not apply to the present

5    situation.

6    　　　　In sum, *Pastoria* suggested that a "literal" reading of Insurance Code § 332

7    could allow a § 17200 claim, but Countrywide cannot have "violate[d]" § 332 so as

8    to give rise to a § 17200 unlawful business act or practice. The § 17200 claim

9    therefore fails as a matter of law.[39]

10   **D. Summary.**

11   　　　　Contract law allows parties to estimate costs and allocate risks in advance.

12   Where sophisticated parties expressly agree about how to handle the risk of

13   misrepresentations, they face a particularly difficult time asserting negligence and

14   negligent misrepresentation. As for fraudulent inducement, reliance on some types

15   of misrepresentations becomes less reasonable when the parties are more

16   sophisticated. Likewise, the Insurance Code includes numerous provisions

17   codifying default contract rules, procedures, and remedies. But in complex

18   insurance transactions those provisions are likely to be displaced by the parties'

19   bargain. Such is the present case, which remains a contract action.

20   / / /

21

22

23

24

25

26

---

27   [39]　　Because no claim against Countrywide Financial survives, the parties'
28   dispute about whether the AC adequately pleads Countrywide Financial's role is
     moot.

-45-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VII.

## CONCLUSION

For the foregoing reasons, Countrywide and BNY Trust's motions are GRANTED IN THEIR ENTIRETY.

United Guaranty shall not have leave to amend.

Answers are due within 14 calendar days of this Order's filing.


IT IS SO ORDERED.

DATED: October 5, 2009

Hon. Mariana R. Pfaelzer
United States District Judge